# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Case No. 2:14−CV−09600−RGK−SH

MICHAEL CORONA,
CHRISTINA MATHIS, et al.,
individually and on behalf of
others similarly situated,

      Plaintiffs,

v.

SONY PICTURES
ENTERTAINMENT, INC.,

      Defendant.
_____/

## EXPERT REPORT
## IN SUPPORT OF CLASS CERTIFICATION

June 30, 2015

**Henry H. Fishkind, Ph.D.**

Digitally signed by Henry H.
Fishkind, Ph.D.
Date: 2015.06.30 17:25:29 -04'00'

-----------------------------------------------------------

Henry Fishkind, Ph.D., President
Fishkind & Associates, Inc.
12051 Corporate Boulevard
Orlando, Florida 32817
(407) 382-3256
Fishkind.com

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**Introduction**

1.0   The Plaintiffs through their counsel retained Fishkind and Associates, Inc. to provide expert economic analysis and litigation support, including by: (a) quantifying their economic damages arising from the unauthorized disclosure of their personal identifying information ("PII"); (b) providing this expert report; and (c) testifying at trial.

2.0   I conducted the research in this engagement; I drafted this opinion and will offer the testimony.  Clerical support was provided by other members of my firm.  My resume is attached as Exhibit #1, and my court experience as an expert is provided in Exhibit #2.  The materials reviewed and relied upon in rendering this opinion are presented in Exhibit #3.  A list of all publications I have authored in the last 10 years is provided in Exhibit #4.

3.0   Our standard hourly fees apply in this engagement.  These are as follows:

|              |                                                   |
| ------------ | ------------------------------------------------- |
| Dr. Fishkind | $450/hour for office work, and                    |
|              | $900/hour for testimony at trial or deposition    |
| Assistants   | $250/hour for research                            |

**Qualifications to Provide Expert Opinion in this Matter**

4.0   I am qualified to provide the Court with this expert opinion because of my education and my experience.  I am an economist and President of Fishkind & Associates, Inc. ("FA").  FA is an economic and financial consulting firm with offices in Orlando and Port St. Lucie, all in Florida. My clients include state and municipal governments, the U.S. Department of Justice, Fortune 500 Companies, and major property developers, as well as both plaintiffs and defendants in litigation.

5.0   My resume is included as Exhibit #1 which documents my qualifications.  I have a Ph.D. in economics with specialties in Urban and Regional economics and in Econometrics.

6.0    For many years I was Research Economist with the Bureau of Economic and Business Research at the University of Florida, and from time-to-time I served as its Acting Director and its Associate Director. During the course of my work at the Bureau I conducted numerous surveys. I designed, launched, and administered the Bureau's monthly economic confidence index which involved sample surveys of Floridians. I also designed and executed the Bureau's economic forecasting program.

7.0    I have also served on the Governor's Council of Economic Advisors under two different administrations. In addition, I was a founding board member of two publicly traded companies, Summit Properties (NYSE) and Engle Homes (NASDAQ) until both companies were sold.

8.0    As the President of FA, I am regularly engaged to provide valuations of goods and services as well as tangible and intangible properties. That experience includes valuation of market traded goods and services and non-market traded goods and services. I have conducted numerous surveys similar to the types of surveys I have identified for possible use in this matter. These surveys have assisted FA's clients in business decision making, and the surveys have been used in court proceedings.

9.0    Furthermore, I have been qualified as an expert witness to provide economic value testimony on more than 50 occasions by both the federal and state courts in Florida and in federal courts in Tennessee and Washington, D.C. I have also served as a court-appointed expert to provide valuation reports to the U.S. Tax Court. Exhibit #2 lists my court experience over the last five years.

10.0   I have been engaged to provide expert economic analysis, reports and testimony in privacy related court cases on five previous occasions. In those matters I developed expert reports and I was deposed in four of them. All of these matters settled prior to their trials.

11.0   Finally, I am experienced in conducting contingent valuation ("CV") surveys to determine the values of non-market traded goods. This experience includes the application of a CV survey to determine the value of privacy in *Fresco et al. v. Automotive Directions, Inc., et al.*, Case No. 03-61063 (S.D. Fl.).

**Summary of Expert Opinions**

12.0    Sometime in late November and early December 2014, the personal identifying information ("PII") of current and former employees of Defendant, Sony Pictures Entertainment, Inc. ("SPE") was posted to the internet as a result of the cyber-attack ("Breach") on SPE.  The PII included names, addresses, social security numbers, employment files, salary and bank account information, email addresses, medical information, visa and passport numbers, and information on family members.[1]  Soon thereafter, WikiLeaks posted a searchable database containing 30,287 documents and 173,132 emails from the Breach.[2]  WikiLeaks posted a second installment on June 18, 2015.[3]

13.0    All Plaintiffs report that their PII was published on the internet, and many also learned that their PII is being sold on the dark web.  Furthermore, there are already some direct instances of the actual misuse of their PII.  These misuses include: (1) unauthorized charges on credit card;[4] (2) an attempt to open a fraudulent PayPal credit card;[5] and (3) an unauthorized notification to a credit card company of an intent to make a large purchase.[6]

14.0    All of the Plaintiffs have acted to mitigate the economic harm arising from the increased risk of identity fraud due to the unauthorized disclosure of their PII.  Plaintiffs report that they felt compelled to investigate the extent to which their PII was disclosed given that the disclosure of their PII put them at increased risk of identity fraud.  Furthermore, since the Plaintiffs and putative class members were not immediately provided with any identity protection services by SPE, most felt compelled to purchase their own credit monitoring/ identity

---

[1] *Corona, et al. v. Sony Pictures Entertainment, Inc.*, No. 14-9600, Amended Class Action Complaint, Doc. 43 ("Amended Complaint"), at 1.

[2] *See* https://wikileaks.org/sony/emails/ (June 29, 2015 9:56 am).

[3] *See* http://techcrunch.com/2015/06/19/wikileaks-unloads-second-batch-of-sony-files-into-its-database/ (June 29, 2015 9:57 am).

[4] Plaintiffs' Amended Consolidated Responses and Objections to Defendant Sony Pictures Entertainment Inc.'s First Set of Interrogatories ("Plaintiffs' Interrogatory Responses"), Interrogatory 1 for Mr. Corona.

[5] Amended Complaint, ¶ 93 for Mr. Forster.

[6] Plaintiffs' Interrogatory Responses, Interrogatory 1 for Mr. Shapiro.

theft protection services to protect against the increased risk of the fraudulent use of their PII.

15.0   Additionally, many Plaintiffs reported that they felt compelled to purchase credit monitoring/identity theft protection services which exceeded the AllClear ID service provided for free.[7]

16.0   One form of harm to Plaintiffs and the putative class members here is the increased risk of identity fraud and the misuse of their PII. That increased risk can be conservatively valued based on the reasonable cost of protecting and insuring oneself from such misuse, as measured by reference to the protection/insurance products available in the marketplace. From an economic perspective, the focus of measuring this economic harm is what a reasonably prudent person would have done in terms of purchasing credit monitoring/identity theft protection services on an ongoing basis starting from the time of the Breach.

17.0   The actions described above are steps that the Plaintiffs have already taken and for which they have already incurred costs and will continue to incur costs for the first year following the Breach ("Year One"). These costs amount to $311 on average per Plaintiff. A reasonably prudent person would have purchased credit monitoring/identity theft protection services for Year One. The costs incurred by the Plaintiffs for Year One are representative of economic damages incurred by other members of the putative class for Year One.

18.0   In addition, beyond Year One (after the AllClear ID service offered through SPE is no longer available), the Plaintiffs are also exposed to substantial on-going economic damages. To date, the preponderance of these damages arise from the need for future credit monitoring and insurance and are applicable to the putative class as a whole. SPE automatically enrolled members of the class in AllClear Secure, a minimal credit protection service, for Year One; however, this credit protection will not extinguish the putative class members' exposure to the risk of the future misuse of their PII nor will it protect them from future monetary harm arising from misuse that occurred in Year One or

---

[7] Amended Complaint, ¶ 74; *see also* https://spe.allclearid.com/ (June 29, 2015 6:35 pm).

future years.[8]  It is economically reasonable and prudent to expect that the putative class members will need to purchase protective monitoring and insurance for at least two years beyond the initial year of credit monitoring provided by SPE following the Breach ("Years Two and Three").  I have calculated the reasonable cost for these services for the subsequent two years ("Years Two and Three") at $720 per class member, or $637 per class member when discounted to present value.[9]  These economic damages are commonly applicable to all members of the putative class.

19.0    Additionally, each member of the putative class whose medical information was compromised in the Breach has suffered additional harm which I understand carries statutory damages of $1,000 under the California Confidentiality of Medical Information Act ("CMIA").

20.0    Table 1 summarizes damages arising from the Breach for Years One, Two and Three.

[8] To the extent putative class members suffer harm in the form of fraudulent financial charges for which they incur out-of-pocket damages, these damages could also be accounted for in my damages model.

[9] I have estimated this cost using the current monthly rate for LifeLock Ultimate Plus offered at $30/month (which is below the average of $36.90/month actually incurred by the Plaintiffs for similar services). LifeLock Ultimate Plus provides an array of services including credit monitoring, identity theft monitoring, black market website surveillance, an identity theft insurance, among others.  *See* https://secure.lifelock.com/enrollment?flag=20 (June 29, 2015 7:08 pm).  Using a discount rate of 8.55%, the total for Years Two and Three is $720 per class member or $637 when discounted to present value.

**Table 1.**

| Damages Per Member | Total | Present Value |
|---|---|---|
| Economic Damages for Year One<br>    Pecuniary –Credit Monitoring/Identity Theft Protection Services | $311 | $311 |
| Economic Damages for Years Two and Three<br>    Pecuniary - Credit Monitoring/Identity Theft Protection Services | $720 | $637 |
| | ======== | ======== |
| Subtotal Economic Damages for Years One, Two and Three | $1,031 | $948 |
| Statutory Damages under the CMIA | $1,000 | $1,000 |
| | ======== | ======== |
| Total Damages | $2,031 | $1,948 |

21.0   Credit monitoring and insurance services such as Lifelock do not prevent identity theft or fraud.  Instead, these services monitor activity and reimburse their insureds for losses after they have occurred.  The putative class will still need to exert heightened levels of review of their accounts over the upcoming years.  However, since it is difficult to precisely gauge the future amount of time the members of the putative class will need to invest in the heightened scrutiny of their financial transactions, I have not added any additional costs for this.  Thus, my estimate of the economic damage in this matter – three years of credit monitoring/identity theft protection services – is conservative.

22.0   In total I have estimated that the Plaintiffs have suffered total economic damages of $948 per Plaintiff to a reasonable degree of economic certainty, non-inclusive of statutory damages under the CMIA.  These damages are common to each member of the putative class who also purchased credit monitoring/identity theft protection services for Year One.  To the extent a member of the putative class did not purchase credit monitoring/identity theft protection services for Year One, the total economic damages (non-inclusive of statutory damages under the CMIA) are common to each such class member – $637 per class member to a reasonable degree of economic certainty.

**The Nature of the Economic Damages in This Case**

23.0   As noted above, the Breach in this case caused extensive disclosure of the class members' PII.  While there have been a number of recent massive data breaches containing PII, including medical records,[10] the Breach in this case was particularly broad ranging.  In this case the Breach included not only PII and medical records, but in some cases detailed employment records as well.

24.0   Another distinguishing feature of this Breach is that unlike some other well publicized breaches, such as in the breach of Advocate Health and Hospital Corp[11] or of Starbucks,[12] in this case there is already direct evidence that the PII is being misused.

25.0   In this case, the damages I have identified are economic and statutory damages.  The economic damages refer to the harm incurred by Plaintiffs and the class members in the form of increased risk of identity theft and misuse of their PII, which can be valued economically as the reasonable cost of protecting and insuring oneself from such risk, as measured by reference to the cost of such protection/insurance products on the market.

26.0   For purposes of this report, I have separated the economic harm between the first year after the Breach, when SPE has offered (albeit not immediately) AllClear ID's limited monitoring service (Year One) and the subsequent two years (Years Two and Three).

27.0   The Plaintiffs have purchased additional reasonable protection for Year One at an average cost of $311 for the year. These economic damages are representative of economic damages for each member of the class who incurred expenses due to the purchase of credit monitoring/identity theft protection services, beyond the AllClear ID service offered by SPE, for Year One.

---

[10] *See, e.g.*, The Ponemon Institute, *2013 Survey on Medical Identity Theft* (2013); The Ponemon Institute, *2014 A Year of Mega Breaches* (2014).
[11] *Matias Maglio et al., v. Advocate Health and Hospitals Corp. et al.*, No. 13-538 (16th Judicial Cir. Ct.).
[12] *Krottner v. Starbucks Corp.*, No. 09-35823 (W.D. Wash.).

28.0   In addition, the nature of this Breach means that the members of the putative class will reasonably need to protect themselves well after the end of Year One, when SPE will no longer be providing any protection for free.  As noted previously, the Breach in this case is unusual in the expansiveness of PII compromised and posted on the internet in a user friendly format. Although the putative class members can change their bank accounts, credit card numbers, and passwords, they cannot change their dates of birth and other PII that has been compromised.

29.0   Changing a social security number can take months, and involves voluminous paperwork.   In addition, changes to a social security number creates additional complications and expenses related to establishing new bank accounts and credit ratings. This means that the class will be exposed to heightened risk of identity theft and misuse of their PII for some time.

30.0   While it is unclear precisely how far into the future the Plaintiffs and the putative class will be exposed to identity theft and fraud damages, SPE has offered credit monitoring through AllClear ID for 12 months. This is tantamount to an admission that SPE is concerned that all of the Plaintiffs and putative class members are exposed for at least one year.

31.0   In contrast to SPE, Premera Blue Cross has offered its customers two years of free credit monitoring despite the fact that, unlike this Breach, there is no evidence yet of any misuse of the PII released in the Premera breach.[13]   David Kennedy, an expert in health-care security and CEO of TrustedSEC, said that although Premera's offer of free monitoring is a good step, identity theft could happen "tomorrow or five years from now."[14]

32.0   According to the latest research by Javelin,[15] data breaches, similar to the Breach in this case, create the greatest risk factor for identity fraud. Javelin defines identity fraud as "the unauthorized use of another person's personal information to achieve illicit financial gain.  Identity

_____

[13] Shane Pringle, *5 Ways the IRS Scammers Could Have Stolen All Those Tax Returns*, Security News (June 29, 2015 10:07 a.m.), https://securedataafrica.wordpress.com/category/pii/.
[14] *Id.*
[15] Javelin Strategy and Research, *2015 Identity Fraud Study* (2015).

_____

fraud can range from simply using a stolen payment card account, to making a fraudulent purchase, to taking control of existing accounts or opening new accounts."[16]

33.0   Javelin provided information that informs my opinion concerning how long into the future credit monitoring and insurance may be needed in this case.   According to Javelin's research most identity fraud is discovered quickly.   For all identity fraud, the average time prior to a discovery was 37 days and the average time of misuse was 47 days.[17] However, for new account identity fraud, the average time increased to 99 days for discovery and 130 days for average time of misuse.[18]

34.0   However, Javelin also found that 13% of all victims of new account fraud did not even discover that a fraudulent new account had been opened and used for a year or more.[19]  These findings support the view that identity fraud arising from data breaches similar to the Breach in this case give rise to at least two years or more of future exposure.

35.0   Therefore, while the heightened risk here will likely persist for many more years to come for the putative class members, it is reasonable to project that the majority of any identity theft or PII misuse will occur within the three years following the Breach.

36.0   Even this three-year period is a conservative estimate of the time period when the Plaintiffs and putative class members may be at risk.   The Javelin research indicates that in most cases discovery happens soon after the misuse occurs, not that misuse occurs soon after the breach itself.   Therefore, it is likely that in this case additional misuse will occur for a number of additional years after the Breach.

37.0   There is uncertainty involved with the time horizon for damages arising from the Breach.   Furthermore, as noted above, most damage from

---

[16] Javelin Strategy and Research, *$16 Billion Stolen from 12.7 Million Identity Fraud Victims in 2014, According to Javeline Strategy &* Research (Mar. 2, 2015), https://www.javelinstrategy.com/news/1556/92/16-Billion-Stolen-from-12-7-Million-Identity-Fraud-Victims-in-2014-According-to-Javelin-Strategy-Research/.

[17] *2015 Identity Fraud Study*, at 44.

[18] *Id.*

[19] *Id.* at 57.

identity fraud is identified soon after the breach occurs.  These facts give rise to my calculation of a discount rate of 8.55% via the build-up method that is described in more detail later in this report.

**Economic Damages**

38.0  The economic damages to the Plaintiffs, and to the putative class, can be directly quantified to a reasonable degree of economic certainty based on formulae and facts that are common to the proposed class.

39.0  Table 2 documents the scope of the PII that Plaintiffs have discovered was revealed in the Breach.  It is important to note that this is just the PII that Plaintiffs have discovered was posted on the internet.  This does not mean that this inventory developed by Plaintiffs fully represents all of their employees' PII that has been compromised in the Breach.  SPE has yet to provide a full inventory of the PII compromised in the Breach, and SPE may not be able to do so, compounding the uncertainty.

40.0  Not only have the Plaintiffs already incurred damages, they will continue to be exposed to damages from the Breach into the future.  As discussed above, it is reasonable to project at least three years of needed identity theft protection/monitoring arising from the Breach.

41.0  Most of the Plaintiffs have purchased LifeLock, have taken advantage of SPE's offer of AllClear ID for a year or, in some cases, both.  However, the Plaintiffs will still need protection from economic damages related to the Breach for at least two additional years.  I have estimated this cost at the LifeLock rate of $360/year which is their current rate.  As noted above, I have used a 12.6% discount rate to reduce the future costs for credit monitoring and insurance to their present value.

---

**Table 2. Summary of Plaintiffs' PII Exposed and Mitigating Actions by Plaintiffs**

| Plaintiff | PII Exposed | Identity Theft | ID Prot. ($) | ID Prot. (Time) |
|---|---|---|---|---|
| Corona | Name, SSN, former address, salary, employment information. Birthdate, salary history, medical information, and beneficiary PII also believed to be exposed. | Fraudulent credit card transactions | LifeLock, $282/yr. | 102 hrs. |
| Mathis | Name, SSN, prior address. Beneficiary PII also believed to be exposed. | | LifeLock, $305/yr.; $30 password management software | 10 hrs. |
| Forster | Name, former address, SSN, birthdate, telephone number, salary, employment information. Bank account information, driver's license, resident alien card, and medical information also believe to be exposed. | Fraudulent credit card application | | 23 hrs. |
| Archibeque | Name, address, email address, SSN birthdate, former bank account information, passport, and driver's license. | Lifelock notification that PII being sold on black market | LifeLock, $240/yr. | 2 hrs. |
| Levine | Name, former address, SSN, and employment information. Birthdate, address, bank account information, employment history, education history, and medical information also believed to be exposed. | | $45/yr. | 100 hrs. |
| Springer | Name, SSN, former address, employment information. Birthdate, bank account information, employment history, education history, and medical information also believed to be exposed. | Lifelock notification that PII being sold on black market | LifeLock, $360/yr.; $30 security freeze fees | 85 hrs. |

| Plaintiff | PII Exposed | Identity Theft | ID Prot. ($) | ID Prot. (Time) |
|---|---|---|---|---|
| Bailey | Name, SSN, former address, employment information, and family member's PII. Signature, birthdate, marital information, telephone number, driver's license, passport, visa, bank account information, medical information, insurance information, financial information, beneficiary information, employment history, education history, and passwords also believed to be compromised. | Lifelock notification that PII being sold on black market | LifeLock, $1,028/yr. | 170 hrs. |
| Shapiro | Name, SSN, former address, bank account information, and employment information. Driver's license, passport, salary history, education history, employment history, and medical information also believed to be compromised. | Unauthorized notification of an anticipated large purchase to credit card company | $170 credit-related fees | 200 hrs. |

**Derivation of the Discount Rate**

42.0   The discount rate is a factor used widely in economics, finance and accounting to convert a stream of future values to their present value amount.[20]  The appropriate discount rate reflects two factors.

43.0   The risk-free, or safe, rate of return for a similar investment horizon.

44.0   An additional return (premium) that reflects the relative degree of risk in excess of the risk free rate associated with the future expected stream of values.[21]

45.0   To estimate the appropriate discount rate in this case I used the build-up method that is commonly employed for this purpose.[22]  This method "builds up" the discount rate by combining the risk-free rate with the additional risk premiums from systematic risk and non-systematic risk. Systematic risk is that risk above the risk-free rate that is market driven or associated with the investment market in general, and usually measured by returns in the stock market.  The non-systematic risk is composed of factors specific to the future stream of expected values.[23]

46.0   Table 3 provides the calculations for the discount rate in this matter. The risk-free rate is the average rate on a 3-Year U.S. Treasury Note in 2015.   The systematic risk amount is the risk calculated as the difference between the 3-year return on the stock market less the return on long term U.S. Treasury Bonds.[24]  Finally, I set the non-systematic risk at 5% to reflect the uncertainties surrounding the future effects of

---

[20] The National Association of Certified Valuators and Analysts, *Fundamentals*, Techniques and Theories ch. 5, at 3 (2012).

[21] *Id.*, ch. 5, at 1.

[22] Shannon P. Pratt, *Valuing a Business 5th Edition: The Analysis and Appraisal of Closely Held Companies*, at 198-204 (5th ed. 2008); Jay E. Fishman, et al., *PPC's Guide to Business Valuations*, 5-55 - 5-63 (24th ed. 2014).

[23] Pratt, at 191-204.

[24] Duff & Phelps, *2014 Valuation Handbook – A Guide to Cost of Capital*, ch. 3, at 14 (2014).

the Breach.[25]  As noted previously, a significant portion of the future economic damage is associated with Plaintiffs need to mitigate their damages by purchasing credit monitoring and identity fraud insurance. While SPE has offered to pay for one year of protection, it is very likely that the Plaintiffs will purchase at least two additional years of protection in light of the magnitude of the Breach.  The result is a conservatively determined overall rate of almost 12.6%.

**Table 3. Derivation of the Discount Rate**

| Category | Amount |
|---|---|
| Risk Free Rate | 0.95% |
| Systematic Risk | 6.60% |
| Non Systematic Risk | 5.00% |
| | ======= |
| Discount Rate | 12.55% |

## Summary of Conclusions

47.0  One form of economic harm incurred by the putative class members here is the reasonable cost of credit monitoring/identity theft protection services as a form of insurance against the increased risk of the fraudulent use of their PII on an ongoing basis for a reasonable period of time which I have estimated at three years from the Breach.

48.0  In my opinion, Plaintiffs and class members who have mitigated their economic harm for Year One by purchasing credit monitoring/identity theft protection services as a form of insurance against the increased risk of the fraudulent use of their PII acted reasonably.  The purchase of credit monitoring/identity theft protection services was reasonable due to: (1) SPE's failure to confirm within a reasonable time period following the Breach that free credit protection services were available to class members for one year and (2) the limited protections the credit protection services SPE offered (AllClear ID) provided class members.

---

[25] The quantification of this type of specific risk is a matter of professional judgment well recognized in the professional literature.  *See, e.g.,* Pratt, at 213.

49.0   These damages for Year One amounted to $311 on average per
Plaintiff.   The economic damages suffered by the Plaintiffs are
commonly applicable to those members of the putative class who
purchased credit monitoring/identity theft protection services for Year
One.

50.0   In my opinion, given the expanse of PII revealed and posted on the
internet in a user friendly format, as well as the documented instances
of misuse, it is economically reasonable and prudent to expect that the
members of the putative class will need to avail themselves of credit
monitoring/identity theft protection services for at least three years
following the Breach.

51.0   Given that SPE has provided members of the class AllClear ID credit
monitoring for Year One, I have calculated that the total economic
damages for these services for the subsequent two years ("Years Two
and Three") is $720 per class member, or $637 per class member when
discounted to present value.  These economic damages are commonly
applicable to all members of the putative class.

52.0   In addition to economic damages, under the California Confidentiality
of Medical Information Act, statutory damages of $1,000 are
commonly applicable to all members of the putative class whose
medical information was compromised in the Breach.

53.0   To the extent putative class members suffer harm in the form of
fraudulent financial charges for which they incur out-of-pocket
damages, these damages could also be accounted for in my damages
model.

**Discovery Developments May Warrant an Update**

54.0   Should additional information become available that would materially
alter my analysis, I would update this report accordingly.

## Exhibit #1 – Resume



**SELECT CLIENT LIST**
AEGON
Baron Collier
BP
Cemex/CSR/Rinker Materials
Centex
Colonial Properties Trust
Collier Enterprises
Fannie Mae
Florida Power Corporation
Forrest City Enterprises
Waste Management, Inc.
FPL
King Ranch
Lennar
Major Central FL Attraction Co.
Mosaic
Newland Communities
Perry Capital
State of Florida
State of Pennsylvania
St. Joe
U.S. Department of Justice
The Villages
Waste Management, Inc.
WCI Communities

# Henry H. Fishkind, Ph.D.
## President

hankf@fishkind.com  

**PROFESSIONAL SYNOPSIS**

With over 30 years of experience in economic analysis and forecasting, Dr. Henry Fishkind is widely regarded as one of Florida's premier economists and financial advisors. Dr. Fishkind's career began in the public sector where he worked as an economist and associate professor at the University of Florida. In 1980 Dr. Fishkind became the associate director for programs at the University of Florida's Bureau of Economic and Business Research. During his tenure at the university, Dr. Fishkind served from 1979-1981 on the governor's economic advisory board. He began his career as a private sector consultant when he became president of M.G. Lewis Econometrics in Winter Park, Florida. In 1988 Dr. Fishkind formed Fishkind & Associates, Inc. as a full service economic and financial consulting firm.

From 2001-2003 Dr. Fishkind was a member of Governor Bush's Council of Economic Advisors, and also served on the board of directors of Engle Homes and Summit Properties until the companies were sold.

**AREAS OF EXPERTISE**
Economic Analysis
Econometric Modeling
Project Finance & Feasibility
Financial Analysis & Advisory
Fiscal Analysis
Intellectual Property and Fiscal Impact Analysis
Real Estate Economics

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| Chairman, FLSAFE | 2008 - 2011 |
| Managing Partner, Woodbridge Vintage Chips | 1994 - 2007 |
| President, Fishkind & Associates, Inc. | 1988- Present |
| President, M.G. Lewis Econometrics, Inc. | 1984 - 1987 |
| Associate Director for Programs, | 1980 - 1983 |
| Bureau of Economics & Business Research, | |
| University of Florida | |
| Economist/Associate Professor, University of Florida | 1975 – 1983 |

**EDUCATION**
Indiana University, Doctor of Philosophy, Economics, 1975
Syracuse University, BA, Economics, 1971



Fishkind & Associates, Inc., 12051 Corporate Blvd., Orlando, FL 32817, 407.382.3256/Office, 407.382.3254/Fax

## Exhibit #2 – Court Experience

| DEPOSITIONS AND TESTIMONY | *2011-2012-2013-2014-2015* | | | | | | |
|---|---|---|---|---|---|---|---|
| **HENRY H. FISHKIND, PH.D., FISHKIND & ASSOCIATES, INC.** | | | | | | | |
| **CASE NAME** | **Court** | **Case Number** | **Worked For** | **Opinion** | **Testified** | **Depo** | **Affidavit** |
| Andress Family Florida v. Charlotte County | In the Circuit Court of the Twentieth Judicial Circuit In and For Charlotte County, Florida | 10-0639-CA | Plaintiff | yes | yes | yes | |
| Anutra, LLC v. Chris Byrd | In the Circuit Court of the Ninth Judicial Circuit, In and For Orange County, Florida | 2011-CA-008482-O; Division 43 | Defendant | yes | yes | yes | |
| Atlantic Housing Partners, LLP, Town Parke, Ltd., CPG Construction, LLP, Global Realty Company, LLP, and Concord Management, Ltd., v City of Winter Springs, Florida | United States District Court, Middle District of Florida, Orlando Division | 6:10-cv-01905-MSS-DAB | Plaintiff | yes | no | yes | |
| Bank of America, N.A. v. Robert G. Dello Russo and Stephen Rominger | United States District Court Middle District of Florida Orlando Division | 6:11-cv-734-Orl-22GJK | Defendant | yes | | yes | |
| Beach Group Investments, LLC v. State of Florida Department of Environmental Protection | In the Circuit Court of the Nineteenth Judicial Circuit In and For St. Lucie County, State of Florida, Civil Division | 2011-CA-000702 | Plaintiff | yes | yes | yes | |
| BGR, LLC d/b/a Deland Dodge v. Chrysler Group, LLC | American Arbitration Association | 33 532 00034 10 | Plaintiff | yes | yes | yes | |
| Big 5 Sporting Goods Song-Beverly Cases | Superior Court of the State of California, County of Los Angeles - Central District | JCCP 4667 | Plaintiff | yes | | yes | |
| Boral Material Technologies Inc., v PMI Ash Technologies, LLC | In the Circuit Court for the Fifth Judicial Circuit In and For Citrus County, Florida - Civil Division | 2010-CA-3798 | Defendant | yes | no | yes | |

| Case | Court | Case Number | Role | | | | |
|---|---|---|---|---|---|---|---|
| Caribbean Condominium Limited Partnership v The City of Flagler Beach | In the Circuit Court of the Seventh Judicial Circuit in and for Flagler County, Florida | 2010-CA-000445 | Defendant | yes | yes | yes | |
| City Center Community Development District v. Boardwalk and Baseball, et al. | In the Circuit Court for the Tenth Judicial Circuit in and for Polk County, Florida Civil Division | 2009-CA-10330 | Plaintiff | yes | yes | yes | |
| Clarkston-Potomac Group Inc v Internet Technology Broadcasting Corp. | In the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida | 11-CA-003073 | Defendant | yes | yes | yes | |
| Colony Beach & Tennis Club Assn. v. Colony Beach & Tennis Club, William W. Merrill, Carolyn L. Field | United States Bankruptcy Court, Middle District of Florida , Tampa Division | 8:08-bk-16972-KRM | Plaintiff | yes | yes | yes | |
| Consolidated Citrus, LP, vs. Martin County, and 1000 Friends of Florida Inc. | State of Florida Division of Administrative Hearings | 13-3393GM; 13-3395GM; 13-3397GM; 13-3413GM; 14-0118GM;14-0132GM; 14-0135GM | Respondent | yes | yes | yes | |
| Crystal Dunes Owners' Association Inc., v. City of Destin, Florida | United States District Court Northern District of Florida Pensacola Division | 3:10-CV-157 | Plaintiff | yes | | yes | |
| Deer Valley Realty, Inc. v. SB Hotel Associates | In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida | 12-10560 CACE (07) | Defendant | yes | | yes | |
| Fasse Paint v Arch Chemicals | State of Wisconsin, Circuit Court, Branch 1, Sheboygan County | 10-CV-746; Case Code: 30301, 30303 | Plaintiff | yes | yes | yes | no |
| Federal Deposit Insurance Corp. as Receiver for Peoples First Bank, v. Greg M. Brudnicki | In the United States Distrit Court Northern District of Florida Panama City Division | 5:12-cv-00398-RS-GRL | Defendant | yes | | yes | |
| Federal Deposit Insurance Corp. as Receiver for Orion Bank of Naples, v. James Aultman, et al. | In the United States Distrit Court for the Middle District of Florida, Ft. Myers Division | 2:13-cv-FtM-99SPC | Plaintiff | yes | no | no | |
| Federal Deposit Insurance Corp. as Receiver for Wakulla Bank, v. Walter C. Dodson, et al. | In the United States Distrit Court for the Northern District of Florida, Tallahassee Division | 4:13-cv-00416-MW-CAS | Defendant | yes | | yes | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Federal National Mortgage Association v. Velma Scott v Federal National Mortgage Association & Chase Home Finance | In the Circuit Court of the Fourth Judicial Court In And For Duval County, Florida | 2010-CA-011095, Division FC-F | Plaintiff | yes | | yes | |
| Fiddler's Creek Bankruptcy | United States Bankruptcy Court, Middle District of Florida, Fort Myers Division | 9:10-bk-03846-ALP | Debtors | yes | yes | yes | |
| Fiddler's Creek Community Development CDD 2 v. U.S. Bank | In the Circuit Court of the 20th Judicial Circuit In and For Collier County, Florida, Civil Division | 11-CA-3947 and 13-CA-1143 | Plaintiff | yes | | yes | |
| Florida Department of Financial Services v. Deloitte & Touche, LLP | IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT IN AND FOR LEON COUNTY, FLORIDA | CASE NO.: 2010-CA-003201 | Defendents | yes | | yes | |
| Florida East Coast Railway v. Norfolk Southern Railway | American Arbitration Association | 33 125 00161 13 | Respondent | yes | | yes | |
| Florida Gulf Venture, LLC v City of Cape Coral | In The Circuit Court of the Twentieth Judicial Circuit In and for Lee County, Florida | 09-CA-004379 | Plaintiff | yes | | yes | |
| Florida Oncology Network v. Adventist Health System/Florida Hospital | AAA Arbitration | 33 193 Y 00168 06 | Defendant | yes | no | yes | |
| Florida Oncology Network v. Michael Pirkowski and Atlantic Urological Associates, P.A. | In the Circuit Court of the Nineth Judicial Circuit in and for Orange County, Florida | 2008-CA-0044750 | Defendant | yes | | yes | |
| Florida Power & Light Co. Turkey Point Units 6 & 7 Power Plant Siting Application No. PA 03-45A3 | State of Florida Division of Administrative Hearings | DOAH Case No.: 09-3575EPP; OGC Case No.: 09-3107 | FPL | yes | yes | yes | |
| Fountain Lakes Residential (MDG Capital)  v Regions Bank | Circuit Court of the Twentieth Judicial Circuit, In and For Collier County, Florida | 09-5010-CA-01-HDH | Plaintiff | yes | | yes | |
| Good Gateway LLC v. Orlando Gateway | In the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida | 2010-CA-015315-O | Plaintiff | yes | yes | yes | |
| Hanson v Tetti | Circuit Court 12th Circuite Collier County | 09-6515-CA | Plaintiff | yes | yes | no | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hillcrest Property, LLP, v Pasco County, a polititical subdivision of the State of Florida | United States District Court Middle District of Florida, Tampa Division | 8:10-cv-819-T-23TBM | Plaintiff | yes | | yes | |
| Home Design Services, Inc. v. Turner Heritage Homes, Inc. | United States District Court Northern District of Florida Tallahassee Division | 4:08-cv-355-SPM-WCS | Defendant | yes | no | yes | |
| Hopewell, LLC v. SDII Global Corp. | In the Circuit Court of the Eighth Judicial Circuit In and For Alachua County, Florida | 2011-CA-4530 (Div. 01) | Plaintiff | yes | | yes | |
| Ivonne Aurea Garcia | United States Bankruptcy Court Southern District of Florida | 12-11839-LMI | Respondent | yes | no | no | |
| James A. Armour v Howard A. Jacobs (Armour v Karins) | American Arbitration Association | 32-110-Y-00911-09 | Plaintiff | yes | yes | yes | yes |
| LaColonnade Development, LLC, A Florida limited liability company v Clancy & Theys Construction Company, a North Carolina corporation | In the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida | 05-2007-CA-029535-xxxx-xx | Defendant | yes | no | yes | |
| Leon Timothy White III, v. United States of America | United States District Court, Middle District of Florida Tampa Division | 8:11-cv-1355-T-33-EAJ | Defendant | yes | | yes | |
| Liberty Wentworth LLC v. Savannah West, LLC et al | Circuit Court Ninth Judicial Circuit in and for Orange County, Florida | 48-2007-CA-011485-O | Plaintiff | yes | no | yes | |
| Lynn Hartenberger & Nancy Stevens v. High Desert Investment Corp | Thirteenth Judicial District County of Sandoval State of New Mexico | D-1329-CV-2012-02350 | Defendant | yes | | yes | |
| Malbec Investments v. Grande Palisades Loan Holdings | In The Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida | 2014-CA-9320-O | Defendants | yes | | yes | |
| Marion County v. G&C Enterprise of Ocala | In the Circuit Court of the Fifth Judicial Circuit In and For Marion County, Florida | 12-2339-CA-G; Parcel: 32 | Petitioner | yes | no | yes | |
| Matthew Ellison v James D. Salter | In the Circuit Court, Third Judicial Circuit, In and For Taylor County, Florida | 2011-371-CA | Plaintiff | yes | | yes | |
| MDI v MCCS, et al | Circuit Court, Seventh Judicial Circuit, in and for St. Johns County, Florida | CA06-17 | Defendant | yes | yes | yes | |
| Mee Industries v Wasserman Comden & Casselman, LLP | In the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida | 2011-CA-004008-O | Plaintiff | yes | no | yes | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Okaloosa County, FL v. State of Florida & Taxpayers, Property Owners & Citizens of Okaloosa County | Circuit Court for the First Judicial Circuit in and for Okaloosa County, FL | 2008-CA-006280 | Defendant | yes | yes | yes |
| OSI Restaurant Partners, LLC v T-Bird Nevada, LLC | Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida | 09-CA-04270 | Defendant/Counter Plaintiff | yes | no | yes |
| Pacetta, LLC, a Florida limited liability company; Down The Hatch, Inc., a Florida corporation; Sea Love, Inc., a Florida corporation; and Mar-Tim, Inc., a Florida corporation v The Town of Ponce Inlet, a Florida municipality | In The Circuit Court, Seventh Judicial Circuit In and For Volusia County, Florida | 2010-31696-CICI | Plaintiff | yes | yes | yes |
| Palm Partners LLC v. City of Oakland Park | United States District Court Southern District of Florida | 14-21242-CIV-MOORE/MCALILEY | Plaintiff | yes | | yes |
| Patricia Chandler v. Curtis Chandler | In the County Court of the Twentieth Judicial Circuit In and For Collier County Florida (Civil Division) | 13-0817-DR | Respondent | yes | | yes |
| Pedro J. Soto v Luis Batista, individually, Jaime Corona, individually, and FEDEX Ground Package System, Inc., a foreign corporation authorized to do business in the State of Florida | Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida | 2009-CA-020860-O | Defendant | yes | | yes |
| Razorback Funding, LLC et al., v Scott W. Rothstein, et al | In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida | 09-062943 (07) | Plaintiff | yes | no | yes |
| Reid Yeoman and Rita Medellin v Ikea US West Inc | United States District Court Southern District of California | 3:11-cv-00701-WQH(BGS) | Plaintiff | yes | | yes |
| Richard J. Felsenstein v. Keene's Point Community Association | In the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida | 2010-CA-024506-O | Defendant | yes | yes | yes |
| Sandra Landwehr v AOL Inc. | United States District Court for the Middle District of Florida | 1:11CV1014-CMH-TRJ | Plaintiff | yes | no | yes |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| School Board of Miami-Dade County v Matheson Properties, S.A. | The 11th Judicial Circuit in Miami-Dade County a/k/a the Dade County Courthouse | 07-25661 CA 22 | Defendant | yes | | yes | |
| School Board of Orange County, Florida v. Universal Engineering Sciences | In the Circuit Court of the Ninth Judicial Circuit Court In and For Orange County Florida, Civil Division | 2009-CA-022063-O; Division 43 | Plaintiff | yes | yes | yes | |
| Seda Construction Comp. v. Nassau County, Florida | In the Circuit Court, Fourth Judicial Circuit, In and For Nassau County, Florida | 45-2010-CA-000294, Division A | Defendant | yes | | yes | |
| Seminole Tribe of Florida v. Hendry County, Florida & Florida Power & Light | In the Circuit Court of the Twentieth Judicial Circuit In and For Hendry County, Florida | 2011-540-CA | Defendant | yes | | yes | |
| Shingle Creek Community Development District v. Osceola Trace LLC | In the Circuit Court of the Ninth Judicial Circuit of the State of Florida, In and For Orange County, Florida | 2011-CA-001286 | Plaintiff | yes | | yes | |
| South Bay Community Development District v. Bahia Sun Associates | In the Circuit Court of the Thirteenth Judicial Circuit In and For Hillsborough County, Florida Civil Division | 08-27737 | Defendant | yes | | yes | yes |
| Spartan v Cheeburger | United States Court, Middle District | 2:10-cv-91-FtM-360NF | Plaintiff | yes | | yes | |
| Spitznagel v Rubinton | United States District Court for the Middle District of Florida, Ft. Myers Division | 2:09-cv-00824-CEH-SPC | Defendant | yes | no | yes | yes |
| Stock Development LLC v. Lely CDD | In The Circuit Court of the Twentieth Judicial Circuit In And For Collier County, Florida Civil Division | 11-2013-CA-001507-0001-XX | Plaintiff | yes | | yes | |
| Susan McCurry v Kurtz Homes LLC | Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida | 09-8469-CA | Plaintiff | yes | | yes | |
| Sylvia Sussman, vs. The Cessna Aircraft Company | In the Circuit Court of the Seventh Judicial Circuit, In and For Volusia County, Florida | 2007-20336 | Defendents | yes | | yes | |
| T.H. Old Town Associates Ltd. | United States Bankruptcy Court Middle District of Florida Orlando Division | 6:13-bk-04147-KSJ | Debtors | yes | | yes | |
| Teamster's Impasse Hearing | City Hall, Commission Chambers, Coral Gables | NA | City | yes | yes | no | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Broadcast Team. Inc. v. Hartford Insurance Co. of the Southeast | Circuit Court Seventh Judicial Circuit in and for Volusia County, Florida | 2003-30717-CICI Div 31 Watson | Plaintiff | yes | yes | yes | |
| The Villas at Green Gate, LLC, v Walling Engineering, Inc. | In the Circuit Court of the Fifth Judicial Circuit In and For Lake County, Florida | 07-CA-2354 | Defendant | yes | | yes | |
| Town Center at Doral LLC, et al | United States Bankruptcy Court, Southern District of Florida, Miami Division | 11-35884-RAM | Debtors | yes | no | yes | |
| Tuscano, LLC v. Pulte Home Corporation & Pulte Homes, Inc. | American Arbitration Association | 32 115 Y 00208 09 | Plaintiff | yes | no | yes | |
| United States v. Samir Cabrera | Federal Defender, Middle District of Florida | Case No.: 2:08-CR-94-FTM-29DNF | Defendant | yes | yes | yes | |
| Vulcan v FDOT | In The Circuit Court, Second Judicial Circuit, In And For Leon County, Florida | 2010 CA 4040 | Defendant | yes | no | yes | |
| Wilder v Wilder | In the Circuit Court in and for Pinellas County, Florida | 06-9990-FD022/Family Division | Respondent | yes | | yes | |

## Exhibit #3 – Materials Relied Upon

*Corona, et. al v. Sony Pictures Entertainment, Inc.*, No. 14-9600 (C.D. Cal.),
Amended Class Action Complaint,  Doc. 43 (Mar. 2, 2015).

*Corona, et. al v. Sony Pictures Entertainment, Inc.*, No. 14-9600 (C.D. Cal.),
Sony Pictures Entertainment Inc.'s Memorandum of Points and Authorities in
Support of Its Motion to Dismiss Amended Class Action Complaint Pursuant
to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Doc. 59-1 (Mar.
25, 2015).

*Corona, et. al v. Sony Pictures Entertainment, Inc.*, No. 14-9600 (C.D. Cal.),
Plaintiffs' Memorandum of Points and Authorities in Opposition to Sony
Pictures Entertainment Inc.'s Motion to Dismiss Complaint Pursuant to
Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Doc. 62 (Apr. 13,
2015).

*Corona, et. al v. Sony Pictures Entertainment, Inc.*, No. 14-9600 (C.D. Cal.),
Order on Sony Pictures Entertainment Inc.'s Motion to Dismiss, Doc.
Document 97 (June 15, 2015).

*Corona, et. al v. Sony Pictures Entertainment, Inc.*, No. 14-9600 (C.D. Cal.),
Plaintiffs' Amended and Consolidated Responses to Defendants First Set of
Interrogatories (June 9, 2015).

Timothy C. Haab & Kenneth E. McConnell, *Valuing Environmental and
Natural Resources* (2002).

Nathalie G. Schwab Christie & Nils C. Soguel, *Contingent Valuation,
Transport Safety and the Value of Life* (1995).

Raymond J. Kopp et al., *Determining the Value of Non-Marketed Goods*
(1997).

R. Kerry Turner et al., *Environmental Economics: An Elementary
Introduction* (1993).

Robert Gellman, *Privacy, Consumers, and Costs: How the Lack of Privacy
Costs Consumers and Why Business Studies of Privacy Costs are Biased and
Incomplete* (2002).

Graham Pearce & Nicholas Platten, *Achieving Personal Data Protection in the European Union*, Journal of Common Market Studies (1998).

Nadia Olivero & Peter Lunt, *Privacy versus willingness to disclose in e-commerce exchanges: The effect of risk awareness on the relative role of trust and control*, Journal of Economic Psychology (2003).

Jeffrey Sovern, *Helping Consumers Protect Their Personal Information*, Advancing the Consumer Interest (2002).

Curtis R. Taylor, *Private Demands and Demands for Privacy: Dynamic Pricing and the Market for Customer Information*, Duke University, Department of Economics (2002).

Curtis R. Taylor, *Privacy in Competitive Markets*, Duke University, Department of Economics (2003).

George J. Stigler, *An Introduction to Privacy in Economics and Politics*, Journal of Legal Studies (1980).

Eli M. Noam, *Privacy and Self-Regulation: Markets for Electronic Privacy*, Columbia Institute of Tele-Information.

Hal R. Varian, *Economic Aspects of Personal Privacy*, UC Berkeley (1996).

Richard A. Posner, *The Economics of Privacy*, American Economic Review (1981).

ll-Horn Hann et al., *Direct Marketing: Privacy and Competition*, Workshop on Information Systems and Economics (2003).

Federal Trade Commission, *FTC Releases Survey of Identify Theft in U.S., 27.3 Million Victims in the Past 5 years, Billions in Losses for Business and Consumer* (2003).

Federal Trade Commission, *Federal Trade Commission Overview of the Identity Theft Program* (2003).

Kenneth C. Laudon, *Markets and Privacy*, Communications of the ACM (1996).

Richard T. Carson et al., *A Contingent Valuation Study of Lost Passive Use Values Resulting from the Exxon Valdez Oil Spill* (1992).

*Fresco vs. Automotive Directions*, No. 03-61063, (S.D. Fl.), Plaintiffs' First Amended Class Action Complaint and Jury Trial Demand.

Alessandro Acquisti, *Privacy in Electronic Commerce and the Economics of Immediate Gratification*, H. John Heinz II School of Policy and Management, Carnegie Mellon University (2004).

Alessandro Acquisti, *Privacy and Security of Personal Information: Economic Incentive and Technological Solutions*, H. John Heinz II School of Policy and Management, Carnegie Mellon University (2004).

Tyler Moore et al., *The Economics of Online Crime*, The Journal of Economic Perspectives (2009).

Benjamin Edelman, *Priced and Unpriced Online Markets*, The Journal of Economic Perspectives (2009).

David S. Evans, *The Online Advertising Industry: Economics, Evolution, and Privacy*, The Journal of Economic Perspectives (2009).

Robin S. Lee & Tim Wu, *Subsidizing Creativity through Network Design: Zero-Pricing and Net Neutrality*, The Journal of Economic Perspectives (2009).

ll-Horn Hann et al., *Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach*, Journal of Management Information Systems (2007).

Jessica Litman, *Information Privacy/Information Property* 5 Stan. L. Rev. 1283 (2000).

Bernardo A. Huberman et al., *Valuating Privacy*, Hewlett-Packard Labs, IEEE Security & Privacy (2005).

Ramnath K. Chellappa & Raymond G. Sin, *Personalization versus Privacy: An Empirical Examination of the Online Consumer's Dilemma*, Information Technology and Management (2005).

Luc Wathieu & Allan Friedman, *An Empirical Approach to Understanding Privacy Valuation*, Harvard University, Kennedy School of Government (2007).

Allesandro Acquisti & Hal R. Varian, *Conditioning Prices on Purchase History*, Marketing Science (2005).

David L. Baumer et al., *Quantifying Privacy Choices with Experimental Economics*, 2005 Workshop on the Economics of Information Security (2005).

Sarah Spiekermann et al., *E-privacy in 2nd Generation E-Commerce:  Privacy Preferences versus Actual Behavior*, EC'01 Proceedings of the 3rd ACM conference on Electronic Commerce (2001).

Alessandro Acquisti & Jens Grossklags, *Privacy Attitudes and Privacy Behavior:  Losses, Gains, and Hyperbolic Discounting*, The Economics of Information Security (2004).

Joseph Phelps et al., *Privacy Concerns and Consumer Willingness to Provide Personal Information*,  Journal of Public Policy & Marketing (2000).

Bettina Berendt, et al., *Privacy in E-Commerce: Stated Preferences vs. Actual Behavior*, Communication of the ACM (CACM) (2005).

Paul Syverson, *The Paradoxical Value of Privacy*, Naval Research Laboratory (2003).

Patricia A. Norbert et al., *The Privacy Paradox:  Personal Information Disclosure Intentions versus Behaviors*, The Journal of Consumer Affairs (2007).

Jens Grossklags &  Alessandro Acquisi, *When 25 Cents is too much:  An Experiment on Willingness-to-Sell and Willingness-to-Protect Personal Information* (2007).

Adam Shostack, *Paying for Privacy:  Consumers & Infrastructures*, *2nd Workshop of Security and Economics*, (2003).

Alessandro Acquisti et al., *On the Economics of Anonymity*, *Financial Cryptography* (2003).

ll-Horn Hann et al., *Online Information Privacy:  Measuring the Cost-Benefit Trade-Off*, Twenty-Third International Conference on Information Systems (2002).

Alessandro Acquisti, *Privacy, Economics, and Immediate Gratification:  Why Protecting Privacy is Easy, but Selling It is Not*,  Heinz School, Carnegie Mellon University, PGuardian Technologies, Inc. (2004)

Alessandro Acquisti & Jens Grossklags, *Privacy Paradox Notes*, *Economics of Information Security* (2004).

*A Survey of Consumer Privacy Attitudes and Behaviors*, conducted for The Privacy Leadership Initiative (PLI) by Harris Interactive.

*Consumer Privacy Attitudes and Behaviors Survey Wave II*, conducted for The Privacy Leadership Initiative (PLI) by Harris Interactive.

*Privacy Notices Research Final Results*, conducted by Harris Interactive (2001).

*Privacy On and Off the Internet:  What Consumers Want*, conducted by Harris Interactive (2002).

Alessandro Acquisti & Jens Grossklags, *Privacy and Rationality in Individual Decision Marking*,  Security & Privacy, IEEE (2005).

James J. Murphy et al., *A Meta-Analysis of Hypothetical Bias in Stated Preference Valuation*, Environmental and Resource Economics (2005).

John A. List & Jason Shogren, *Calibration of Willingness-to-Accept*, Journal of Environmental Economics and Management (2002).

Glenn W. Harrison & E. Elisabet Rutstrom, *Experimental Evidence on the Existence of Hypothetical Bias in Value Elicitation Methods*, Handbook of Experimental Economics Results (1999).

Steven Nape et al., *Hypothetical bias and willingness to accept*, Economic Letters 78 (2003).

McKinley Blackburn et al., *Statistical Bias Functions and Informative Hypothetical Surveys*, American Journal of Agricultural Economics (1994).

John A. List & Craig A. Gallet, *What Experimental Protocol Influence Disparities Between Actual and Hypothetical Stated Values?*, Environmental and Resource Economics (2001).

Stacey L. Schreft, *How and Why Do Consumers Choose Their Payment Methods?*, prepared for Federal Reserve Bank of Boston's Consumer Behavior and Payment Choice Conference (2005).

The Honorable Jeb Bush, Governor, State of Florida, *Memo re: Sale of Driver's License Information* (1999).

Robert M. Schaefer, *Technology-Safety and Security*, New Directions for Student Services (2002).

Peter E. Hart & Ziming Liu, *Trust in the Preservation of Digital Information*, Communications of the ACM (2003).

Adam Shostock & Paul Syverson, *What Price Privacy? (and why identity theft is about neither identity nor theft)*, Economics of Information Security (2004).

Federal Trade Commission, *Identity Theft Victim Complaint Data* (2006).

*Privacy Leadership Initiative (PLI) Privacy Notices Research Final Result*, conducted by Harris Interactive (2001).

Federal Trade Commission, *Privacy Online: A Report to Congress* (1998).

Federal Trade Commission, *Overview of the Identify Theft Program*, (2003).

Alessandro Acquisti, *Uncertainty, Ambiguity and Privacy*, Carnegie Mellon University (2005).

Nora J. Rifon, *Resolving the Privacy Paradox: Toward A Social-Cognitive Theory of Consumer Privacy Protection*, Michigan State University.

Jeevan Jaisingh, et al., *Privacy and pricing personal information*, European Journal of Operational Research (2008).

Scott J. Savage, & Donald Waldman, *Broadband Internet access, awareness, and use: Analysis of United States household data*, Telecommunications Policy 29 (2005).

Austan Goolsbee, *The Value of Broadband and the Deadweight Loss of Taxing New Technology*, The National Bureau of Economic Research (2006).

Nate Anderson, *FTC forces Sears, Kmart out of the spyware business*, Arstechnica.com (2009).

Federal Trade Commission, *FTC Approves Final Consent Order Requiring Sears to Disclose the Installation of Tracking Software Placed on Consumers' Computers; FTC Approves Final Consent Order in the Matter Concerning Enhanced Vision Systems, Inc.* (2009).
Federal Trade Commission, *Sears Settles FTC Charges Regarding Tracking Software* (2009).

Federal Trade Commission, *In the Matter of Sears Holdings Management Corporation* (2009).

Elinor Mills, *AOL hanging up on dial-up customers?*, CNET News, (Feb. 28, 2006).

Joe Benton, *AOL Now Free … Sort of*, Consumer Affairs.com, (Aug. 9, 2006).

Alessandro Acquisti, et al., *What Can Behavioral Economics Teach Us About Privacy?*, Presented at ETRICS 2006.

Aleecia McDonald, et al., *The Cost of Reading Privacy Policies*, 4 ISJLP 543 (2008-2009).

Paul Hague, *Measuring Brand Value – How Much Are Brands Worth?*, B2B
International (June 29, 2015 11:01 am), http://www.b2binternational.com/
publications/white-papers/value-of-brands/.

David Aaker, et al., *Brand Leadership* (2000).

Gordon Smith, *Trademark Valuation* (1997).

Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harvard L.
Rev. 7, at 2056-2128 (May 2004).

John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally
Identifiable Information ("PII") Equals the "Value" of Financial Assets*,
XV Richmond J. L. & Tech. 11, at 1-32 (2009),
http://jolt.richmond.edu/v15i4/article11.pdf.

Mark F. Knightlinger, *The Gathering Twilight? Information Privacy on the
Internet in the Post-Enlightenment Era*, 24 J. Marshall J. Inf. Tech. &
Privacy L. 353 (2006).

The Ponemon Institute, *2013 Survey on Medical Identity Theft* (2013).

The Ponemon Institute, *2014 A Year of Mega Breaches* (2014).

Javelin Strategy and Research, *2015 Identity Fraud Study* (2015).

Harry Zavos, *Monetary Damages for Nonmonetary Losses: An Integrated
Answer to the Problem of the Meaning, Function, and Calculation of
Noneconomic Damages*, 43 Loy. L.A. L. Rev. 193 (Sept. 1, 2009), available
at: http://digitalcommons.lmu.edu/cgi/viewcontent.cgi?article=2681&
context=llr.

## Exhibit #4 – Publications

(With Byron Walden)   "Correctly Calculating the Present Value of Future Medical Costs in Personal Injury Cases," *The Value Examiner*, February 2015.

(With Stanley K. Smith)  "Elderly Migration into Rapidly Growing Areas:  A Time   Series Approach," *Review of Regional Studies*, Spring 1985, pp. 11-27.

(With Blaine Roberts)  "An Empirical Note on Employment Forecasts," *Monthly   Labor Review*, March 1978, pp. 105-108.

(With Blaine Roberts)   "The Role of Monetary Forces in Regional Economic Activity:   An Econometric Simulation Analysis," *Journal of Regional Science*, April 1979, pp. 15-29.

(With Jerome Milliman and Richard Ellson)   "A Pragmatic Econometric Approach to Assessing Economic Impacts of Growth or Decline in Urban Areas," *Land Economics*, February 1978, pp. 442-460.

The Regional Impact of Monetary Policy:  An Econometric Simulation Study of Indiana 1958-1973," *Journal of Regional Science*, April 1977, pp. 77-88.

"Manitoba Interlake Area – A Review," *Journal of Regional Sciences*, April 1977, pp. 151-153.

## BOOKS AND MONOGRAPHS

(With Jerome Milliman)   "An Econometric Approach to Regional Stagnation," in *Planning Under Regional Stagnation*, 1982.

(With Neil Sipe)  *A Primer on Impact Fees in Florida*, 1981.

"The Impacts of Growth Management Policies on New Home Prices," in *Urban Land Markets:  Price Indices, Supply Measurers and Public Policy Effects*, 1980.

"The Geographic Incidence of Monetary Policy:  An Econometric Analysis," *Geographic Aspects of Inflationary Processes, Volume 2*, 1976.

(With  Ernst  Stromsdorder  and  Kamran  Moayed-Dadkhan)    *Cost Analysis of Manpower Programs:  An Analysis of the Art*, 1973.

"The Big Green – The Fishkind Study," *Responses to an Aging Florida*, Florida  Council on Aging, October 1998.

Topic:  Light Rail System for Orlando, *The Orlando Sentinel*, Letter Writer's Forum, 1999

"Outlook 2000, A Leveling Off," *Florida Realtor*, January 2000.


## NONREFERRED JOURNALS AND NEWSLETTERS

*Econocast*, published quarterly November, 1984 - 1994.

*The Florida Outlook*, published quarterly 1977-1994.

*Economic Indicators*, published monthly, 1979-1982.

*Quarterly Forecasts for Florida and its counties,* published quarterly at Fishkind.com since 1998.

Fund Newsletters for 27 Florida Counties, published monthly 2006-2009.

*Econocast Weekly*, published weekly.

## GRANT SPONSORED RESEARCH ACTIVITY

(With Jerome Milliman and Neil Sipe)  *Modeling Financing Alternatives for Capital Improvements*, Gainesville, Florida: Bureau of Economic and Business Research, April 1983.
(For the Department of Community Affairs.)

(With Jerome Milliman and Neil Sipe)  *A Regional Fiscal Impact Model*, Gainesville, Florida:  Bureau of Economic and Business Research, June 1982.
(For the Department of Veterans and Community Affairs.)

(With Ron Dodson, Charles McDonald, and Scott Hargrave)  *A Cost-Benefit Analysis of Consultants in the Florida Department of Transportation*, Gainesville, Florida:  Bureau of Economic and Business Research, February 1981.
(For the Department of Transportation.)

*The Outlook for Residential Construction in Florida*, Gainesville, Florida:  Bureau of Economic and Business Research, October 1979.
(For the Florida Home Builders Association.)

*The Outlook for Residential Construction*, Gainesville, Florida:  Bureau of Economic and Business Research, March 1979.
(For the Florida Homebuilders Association.)

(With John Alexander and Carl Feiss)  *Largo Prototype Assessment Model*, Gainesville, Florida, April 1979.
(For the Plan Board.)

(With Jerome Milliman)  *An Economic Analysis of Growth Management in Sarasota County*, Sarasota, Florida:  Contractors Association, November 1978.

(With Jerome Milliman)  *Methodology for Assessing the Physical, Economic and Social Tradeoffs Between Increased Economic Development and Enhanced Environmental Quality*, Gainesville, Florida:  Bureau of Economic and Business Research, July 1978.
(For the Department of Administration.)

(With Blaine Roberts)   *A Comparative Regional Housing Market Analysis of Florida and California*, Gainesville, Florida:  Bureau of Economic and Business Research, June 1978.
(For California Federal Savings.)

(With Blaine Roberts)   *A Short-Run Manpower Forecasting Model*, Gainesville, Florida:  Bureau of Economic and Business Research, 1977.
(For the Department of Community Affairs, State of Florida.)

(With Blaine Roberts, Jerome Milliman, and Juan Gonzalez)   *Florida Econometric Manpower Simulation Study*, Gainesville, Florida:  Bureau of Economic and Business Research, 1976.
(For the Division of State Planning, State of Florida.)

(With Jerome Milliman and Richard Ellson)   *Alachua County Econometric Study*.  Gainesville, Florida:  Bureau of Economic and Business Research, 1976.
(For the Gainesville-Alachua County Regional Utilities Board.)

(With Jerome Milliman and Richard Ellson)   *Development of a Methodology for Determining the Need for Vocational and Technical Education in Urban Areas of Florida*, Gainesville, Florida:  Bureau of Economic and Business Research, 1976.
(For the Florida State Advisory Council on Vocational and Technical Education.)

*The Economic Impacts of the Orlando International Airport*, 1992.
*(*For the Greater Orlando Aviation Authority.)

*Tourism:  How Does It Affect Our Economy?  Fiscal Impacts of Tourism on Central Florida*, 1996.
*(*For the Convention and Visitors Bureaus of Orlando/Orange County, Kissimmee/St. Cloud, and Seminole County.)

*The Economic Impact of the Bert Harris, Jr., Private Property Rights Protection Act and the Proposed Property Rights Amendment*, 1998.
(For the Florida Chapter of the American Planning Association.)

*South Carolina Private Property Rights Study:  Economic Impact of
H.3591*, 1998.
(For the South Carolina Coastal Conservation League, Association of
Counties, and Municipal Association.)