# EXHIBIT A

## PUBLIC VERSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Michael Corona, Christina Mathis, et al., individually and on behalf of others similarly situated, <br><br>                             Plaintiffs, <br><br>     v. <br><br> Sony Pictures Entertainment Inc., <br><br>                             Defendant. | Case No. 2:14-cv-09600 RGK E |

# EXPERT REPORT OF MICHAEL A. TURNER, Ph.D.

# TABLE OF CONTENTS

I.      Introduction ........................................................................................................1

II.     Qualifications ....................................................................................................3

III.    Factual Background ...........................................................................................6

        A.      The Rise of Large Data Breaches ..........................................................6

        B.      Overview of Identity Theft and Identity Fraud .....................................8

        C.      The Cyberattack on SPE and SPE's Provision of AllClear ID ............10

        D.      The Named Plaintiffs ...........................................................................11

IV.     The Cyberattack on SPE Did Not Significantly Increase the Risk of Identity Fraud
        Faced by Members of the Proposed Class .......................................................13

        A.      Dr. Ponemon Has Not Shown that the Cyberattack on SPE Caused a
                Significant Increase in the Risk of Identity Theft ................................14

        B.      Dr. Ponemon Overstates the Connection Between Data Breaches and
                Identity Fraud ......................................................................................15

        C.      Dr. Ponemon Overstates the Value of Social Security Numbers and Dates
                of Birth to an Identity Thief .................................................................19

        D.      Dr. Ponemon Fails to Consider Other Sources of Risk Beyond the SPE
                Cyberattack ..........................................................................................22

V.      The Risk of Identity Fraud Arising From the SPE Cyberattack Will Vary Across
        the Class Depending on a Wide Range of Factors ...........................................24

        A.      Variation in the Amount and Combination of Information Exposed ...................25

        B.      Variation in the Age of the Data Exposed ...........................................27

        C.      Variation Based on Demographic Characteristics ...............................28

        D.      Variation Based on Other Sources of Risk ..........................................30

VI.     Plaintiffs Have Not Shown The Reasonableness of Purchasing Identity Protection
        Beyond What SPE Has Already Provided .........................................................34

        A.      SPE's Provision of One Year of Credit Monitoring was a Reasonable
                Response to the Data Breach ................................................................35

        B.      Plaintiffs' Experts Provide No Basis for Their Opinion that Purchasing
                Additional Identity Protection Is Necessary ........................................37

VII.    The Reasonable Need for Any Additional Identity Protection (Beyond That
        Already Provided by SPE) Will Vary Across the Class ....................................40

VIII.   Determining Whether a Particular Instance of Identity Theft Was Due to the
        Cyberattack on SPE, and Not Another Cause, Can Only be Assessed on an
        Individual Basis ...............................................................................................41

Appendix A:  Variation in Types of Data the Named Plaintiffs Allege Were Disclosed in
             Cyberattack on SPE ....................................................................................46

Appendix B:  Other Data Breaches That Have Exposed the Named Plaintiffs' PII......................47

Appendix C:  List of Materials Relied On...............................................................................48

Appendix D:  Expert Witness Testimony .................................................................................53

Appendix E:  List of Publications ............................................................................................54

## I.      <u>Introduction</u>

1.      I have been retained by Sony Pictures Entertainment Inc. (hereafter "SPE") to offer my expert opinion regarding the alleged increased risk of identity theft and identity fraud faced by a putative class of current and former SPE employees whose personal information was exposed in the November 2014 cyberattack on SPE.  I have also been asked to respond to the opinions offered by Plaintiffs' expert Dr. Larry Ponemon, and to respond to the opinions of Plaintiffs' expert Dr. Henry Fishkind insofar as they relate to the opinions in my report.[1]

2.      My opinions are based upon 17 years of experience and knowledge I have gained as an academic and research analyst in the information industry, specifically as an employee of the Columbia Institute of Tele-Information at the Columbia Business School, the Information Services Executive Council (ISEC) of the Direct Marketing Association, the Information Policy Institute, and the Policy and Economic Research Council (PERC).  The findings presented in this report are also based on my review of documents from this case, research conducted for this report, and secondary research carried out by other organizations.  The materials I have relied on in preparing this report are presented in Appendix C.  I represent that all of the statements and opinions included in this report to be accurate and true to the best of my ability and knowledge at the time I drafted this report.

3.      My opinions are as follows:

4.      *First*, there is no reliable evidence that the November 2014 cyberattack on SPE significantly increased the risk of any loss resulting from identity theft or fraud for current and former SPE employees whose PII was disclosed, either relative to the general population or relative to their pre-existing risk levels.  Dr. Ponemon admitted in his deposition that he is unable

---

[1] I understand that SPE has retained a separate expert to address the damages model presented in Dr. Fishkind's report.

to offer any reliable estimate of *how much* increased risk was caused by the cyberattack.[2]  And there are strong reasons to believe that any increased risk is negligible.  Research suggests that the vast majority of members of the proposed class will never experience identity fraud or financial loss as a result of the cyberattack.  In fact, to date, none of the Named Plaintiffs has experienced identity fraud causing any financial loss.  Further, Dr. Ponemon's report overstates the risks posed by the exposure of Social Security Numbers and dates of birth, which are already widely available and which are increasingly difficult for identity thieves to misuse because of developments in authentication technologies.  His report also ignores other sources of risk of identity theft faced by the Named Plaintiffs and putative class members, including other data breaches.

5.     *Second*, whether the cyberattack on SPE exposed the Named Plaintiffs or members of the proposed class to any increased risk of identity fraud will vary depending on a large number of factors specific to each class member.  These factors include (1) the amount and particular combination of information exposed in the cyberattack; (2) the age of the information exposed; (3) the demographic characteristics of class members, including age, income, and creditworthiness; and (4) the other sources of risk to which the class member is also exposed.  Dr. Ponemon acknowledged in his deposition that any increase in risk would vary across the proposed class, yet he ignores all of these factors entirely in his report.

6.     *Third*, Plaintiffs and their experts have not shown that they need additional identity protection services beyond the one year of AllClear ID that SPE has already provided at no cost to the proposed class.  Any marginal increase in risk faced by putative class members is unlikely to last more than one year.  Further, there are a number of steps (such as monitoring

---

[2] Deposition of Larry Ponemon at 148 (Aug. 6, 2015) ("Ponemon Deposition").

accounts and establishing fraud alerts with the national credit bureaus) that all class members may take at no cost to themselves and with minimal effort to mitigate any lingering risks.

7.      *Fourth*, to the extent it *were* reasonable for any class members to purchase additional identity protection beyond what SPE has already provided (which, as noted, Plaintiffs have not shown), the need for such services would vary depending on the various factors noted above.  The Named Plaintiffs themselves illustrate this variation.

8.      *Fifth*, whether any particular instance of identity theft can be attributed to the cyberattack on SPE, and not another cause, can only be determined on an individual basis, based on the facts specific to each of any such incidents.  In this case, Dr. Ponemon has not attempted that analysis for the three Named Plaintiffs who claim to have experienced identity fraud as a result of SPE's alleged negligence.  As I show, none of those instances of identity fraud can reasonably be linked to the cyberattack on SPE.

9.      I have been compensated at an hourly rate of $500 for my work on this matter.  I received assistance from PERC staff on the production of the report.  Any tasks completed for this case by PERC staff was billed at a lower rate contingent upon the function performed (administrative work at $100 per hour, research at $275 per hour for senior researcher and $200 per hour from junior researcher).

## II.      Qualifications

10.      I have a Ph.D. from Columbia University in International Political Economy. Currently, I am the President and Chief Executive Officer (CEO) at the Policy and Economic Research Council (hereafter "PERC"), an IRS designated 501c3 economic policy research and development organization focusing on the use of information products to drive sustainable and responsible financial inclusion, credit access, and economic development.  Established in 2002 as the Information Policy Institute, the vast majority of the PERC's work focuses on various

aspects of data privacy and data security.  While at PERC, I have authored or co-authored a number of published and unpublished works that concern aspects of data breaches and identity theft and fraud, including *Towards a Rational Data Breach Notification Regime*, a study that examined trends in data breaches, identity theft and fraud, and various state and federal legislative proposals on data breach notifications.  I also authored *How Safe and Secure Is It? An Assessment of Personal Data Privacy and Security in Business Process Outsourcing Firms In India*, a study that involved extensive field research in the U.S. and India to assess the data security environments of large financial institutions in the U.S. and data processors in India, and to assess the potential consequences from a breach of sensitive financial data.  Additional publications I have authored or co-authored are listed in Appendix E.

11.     In addition, among other research, PERC has examined the data accuracy of US consumer credit reports,[3] as well as the social and economic impacts from data use and quality (*e.g.*, impacts on the use of prescriber identifiable data upon data privacy, prescription drug prices, and the quality of health care in the United States; the impacts of restricting the quantity or quality of credit information available to consumer or commercial credit bureaus in the US and elsewhere; and the consumer and systemic impacts from the inclusion of non-financial payment data in credit reports).[4]

12.     In 2010, PERC was contracted by the United States Treasury to test how individual data fields would alter the chances of identification of persons in the Home Affordable

---

[3] Michael Turner, Robin Varghese and Patrick Walker, *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts*, PERC (2011).
[4] Michael Turner et al., *The Fair Credit Reporting Act: Access, Efficiency, and Opportunity*, PERC (2003), *available at* http://www.perc.net/wp-content/uploads/2013/09/fcra_report.pdf; Michael Turner et al., *The Fair Credit Reporting Act: Access, Efficiency, and Opportunity – Part II*, PERC (2003), *available at* http://www.perc net/wp-content/uploads/2013/09/institute_fcra_ptII.pdf; Michael Turner et al., *Give Credit Where Credit Is Due*, PERC, Dec. 2006, *available at* http://www.perc.net/wp-content/uploads/2013/09/alt_data.pdf; Michael Turner et al., *The Impact of Provider Identifiable Data on Healthcare Quality and Cost*, PERC (2007), *available at* http://www.perc.net/wp-content/uploads/2013/09/provider_data.pdf.

Mortgages Program ("HAMP") and their Home Affordable Refinance Program ( "HARP")

programs.  PERC collaborated with Treasury, the Federal Housing Finance Authority, Fannie

Mae, and Freddie Mac.  PERC designed an innovative "reverse hacking" process in order to test

whether data elements that were being proposed for disclosure would enable interested parties to

re-identify program participants.  Treasury approved of the PERC/Acxiom proposed data

modifications and had them implemented by Fannie Mae and Freddie Mac for the HAMP and

HARP programs.  This work lasted nearly two years.  Subsequently, in 2013 PERC was retained

by Freddie Mac to perform similar analysis regarding their Structured Agency Credit Risk

program.

      13.     Given my expertise in information policy, I was appointed by Tom Ridge, former

Secretary of the United States Department of Homeland Security ("DHS") to serve a two-year

term on the first ever Data Privacy and Integrity Advisory Committee ("DPIAC").  In this

capacity, I advised the DHS Chief Privacy Officer and Secretary Michael Chertoff on matters

pertaining to data accuracy, data integrity, data privacy, and data security.  I have also served as

an Advisory Board member to the American Medical Association for their

HealthcareProConnect database maintained with Acxiom Corporation.  In this capacity, I

reviewed and helped shape the AMA's data privacy and Acxiom's data security policies

regarding the database on AMA member physicians.  I also advised the Georgia Department of

Labor on its 2013 data breach involving the inadvertent release of roughly 4,500 names,

addresses and Social Security Numbers to over 1,000 people.  Finally, I chaired the research

committee for the Privacy Leadership Initiative for several years and oversaw the production of

considerable empirical research by different vendors on aspects of data privacy and data security.

      14.     Information concerning my prior expert testimony is listed in Appendix D.

III.    <u>Factual Background</u>

15.     In this section, I provide background on identity theft and data breaches in order to place the cyberattack on SPE and the claims of the Named Plaintiffs in context.

A.      **The Rise of Large Data Breaches**

16.     "Data breach" is a broad term, generally meaning an incident in which sensitive (personally identifiable) data has been lost, stolen, or viewed/used by unauthorized individuals. Breaches can involve electronic data or physical/paper records, and may be due to an accident (such as losing files or sending them to the wrong place) or theft (which may take many forms, including the actions of a hacker or a rogue employee).

17.     The development of modern information technology has allowed data to be gathered, stored, and transferred in ways that make possible very large breaches.  Some well-publicized recent examples of data breaches have included millions or tens of millions of records, including the breaches at Target (which involved credit and debit card information for approximately 70 million people),[5] Anthem (which involved personal information for approximately 78.8 million people),[6] and UCLA's Health System (which involved personal information for approximately 4.5 million patients).[7]

18.     The Identity Theft Resource Center (ITRC) tracks information concerning the number of data breaches and the types of information breaches involve.  Since 2005, the ITRC has recorded over 5,300 data breaches, which collectively involved over 780 million records.[8]  In

---

[5] Target, *Data Breach FAQ*, https://corporate.target.com/about/shopping-experience/payment-card-issue-faq (last visited August 7th, 2015).

[6] Anna Wilde Mathews, *Anthem: Hacked Database Included 78.8 Million People*, Wall Street Journal, February 24, 2015, *available at* http://www.wsj.com/articles/anthem-hacked-database-included-78-8-million-people-1424807364.

[7] Robert Hackett, *UCLA Health System data breach may affect millions,*" Fortune, July 17, 2015, *available at* http://fortune.com/2015/07/17/ucla-health-system-data-breach/.

[8] ITRC, *Data Breaches*, http://www.idtheftcenter.org/id-theft/data-breaches html (last visited August 8th, 2015).

2014 alone, ITRC reported 783 data breaches, involving at least 85 million records.[9]  Because

the number of records breached in approximately 38% of those incidents is "unknown," the true

number of records involved may be much higher.[10]  Moreover, these figures just represent

reported data breaches.  Analysts conclude that many data breaches go unreported.[11]

   19.    Figure 1 uses ITRC data from 2005 to 2014 to depict trends in the number of data

breaches over the last decade.  In general, as Figure 1 shows, the number of data breaches has

increased.

   Figure 1: Number of Data Breaches[12]



   20.    Data breaches may involve a variety of types of information.  One particularly

common type of data to be accessed in breaches is Social Security Numbers.  The ITRC reports

that between 2010 and 2014, 1515 data breaches, or 51% of the data breaches ITRC tracked,

involved Social Security Numbers.[13]  According to the ITRC, breaches involving Social Security

Numbers were more common than breaches involving credit card and debit card information,

---

[9] ITRC, *Data Breach Reports* at 4 (2014), *available at*
http://www.idtheftcenter.org/images/breach/DataBreachReports_2014.pdf.
[10] ITRC, *Identity Theft Resource Center Breach Report Hits Record High in 2014*,
http://www.idtheftcenter.org/ITRC-Surveys-Studies/2014databreaches html (last visited August 8th, 2015).
[11] InfoSecurity surveyed malware analysts working at US corporations, and 57% stated that they were working on
unreported data leakages.  A Baseline Magazine survey found that 79% of firms hid breaches to protect their
reputation, and that between 55 and 60% had "don't tell" policies in place concerning cyber-attacks.  Charles
Leaver, Ziften, *Data breaches under-reported: Figures may be worse than they appear,* http://ziften.com/data-
breaches-under-reported-figures-may-be-worse-than-they-appear/ (last visited August 8th, 2015).
[12] ITRC, *ITRC Breach Statistics 2005 – 2014*, http://www.idtheftcenter.org/images/breach/MultiYearStatistics.pdf
(last visited August 8th, 2015).
[13] *Id.*

which accounted for approximately 20% of all breaches during that period.[14]  Some of the largest data breaches—including the recent Anthem breach—have also involved Social Security Numbers.  Breaches involving medical information are also common.  For example, a survey conducted by Plaintiffs' expert Dr. Ponemon concluded that "[m]ore than 90 percent of healthcare organizations represented in this study had a data breach, and 40 percent had more than five data breaches over the past two years."[15]

21.     Given the rise of large data breaches, it is reasonable to conclude that most adults have had their personally identifiable information ("PII") involved in a data breach, and that many have had their data involved in more than one breach.  In 2014 alone, the research firm Javelin Strategy & Research ("Javelin") estimates that 61.8 million individuals were notified that their information was involved in a data breach.[16]  Likewise, given the large number of data breaches involving Social Security Numbers, it is reasonable to conclude that most individuals' Social Security Numbers have been part of a breach.  Indeed, Jay Jacobs, a data scientist at Verizon, "estimates [that] 60 percent to 80 percent of Social Security Numbers have been stolen by hackers."[17]

### B.     Overview of Identity Theft and Identity Fraud

22.     Research by Javelin has tracked the overall rate of identity theft or fraud over time.  For example, Javelin estimates that in 2014, 5.2% of Americans experienced some form of identity theft or fraud.[18]  As can be seen in Figure 2, there has been no clear trend or large

---

[14] *Id.*

[15] Ponemon Deposition Exhibit 9 at 1.

[16] Javelin Strategy & Research, *2015 Identity Fraud: Protecting Vulnerable Populations* at 19 (2015) (hereafter "Javelin, *2015 Identity Fraud*").

[17] Aarthi Shahani, NPR All Things Considered, *Theft Of Social Security Numbers Is Broader Than You Might Think*, June 15, 2015, 5:51 PM ET *available at* http://www.npr.org/sections/alltechconsidered/2015/06/15/414618292/theft-of-social-security-numbers-is-broader-than-you-might-think.

[18] Javelin, *2015 Identity Fraud* at 14.

variation in the rate of identity theft and fraud over the past decade. This contrasts with the general increase in the number of reported data breaches noted in Figure 1, above.



Figure 2: Rate of Identity Theft and Fraud[19]



23.     The terms identity theft and identity fraud are often used synonymously. The main types of identity theft and fraud can be broken down into a few main categories: *Existing account fraud* involves fraud conducted against an existing account, such as when a criminal obtains a victim's credit card information and uses it to fraudulently access the victim's accounts. Javelin estimates that this was by far the most common form of ID theft and fraud, accounting for between 85% to 90% of such incidents and costs in 2014.[20] *Account takeover fraud*, as the name implies, involves conduct beyond simply using account information, such as a criminal's adding themselves as an authorized user to an account or changing the mailing or account addresses. Javelin estimates that 0.63% of individuals experienced account takeover fraud in 2014.[21] *New account fraud* occurs when a criminal uses a stolen identity to open a new

---

[19] Javelin, *2015 Identity Fraud* at 14, figure 2; Javelin Strategy & Research, *2013 Identity Fraud Report (Insights Report Brochure)* (2013), *available at*
https://www.javelinstrategy.com/uploads/web_brochure/1303.R_2013IdentityFraudBrochure.pdf.
[20] Where the rate of all identity fraud and theft is reported as 5.2% in 2014, the rate for existing account fraud is 4.64%. Javelin, *2015 Identity Fraud* at 15.
[21] Javelin, *2015 Identity Fraud* at 16.

account.  Javelin found the rate for this in 2014 to be 0.29% (or about 6% of the total ID theft and fraud rate).[22]

    24.    The vast majority of incidents of identity theft do not cause any financial loss for the person whose identity was misused (although they may cause losses to other entities, such as financial institutions).  For example, the U.S. Department of Justice's study *Victims of Identity Theft* concluded that 86% of identity theft victims experienced no out-of-pocket financial losses.[23]  Likewise, Javelin's surveys have found that the "median consumer cost" due to identity fraud was $0 each year from 2009 to 2014, meaning that – *at minimum* – half of all identity fraud victims incurred no financial loss during each of those years.[24]  Further, even where loss from identity fraud does occur, victims' out-of-pocket losses are often small.  For example, the DOJ study found that of the victims "who suffered an out-of-pocket financial loss, 49% had total losses of $99 or less."[25]

        **C.**    **The Cyberattack on SPE and SPE's Provision of AllClear ID**

    25.    In November 2014, SPE was the victim of a criminal cyberattack that has been attributed by the Federal Bureau of Investigation to the North Korean government.[26]  In December 2014, SPE announced that various types of personally identifiable information concerning current and former SPE employees were obtained by the perpetrators in the cyberattack, including names, addresses, Social Security Numbers, driver's license numbers, bank account information, employment information (including compensation information), and

---

[22] *Id.*

[23] Erika Harrell, Ph.D. and Lynn Langton, *U.S. Dep't of Justice, Victims of Identity Theft, 2012* at 7 (2013), *available at* http://www.bjs.gov/content/pub/pdf/vit12.pdf  ("U.S. Dep't of Justice, *Victims of Identity Theft*, 2012").

[24] Javelin, *2015 Identity Fraud* at 14.

[25] U.S. Dep't of Justice, *Victims of Identity Theft*, 2012 at 7.

[26] The Associated Press, *FBI Director Gives New Clues Tying North Korea to Sony Hack*, New York Times, January 7, 2015 *available at* http://www.nytimes.com/aponline/2015/01/07/us/ap-us-cybersecurity-conference-sony-hack html?_r=0.

medical information.[27]  It is my understanding that files containing personal information were subsequently posted on the internet.

26.     Following the attack, SPE provided current and former employees potentially affected by the cyberattack with one year of credit monitoring services at no cost through AllClear ID.[28]  SPE offered potentially affected individuals access to both AllClear Secure and AllClear PRO.  Eligible individuals were automatically enrolled in AllClear Secure, which provides identity repair assistance.[29]  In addition, eligible individuals were able to enroll in AllClear PRO, which provides to each individual credit monitoring, a $1 million ID theft insurance policy, and other identity protection services.[30]  During the course of my work on information policy research projects over the years, I have become familiar with these products and the services they entail.

### D.     The Named Plaintiffs

27.     ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████  █████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

---

[27] Girard Decl. Ex. 4.
[28] AllClear ID, *Request Your Free Identity Protection*, https://spe.allclearid.com/ (last visited August 8th, 2015).
[29] AllClear ID, *AllClear Secure Terms of Use*, https://allclearid.com/legal/secure/ (last visited August 8th, 2015).
[30] AllClear ID, *Request Your Free Identity Protection*, https://spe.allclearid.com/ (last visited August 8th, 2015); AllClear ID, *AllClear ID Pro.*, https://www.allclearid.com/plans/pro-plan/ (last visited August 8th, 2015).
█ ██████████████████████████████████████████████████████████
████████████████████

████████████████████████████████████

████

28.     As discussed further below, the Named Plaintiffs and putative class members do not all face a similarly increased risk of harm due to the cyberattack.  Rather, there are a number of significant variations among the eight Named Plaintiffs and the putative class that render the effects of the cyberattack dependent on each class member's individual circumstances.  These include variations in: (1) the amount and particular combination of data exposed; (2) the age of the data exposed; (3) the person's demographic characteristics, such as age, income, and creditworthiness; and (4) the person's exposure to other data breaches and other sources of risk for identity fraud.  *See infra* Part V.

29.     The Named Plaintiffs also vary in terms of the costs they claim to have incurred as a result of the cyberattack.  Four of the Named Plaintiffs signed up for AllClear ID.  For example, Joshua Forster enrolled in AllClear ID, and as a result has incurred *zero* out-of-pocket costs to date.[32]  Further, he is unlikely to incur future costs as a result of the SPE cyberattack because he has also received two years of AllClear ID through the Anthem data breach.[33]  The other Named Plaintiffs have all incurred costs that they claim were a reasonable and necessary response to the SPE cyberattack—including, for example, the purchase of credit monitoring services other than those offered by SPE at no cost to the employee.  Those costs range from $45 per year (Michael Levine) to $1,028 per year (Marcela Bailey).

30.     The Named Plaintiffs do, however, have one thing in common.  As discussed below, in the nine months since the cyberattack, none of them has experienced an incident of

---

[32] Deposition of Joshua Forster at 85-88, 265 (June 22, 2015) ("Forster Deposition").
[33] Forster Deposition at 143-144.

identity fraud that either can be clearly tied to the SPE cyberattack or which caused any financial loss.

**IV.   The Cyberattack on SPE Did Not Significantly Increase the Risk of Identity Fraud Faced by Members of the Proposed Class**

31.     Plaintiffs and their expert Dr. Ponemon have not shown that the cyberattack on SPE caused a significant increase in the risk of identity theft and fraud for those whose information was exposed, relative to either the general population or to those individuals' own prior level of risk.  Indeed, as discussed below, Dr. Ponemon admitted in his deposition that he could not say whether the cyberattack on SPE caused more than even a "1 percent" increase in the risk of identity theft.[34]

32.     Although Dr. Ponemon's report focuses on the cyberattack on SPE, most of the risk of identity theft faced by members of the proposed class is likely due to a large array of other sources.  Those other sources of risk include "offline" methods for accomplishing identity fraud (such as fraud by a relative or fraud by a criminal who steals one's wallet), online targeting schemes (such as phishing attacks and malware), other data breaches in which personal information (such as Social Security Numbers) is exposed, and personal information that a person makes available online (for example, through social media).  In short, there is no basis for concluding that the SPE cyberattack, by itself, caused a significant increase in the risk of identity fraud faced by the Named Plaintiffs and proposed class.  Nor is there any basis for concluding that *any* increase in the risk faced by the Named Plaintiffs and proposed class is uniform across the class.

---

[34] Deposition of Larry Ponemon at 148 (Aug. 6, 2015) ("Ponemon Deposition").

### A. Dr. Ponemon Has Not Shown that the Cyberattack on SPE Caused a Significant Increase in the Risk of Identity Theft

33.     At the outset, it is important to emphasize how limited Dr. Ponemon's opinion in this case is.  Dr. Ponemon states in his report "that all SPE data breach victims have experienced and will continue to experience an increase in exposure to identity theft crimes."[35]  However, his report is vague about the extent of that "increase" in risk.  In his deposition, Dr. Ponemon acknowledged that he does not believe that every class member "will suffer an identity theft crime."[36] He also admitted that he does not know "how likely the eight named plaintiffs were to be victims of identity fraud *before* the SPE cyber attack happened."[37] And he acknowledged that he is unable to say *how much* of an increased risk of identity theft the cyberattack on SPE caused for the Named Plaintiffs:  "What we don't know is the rate of increase.  Is it a 1 percent chance, a 10 percent, that is not known to me as a researcher…."[38]  Nor was he able to say how much the risk of identity theft increased for the whole class.

34.     Similarly, Dr. Ponemon claims in his report that putative class members will face increased risks "over a very long time horizon."[39] However, in his deposition, Dr. Ponemon was unable to estimate with any level of precision how many class members might experience identity theft more than one year after the cyberattack (*i.e.*, after the free AllClear ID provided by SPE expires).  He stated that "I don't know what that percentage is,"[40] and further admitted, based on an assumption of a class size of 15,000, that the number of class members who experience identity theft after more than one year "could" only be "15 out of 15,000."[41]

---

[35] Expert Report of Larry Ponemon ¶ 37 (June 30, 2015) ("Ponemon Rpt.").
[36] Deposition of Larry Ponemon at 115 (Aug. 6, 2015) ("Ponemon Deposition").
[37] Ponemon Deposition at 146-47 (emphasis added).
[38] Ponemon Deposition at 148.
[39] Ponemon Rpt. ¶ 37.
[40] Ponemon Deposition at 210.
[41] *Id.*

14

35.     In addition, Dr. Ponemon admitted that any increase in risk would vary, and that he expected "some people to have a greater risk, some people to have a … smaller risk."[42] In light of these statements, it is clear that Dr. Ponemon has not shown that the cyberattack on SPE caused a significant increase in risk of identity theft or identity fraud for all of the Named Plaintiffs or for the putative class.  As I discuss further below, there are numerous reasons to believe that the risks of identity fraud faced by the proposed class did not increase by a significant amount.

### B.    Dr. Ponemon Overstates the Connection Between Data Breaches and Identity Fraud

36.     Dr. Ponemon also opines that as a general matter "data breach victims face an increased risk of identity theft."[43]  The sole published source he relies on in his report to support that statement is Javelin's report *2015 Identity Fraud: Protecting Vulnerable Populations*.  As discussed below, Dr. Ponemon essentially disavowed his reliance on Javelin's research at his deposition.  As an initial matter, however, it bears emphasis that even if Javelin's report is credited, it indicates that the vast majority of data breach victims *do not* experience identity theft as a result of the breach.  Specifically, Javelin found that "the fraud incidence among notified data breach victims was at 13.7%" in 2014.[44]  Thus, over 86% of those who received data breach notifications did not experience *any* fraud.  Further, as noted above, a large portion of those who do experience identity fraud incur no financial loss as a result.[45]  Thus, even crediting Javelin's analysis, *the vast majority of proposed class members are highly unlikely to experience identity fraud or any financial loss as a result of the SPE cyberattack.*

---

[42] Ponemon Deposition at 150.
[43] Ponemon Rpt. ¶ 24.
[44] Javelin, *2015 Identity Fraud* at 33.
[45] *See supra* III.B.

37.     Dr. Ponemon's report points to Javelin's statement, based on a survey that it conducted, that "[r]ecipients of a data breach letter are at least 10 times more likely to become an identity fraud victim than those who haven't received a letter."[46]  However, in his deposition, Dr. Ponemon acknowledged that Javelin's analysis could not be applied to the SPE cyberattack because Javelin's focus is on "consumer oriented" data breaches (such as the Target breach).[47]  Further, Dr. Ponemon admitted that Javelin only found a "*correlation*" between receipt of a data breach letter and a survey response regarding identity fraud, and that it did not conclude data breaches *cause* a significant increase in identity theft.[48]  Dr. Ponemon testified that determining whether Javelin's correlation finding is evidence of causation would be "very complicated" and would potentially require "mathematical and regression techniques" that he has not applied.[49]

38.     Distinguishing correlation from causation is particularly important when considering Javelin's survey results because it is likely that identity fraud victims are more likely to remember receiving a data breach notification letter.  This is sometimes referred to as *Recall Bias*.[50]  Such bias is particularly likely if media sensationalizes the dangers from data breaches and exaggerates links to identify theft and fraud.  A person who did not suffer an identity fraud may not have the same reason to remember a letter they received several months or years previously (or to ask a spouse whether he or she may have received such a letter).

39.     There are a number of additional reasons to be skeptical of Dr. Ponemon's (now disclaimed) reliance on Javelin's 2015 report.  First, Javelin's finding in 2015 of a correlation between identity theft and data breaches runs counter to prior findings.  In 2009, a report published by Javelin noted that:

---

[46] Javelin, *2015 Identity Fraud* at 10.
[47] Ponemon Deposition at 299, 304-05.
[48] Ponemon Deposition at 243-44.
[49] Ponemon Deposition at 240.
[50] *See* E. Hassan, *Recall Bias can be a Threat to Retrospective and Prospective Research Designs*, The Internet Journal of Epidemiology, Vol. 3, No. 2 (2005), *available at* http://ispub.com/IJE/3/2/13060#.

Despite the hefty blame – largely perpetuated by the media – placed on the Internet and cyber-crime, online identity theft methods (phishing, hacking and malware) only accounted for 11% of fraud cases in 2008.  The truth is, most known cases of fraud occur through traditional methods, when a criminal has direct, physical access to the victim's information.  These instances include stolen and lost wallets, checkbooks, or credit cards, or even through the simple act of a criminal surreptitiously eavesdropping into your conversation as you make a purchase.  "Friendly theft," reported by 13% of victims, occurs when friends, family or in-home employees take your private data and use it without your permission for their personal gain.[51]

Javelin's survey of victims who knew how their information was accessed found that only 11% reported that the data came from a business data breach.[52]

40.     Similarly, a 2012 study by Travelers Insurance found that "offline methods are the top known causes of identity fraud."[53]  Based on its claims data, Travelers found that 73 percent of identity fraud was due to "burglary, stolen wallets and pilfered identifications," and an additional 12 percent was due to forgery or postal fraud.[54]  Travelers attributed 15 percent of identity fraud to "online or data breach" sources; thus, this 15 percent includes both data breaches and personal online activity by the consumer.[55]  Unlike Javelin, whose research has been sponsored by credit monitoring companies like LifeLock, which have an interest in portraying the threat of data breaches as significant,[56] insurance companies that cover losses associated with identity fraud have a clear interest in understanding the sources of fraud.

41.     Further, while the incidence of reported data breaches and the number of records breached has *risen* significantly since 2012, there has been virtually no change in the overall

---

[51] Javelin Strategy and Research, *2009 Identity Fraud Survey Report: Consumer Version* at 6-7, February 2009, *available at* https://www.javelinstrategy.com/uploads/files/901.R_Identity_Fraud_Survey_Consumer_Report.pdf.
[52] *Id.*, Figure 2.
[53] Travelers, *73% of identity fraud cases resulted from stolen personal items*, http://investor.travelers.com/Mobile/file.aspx?IID=4055530&FID=15508447 (last visited August 8th, 2015).
[54] *Id.*
[55] *Id.*
[56] Javelin, *2015 Identity Fraud* at 1.

incidence of identity theft and fraud (other than a slight decline).[57]  That trend is inconsistent with Dr. Ponemon's suggestion that data breaches significantly increase the risk of identity fraud for those whose personal information is exposed.

42.    Previous studies also question whether there is a strong link between data breaches and identify theft.  In a 2009 paper, Cate et al. note that the ChoicePoint data breach, which involved such information as names, Social Security Numbers, driver's license numbers, dates of birth, and the like, ultimately resulted in only 131 of the 163,000 individuals involved in the data breach—less than one tenth of one percent—presenting valid claims of identity fraud losses from a redress fund.[58]  This does not suggest an elevated rate of identity fraud relative to the general population.  Three years after that data breach, over 97% of a redress fund that was set up set up to compensate identify theft victims was unused and transferred to the US Treasury.[59]  Similarly, a 2007 report by the Government Accountability Office notes that federal law enforcement have questioned the connection between data breaches and identity fraud.  The report found that "of 24 very large breaches we reviewed, 3 appeared to have resulted in fraud on existing accounts and 1 in the unauthorized creation of new accounts."[60]

43.    To further test the connection between identity fraud and data breaches, I have also conducted a regression analysis.  In this model, the variable to be determined (dependent variable) was the annual number of identity theft and fraud victims (from Javelin data) from

---

[57] Javelin, *2015 Identity Fraud* at 14; Identity Theft Resource Center, *Identity Theft Resource Center Breach Report Hits Record High in 2014, available at* http://www.idtheftcenter.org/ITRC-Surveys-Studies/2014databreaches.html (last visited August 8th, 2015); Statista, Annual number of data breaches and exposed records in the United States from 2005 to 2014, http://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/ (last visited August 8th, 2015) (citing ITRC data).
[58] Cate, et al, Maurer School of Law: Indiana University, *Dos and Don'ts of Data Breach and Information Security Policy* at 2 (2009), *available at*
http://www.repository.law.indiana.edu/cgi/viewcontent.cgi?article=1234&context=facpub.
[59] *Id.*
[60] Government Accountability Office, *Personal Information: Data Breaches Are Frequent, But Evidence Of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* at 21 (2007), *available at* http://www.gao.gov/new.items/d07737.pdf.

2005 to 2014.[61]  The independent variable, or variable used to determine the number of identity theft and fraud victims was the annual number of breached records (ITRC data).[62]  No statistically significant relationship between the annual number of identity theft and fraud victims and the annual number of breached records was found.  While the small number of observations, only 10 years of data points, would be insufficient to identify a minor relationship between the two variables, it is sufficient to establish that there is not a large and significant causal relationship between occurrences of breached records and identity theft and fraud.[63]

44.     In short, the available evidence does not indicate that an individual data breach—such as the cyberattack on SPE—is likely to cause a significant increase in the risk of identity fraud for those whose information is exposed.

### C.     Dr. Ponemon Overstates the Value of Social Security Numbers and Dates of Birth to an Identity Thief

45.     Dr. Ponemon also claims that "[t]he type of PII exposed in this incident is even more sensitive and valuable to data thieves than that exposed in many consumer breaches, making identity fraud even more likely here."[64]  As an initial matter, I note that much of the personal information exposed in the cyberattack—such as old employment information regarding employees' former job titles or previous salaries—has essentially no value to a would-be identity thief.  Dr. Ponemon largely ignores such information, and instead focuses on the risks posed by the exposure of Social Security Numbers and dates of birth.  He claims that those whose Social Security Numbers and dates of birth are exposed in a data breach "experience a much higher

---

[61] Javelin, *2015 Identity Fraud* at 14.
[62] Statista, Annual number of data breaches and exposed records in the United States from 2005 to 2014, http://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/ (last visited August 8th, 2015) (citing ITRC data).
[63] While the available data is far from perfect, this exercise demonstrates that with the data that *is* available, I was not able to determine a basic statistical relationship between total number of breached records and total occurrences of identity theft and fraud.
[64] Ponemon Rpt. ¶ 25.

likelihood of becoming a victim of an identity theft crime."[65]  But Dr. Ponemon does not substantiate this claim with any reliable evidence.

46.   At his deposition, Dr. Ponemon acknowledged that he is not aware of any studies measuring the likelihood of identity theft for those whose Social Security Numbers and dates of birth were stolen,[66] or studies measuring "what data elements are most valuable to a cyber criminal."[67]  Dr. Ponemon also acknowledged that there are "many data breaches" involving the exposure Social Security Numbers and dates of birth, yet he was unable to identify a single example of a data breach involving those two pieces of information that actually resulted in a higher likelihood of identity theft.[68]

47.



---

[65] Id.
[66] Ponemon Deposition at 254.
[67] Ponemon Deposition at 259.
[68] Ponemon Deposition at 259-60.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ ████████████████████████████████

████████████████████████████████████████████

████████████████████████

48.　　Another indication that Social Security Numbers do not pose the dramatically heightened risk suggested by Dr. Ponemon is the actual price for those numbers on the black market.  Prices for stolen or breached data on the black market reveal information about demand (*i.e.*, how valuable stolen data is to potential identity thieves) as well as supply.  One 2011 study reported by the federal National Counterintelligence and Security Center concluded that the black market value of a Social Security Number is only $3.[73]  By comparison, the study found that a mother's maiden name cost $6, a "mag-stripe data from a 'secure' premium-level credit card" cost $80, and the name and password for an online bank account cost $1,000.[74]  As this comparison suggests, a Social Security Number alone is far less useful to an identity thief than Dr. Ponemon claims.  Unlike complete credit card or bank account data, a Social Security Number by itself cannot be used to purchase things or transfer monies.

49.　　Further, ongoing improvements in the technology used to detect identity fraud also undermine Dr. Ponemon's claim about the unique risk posed by the exposure of a Social Security Number and date of birth.  The financial services industry, and more recently the health care and government tax authorities, have made massive investments in sophisticated identity

---

[72] Government Accountability Office, Social Security Numbers: Governments Could Do More to Reduce Display on Public Records And On Identity Cards, at 6 (2004), *available at* http://www.gao.gov/assets/250/244719.pdf.

[73] Office of the Director of National Intelligence, National Counterintelligence and Security Center, *How Much Do You Cost On the Black Market?*, http://www.ncsc.gov/issues/cyber/identity_theft.php (last visited August 8th, 2015) (citing June 2011 study by *Consumer Reports*).

[74] *Id.*

verification and authentication products.  For example, Experian's Precise ID and FraudNet platform screens credit applications against multiple data sources and then highlights anomalies for further investigation.  These tools check a range of variables—including number of devices, IP addresses, street addresses, phone numbers, and Social Security Numbers associated with a name; whether the information provided on the application matches known current information; whether the information on the application or the device have been associated with past fraudulent activities—and generates a fraud risk score.[75]  Another new authentication technique is the use of  so-called knowledge-based authentication (KBA), in which a consumer is asked a number of "out of wallet" questions that do not rely on information that is generally publicly available (*e.g.*, "What is the name of your first school?").[76]  These new techniques greatly minimize the usefulness of generally available personal information, such as a name, address, date of birth, or Social Security Number.

### D.     Dr. Ponemon Fails to Consider Other Sources of Risk Beyond the SPE Cyberattack

50.     Dr. Ponemon's report also fails to assess any sources of risk of identity fraud aside from the cyberattack on SPE.  Yet the Named Plaintiffs and putative class face numerous other sources of risk for identity fraud, as Dr. Ponemon acknowledged in his deposition.  Accordingly, he has not shown that the SPE cyberattack significantly increased the risk of identity fraud faced by the Named Plaintiffs and proposed class relative to either the general population or to the risks they would have faced in the absence of the cyberattack.

---

[75] Experian, *Experian Launches Platform to Manage Cross-Channel Fraud Risk: Precise ID with FraudNet Provides a Single View of a Consumer's Identity Across Devices*, http://www.the41.com/buzz/announcements/experian-launches-platform-manage-cross-channel-fraud-risk (last visited August 8th, 2015).
[76] Monica Pearson, *FFIEC Authentication Guidance: The Case for Knowledge-based Authentication*, Experian MicroAnalytics. Oct. 17, 2011, *available at* https://www.experian.com/assets/regulatory-compliance/decision-analytics/articles/ffiec-knowledge-based.pdf.

51.     With respect to the risks faced by the general population, Dr. Ponemon's report ignores evidence that a large portion of the population is already exposed to the risk of identity fraud due to other sources, such as other data breaches or widespread availability of Social Security Numbers discussed above.  Dr. Ponemon likewise makes no effort to consider the risks of identity fraud that the Named Plaintiffs or other class members face relative to their own prior levels of risk.  For example, his report does not consider whether any class members were *already* at a heightened risk of identity theft due to other causes, such as other data breaches or other sources of risk.  However, at his deposition, Dr. Ponemon stated that "an individual could … experience many data breaches,"[77] and that he believes "some percentage" of the SPE class will have already "experienced a data breach involving their loss of SSNs."[78]  He also acknowledged that phishing and malware attacks are "incredibly common."[79]

52.     Dr. Ponemon also testified that in "today's day and age" of numerous data breaches it would be "prudent" for everyone to have identity monitoring,[80] which suggests that class members *already* needed identity monitoring (the remedy they seek in this case) even before the cyberattack on SPE.  Further, as discussed above, Dr. Ponemon does not attempt to assess the *portion* of any Named Plaintiff's risk of identity fraud attributable to the cyberattack on SPE, leaving open the possibility that that risk was due largely or almost entirely to other sources.  Nor does he show how one could determine the portion of the risk of fraud attributable to the cyberattack on SPE for all of the thousands of members of the proposed class without examining the particular circumstances of each of those class members.

---

[77] Ponemon Deposition at 185-86.
[78] Ponemon Deposition at 276.
[79] Ponemon Deposition at 81-82, 87-88.
[80] Ponemon Deposition at 217, 219.

53.     It appears that Dr. Ponemon may have disregarded these alternative sources of
risk because SPE's records were posted "on the public Internet,"[81] thus, in his apparent view,
differentiating the cyberattack on SPE from other data breaches.  However, if that is the case, he
provides no justification for that methodological decision.  Stolen information is regularly posted
on publicly accessible sites such as Pastebin (a site on which stolen SPE data was temporarily
posted).[82]  Further, Dr. Ponemon himself has testified in another data breach case that the theft of
personal information causes an increased risk of identity theft even where there is no evidence
that stolen records were ever posted on the public internet, because "[a] black market exists for
sensitive personal data."[83]  Hackers often share stolen information on so-called "black market"
web sites such as AlphaBay, which (while not the "public" internet) are underground
marketplaces in which stolen information is traded.[84]  In short, Dr. Ponemon provides no reason
to believe that the cyberattack on SPE raises unique risks distinguishing it from other data
breaches.

54.     As discussed further below, assessing these alternative sources of risk is essential
to determining whether it was reasonable and necessary for any individual class members to
purchase identity theft protection in response to the SPE cyberattack.

**V.     The Risk of Identity Fraud Arising From the SPE Cyberattack Will Vary Across
         the Class Depending on a Wide Range of Factors**

55.     In his expert report, Dr. Ponemon asserts that the SPE cyberattack "uniformly
affect[ed]" every current and former SPE employee whose personal information was exposed in

---

[81] Ponemon Rpt. ¶ 30.
[82] Lenny Zeltser, *The Use of Pastebin for Sharing Stolen Data*, https://zeltser.com/pastebin-used-for-sharing-stolen-data/ (last visited August 8th, 2015).
[83] *Ruiz v. Gap, Inc.*, Case No. CV07-05739-SC (N.D. Cal.), Declaration of Dr. Larry Ponemon, Dkt. No. 105-14 (Feb. 27, 2009), at 3.
[84] Jay McGregor, *The Top 5 Most Brutal Cyberattacks of 2014 So Far*, Forbes, July 28, 2014, *available at* http://www.forbes.com/sites/jaymcgregor/2014/07/28/the-top-5-most-brutal-cyber-attacks-of-2014-so-far/; Robert Hackett, *Stolen Uber User Logins Are For Sale on the Dark Web: Only $1 Each*, Fortune, Mar. 30, 2015, *available at* http://fortune.com/2015/03/30/uber-stolen-account-credentials-alphabay/.

the cyberattack."[85]  At his deposition, however, Dr. Ponemon clarified that it is *not* his opinion that all class members experienced that *the same* increase in risk as a result of the cyberattack. Rather, he testified that class members face "different likelihoods of … the materiality of risk" depending on factors such as the amount of information exposed.[86]  As he elaborated:

> You know, it – it's my belief that a person has certain characteristics, having, for example, been a victim of a prior data breach, having-- not having identi[t]y protection services, just having maybe more money in their bank account, it could be a whole bunch of variables, that they are more likely to experience an identity theft crime, or less likely in some cases.[87]

56.     I agree that whether the cyberattack on SPE exposed the Named Plaintiffs to an increased risk of identity fraud relative to their risks had the cyberattack not occurred or to the risks of the public at large will vary depending on each Plaintiffs' particular circumstances.  The same will likely be true of the thousands of other class members of the proposed class.

### A.     Variation in the Amount and Combination of Information Exposed

57.     First, the amount and particular combination of personal identifying information varies significantly across the Named Plaintiffs.  Indeed, each of the eight Named Plaintiffs asserts that a different combination of information was exposed.[88]  Christina Mathis claims only that her name, Social Security Number, and a former address were disclosed.[89]  However, Social Security Numbers are already widely available.[90]  And a Social Security Number combined with a single piece of additional information—an old address—is unlikely to be of use to an identity thief, because more information is generally required to access or open an account.  Thus, even assuming her Social Security Number was disclosed, Ms. Mathis likely faces little, if any,

---

[85] Ponemon Rpt. ¶ 18.
[86] Ponemon Deposition at 160-61.
[87] Ponemon Deposition at 151.
[88] I summarize these combinations in Appendix A.
[89] Plaintiffs' Interrogatory Responses at 36; Deposition of Christina Laverne Mathis at 53, 105, 383 (June 19, 2015) ("Mathis Deposition").
[90] *See supra* note 72.

increased risk of identity fraud relative either to the general population or to the level of risk she faced prior to the cyberattack.

58.     Other Named Plaintiffs claim that additional personal information was disclosed, yielding numerous variations.  Steven Shapiro claims that he has verified that his full name, Social Security Number, former address, bank account and routing numbers, and SPE employment information (including his salary), were all exposed.[91]  By contrast, Michael Corona asserts that a different combination of information was disclosed—a combination that does not include his bank account information or driver's license, but does include his date of birth (which Shapiro does not claim was disclosed).[92]  Ella Archibeque asserts yet another combination—her combination includes her driver's license and date of birth, but only includes information about a former (not current) bank account.[93]  The remaining Named Plaintiffs present still other variations, which are summarized in Appendix A of my report.

59.     Each of these combinations entails a different potential risk of identity theft.  As Dr. Ponemon stated at his deposition, for an identity thief "the more [information] you have, the better the quality of the attack," and "the more likely the [thief] will take over an account."[94]  In his report, however, Dr. Ponemon does not acknowledge the variations in different amounts and combinations of data exposed among the Named Plaintiffs, much less consider how they affect each Named Plaintiff's potential risk of identity theft.  Further, in his deposition he stated that to "do a really thorough analysis" of the risks faced by all class members he would need to consider "what categories of information w[ere] stolen as to each of" them.[95]

---

[91] Plaintiffs' Interrogatory Responses at 16-17; Deposition of Steven Sandor Shapiro at 15-16, 25 (June 18, 2015) ("Shapiro Deposition").
[92] Deposition of Michael Corona at 44-45, 76, 93-94, 101, 107-08, 169 (June 24, 2015) ("Corona Deposition").
[93] Plaintiffs' Interrogatory Responses at 11; Deposition of Ella Carline Archibeque at 15-16 (June 16, 2015) ("Archibeque Deposition").
[94] Ponemon Deposition at 160.
[95] Ponemon Deposition at 301.

60.     Research on identity fraud and the black market for personal information provides further evidence of this variation in risk.  For example, on the black market, different types of personal information have different prices, indicating that data sellers and illegal data buyers themselves recognize that some types of personal information are considerably more valuable than others.[96]  Research on the black markets for stolen data also shows that different combinations of data are considered different products, sold under different names, and command different prices.[97]

61.     In short, any increased risk created by the cyberattack will vary significantly depending on the amount and particular combination of information that was exposed.

**B.     Variation in the Age of the Data Exposed**

62.     The age of the data exposed in the cyberattack also varies.  Such variation is significant because stale information in general is less useful than current information.[98]  Indeed, Plaintiffs' expert Dr. Fishkind acknowledged in his deposition that "some pieces of information age and are less valuable," and that the exposure of an old address is not "as problematic as a new address."[99]  On this point, Dr. Fishkind is correct:  The exposure of former address information poses less risk, because current addresses are generally more significant for authenticating an identity than former addresses.  This has significant implications for the risks faced by the Named Plaintiffs: certain Plaintiffs (such as Marcela Bailey) claim that their current home addresses were exposed, whereas other Plaintiffs (such as Geoffrey Springer) only claim

---

[96] *See supra* ¶ 48 & note 73.
[97] Thomas J. Holt and Olga Smirnova,  U.S. Dep't of Justice, *Examining the Structure, Organization, and Processes of the International Market for Stolen Data,* at 55 (March 2014), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/245375.pdf (as of March 2014, identity documents and information are worth one tenth of information such as bank account numbers).
[98] *Id.* at 20 (hackers have a "short window of time" to use data obtained).
[99] Deposition of Henry H. Fishkind at 219 (July 28, 2015) ("Fishkind Deposition").

that old address information was exposed.  These variations among the Named Plaintiffs are summarized in Appendix A of my report.  Similar variations can be expected across the class.

63.     Many other types of information exposed in the breach—such as bank account information, telephone numbers, salary information, and driver's license information—may likewise become stale.  For example, as noted above, Michael Corona asserts that his current bank account information was exposed, whereas Ella Archibeque claims that only a former bank account was exposed.[100]  (Some of the other Named Plaintiffs do not claim that any bank account information was exposed.)  Further, it is generally not possible to determine from the face of the documents exposed in the breach whether the information that was exposed in the cyberattack is current or stale (particularly for former employees).  Rather, determining whether the particular information exposed in the breach was current or stale would require individual inquiries for each of the thousands of members of the proposed class.

64.     Thus, different class members face different risks depending on the age of the data exposed in the cyberattack.

### C.     Variation Based on Demographic Characteristics

65.     The risks posed by the SPE breach vary depending on individual class members' demographic characteristics.  Again, Dr. Ponemon agrees, testifying that the risk of identity theft may vary depending on "a person's age, education, gender, household income and other demographic variables."[101]  The U.S. Department of Justice's *Victims of Identity Theft* study found significant variations in the rate of identity fraud depending on an individual's income.  For example, the Department of Justice found that individuals in households with over $75,000 in annual income experienced identity theft at twice the rate individuals with less than $25,000 in

---

[100] Archibeque Deposition at 15-16, 54.
[101] Ponemon Deposition at 128-29.

annual income (10% vs. 4.9% over past 12 months).[102]  It also found that different age groups experience identity fraud at different rates.  For instance, those ages 35 to 49 experienced identity theft at a rate two-thirds higher than those who are 18 to 24 or 65 or older (8.0% vs. 5.0% over past 12 months).[103]

66.



67.    As this example demonstrates, there will likely be considerable variation in the credit and economic profiles of members of the proposed class, and thus variation in the extent to which the cyberattack may place class members at an increased risk of successful identity fraud, relative either to their pre-breach position or to the population as a whole.

---

[102] Erika Harrell, Ph.D. and Lynn Langton, *U.S. Dep't of Justice, Victims of Identity Theft, 2012* at 3 (2013), *available at* http://www.bjs.gov/content/pub/pdf/vit12.pdf ("U.S. Dep't of Justice, *Victims of Identity Theft*, 2012").
[103] *Id.*

### D.      Variation Based on Other Sources of Risk

68.      The relative increase in risk of identity theft and fraud caused by the SPE cyberattack will also vary depending on each class member's exposure to other sources of risk. Those other sources of risk can take a variety of forms.

69.      For example, the risks posed by other data breaches will vary across the class depending on whether a class member's information was exposed in other data breaches, and if so, what particular information was exposed.  Dr. Ponemon's report makes no attempt to assess the relative risk posed by other data breaches as compared to the cyberattack, and simply ignores the fact that seven of the eight Named Plaintiffs have acknowledged being exposed to other data breaches.  However, Dr. Ponemon acknowledged at his deposition that  "an individual could … experience many data breaches,"[106] and that an individual's risk of identity theft could depend on "a whole bunch of variables," including having been "a victim of a prior data breach."[107]  As a result, as he noted, some class members "are more likely to experience an identity theft crime," while others are "less likely."[108]

70.      ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████

---

[106] Ponemon Deposition at 185-86.
[107] Ponemon Deposition at 151.
[108] *Id.*



71.     It is worth noting that Table 1 only includes data breaches to which the Named Plaintiffs know they were exposed (because, for example, they remembered receiving a breach notification letter).  Table 1 likely undercounts the number of other data breaches in which the Named Plaintiffs' personal information has been exposed, because each of the Named Plaintiffs has acknowledged providing personal information to a number of other entities that have experienced data breaches.[125]



72.

73.

---

[125] Plaintiffs' Interrogatory Responses at 30 (Corona),31 (Mathis and Forster), 31-32 (Archibeque), 32 (Levine, Springer, and Bailey), 32-33 (Shapiro); Archibeque Deposition at 100-130; Bailey Deposition at 168-174; Shapiro Deposition at 141-161; Levine Deposition at 138-164; Forster Deposition at 211-225; Corona Deposition at 305-33; Mathis Deposition at 135-88; Springer Deposition at 196-200, 206-211.



74.

75.

76.     Indeed, Dr. Ponemon even suggested at his deposition that it's "possible" that a person actually experienced "a decrease" in risk following a data breach if, for example, they then "become more mindful of privacy."[133]   As he noted, some people are "compla[ce]nt" about privacy—they just "don't care about privacy."[134]   But in his view it's possible that a data breach may cause certain individuals to become more "privacy sensitive," and therefore at less risk.[135]

## VI.   Plaintiffs Have Not Shown The Reasonableness of Purchasing Identity Protection Beyond What SPE Has Already Provided

77.     As noted above, SPE provided one year of credit monitoring and identity protection services through AllClear ID to all current and former employees potentially affected by the cyberattack at no cost, including both AllClear Secure and AllClear PRO.[136]   The AllClear PRO service includes credit monitoring and identity theft monitoring, which are likely to detect any instances of misuse of personal information, such as attempts to open a new account in a class member's name.   The AllClear PRO product also includes a $1 million identity theft insurance policy, which covers identity restoration costs, legal expenses associated with identity fraud, lost wages due to identity fraud, and other costs.[137]   In my opinion, SPE's decision to provide AllClear ID for one year was a reasonable response to the cyberattack in light of any risks that may have been created by the cyberattack.   Further, the decision of certain of the Named Plaintiffs to decline to sign up for AllClear PRO and instead spend money on alternative credit monitoring services—such as LifeLock—was neither necessary nor reasonable.

---

[133] Ponemon Deposition at 154-55.
[134] Ponemon Deposition at 155.
[135] *Id.*
[136] *See supra* note 29-30.
[137] AllClear ID, *AllClear ID Pro.*, https://www.allclearid.com/plans/pro-plan/ (last visited August 8th, 2015).  This insurance plan is subject to certain terms and conditions described on AllClear's website.  *See* AllClear ID, Description of Benefits for the Personal Internet & Identity Theft Insurance Coverage Master Policy, https://www.allclearid.com/legal/insurance (last visited August 8th, 2015).

A.     **SPE's Provision of One Year of Credit Monitoring was a Reasonable Response to the Data Breach**

78.     Dr. Ponemon provides no reliable evidence to support his assertion that cyber criminals often wait years to use stolen information, and admitted in his deposition that he is unaware of any "research studies" addressing the frequency of identity theft more than one year following a data breach.[138]  Instead, he indicated that criminals waiting to use information was "like one of those things that you hear.  You just assume it to be true."[139]  However, contrary to these claims by Dr. Ponemon, even if the cyberattack did increase the risk of identity theft for some class members—and as discussed above there is little reliable evidence suggesting that it did—the duration of that risk is likely to be quite limited.

79.     As noted above, much of the information exposed in the cyberattack (such as address information and bank account information) is already outdated.  With the passage of time, the information exposed will become increasingly so.  Further, it is reasonable to infer that identity thieves will have already tried to rapidly exploit personal information in the immediate wake of the cyberattack and that their attempts will stop or significantly diminish given the publicity surrounding the cyberattack and the continuing development of technologies that are increasingly effective at detecting attempts at identity fraud.  In addition, once it occurs, most identity fraud is detected quickly.  As Dr. Fishkind notes, based on Javelin data, that for all identity fraud the average time prior to discovery of the fraud was 37 days.[140]

80.     Further, while providing credit monitoring is a common response to a data breach, and the best protection that a third party like SPE can provide, there are a number of other protective measures that individuals can employ at no cost to themselves and with minimal

---

[138] Ponemon Deposition at 205.
[139] Ponemon Deposition at 202.
[140] Expert Report of Henry H. Fishkind ¶ 33 (June 30, 2015) ("Fishkind Rpt.").

effort.  For example, under federal law, individuals can place "fraud alerts" on their credit files at no cost.  If a fraud alert is placed with one of the three national credit reporting bureaus, that bureau is required to notify the other two bureaus, which must then also establish fraud alerts.[141] Initial fraud alerts remain in place for 90 days, and can be renewed.[142]  During that period, a business must take steps to verify an individual's identity (such as calling the individual) before it issues credit, which makes it more difficult for an identity thief to accomplish new account fraud.[143]  It is possible to sign up for and remove a fraud alert online.  Transunion's website, for example, states that doing so is "easy."[144]  Further, under federal law, victims of identity theft may obtain an extended fraud alert lasting 7 years by providing the credit bureau an identity theft report (which can, for example, be a printed copy of a complaint the victim filed on the FTC's website).[145]

81.     Individuals also have the right under federal law to obtain a free copy of their credit reports on an annual basis.[146]  Individuals are also entitled to a free copy of each of their credit reports when they place a fraud alert or when they are denied credit.[147]  Credit reports can be easily accessed online.[148]  Monitoring a credit report regularly is an effective way to detect forms of identity theft such as new account fraud.

82.     Individuals may also monitor their existing financial accounts at no cost.  With the rise of online banking it is increasingly easy to do so.  For example, many financial institutions allow individuals to establish automated alerts for large purchases or for cash

---

[141] 15 U.S.C. § 1681c-1.
[142] 15 U.S.C. § 1681c-1(a)(1)(B).
[143] 15 U.S.C. § 1681c-1(h).
[144] TransUnion, *Fraud Alerts*, https://www.transunion.com/fraud?tab=typesoffraud (last visited August 8th, 2015).
[145] 15 U.S.C. § 1681c-1(b).
[146] 15 U.S.C. § 1681j (2015).
[147] *Id.* (b)-(d) (2015).
[148] *See* Annual Credit Report, *available at* https://www.annualcreditreport.com/index.action (last visited August 8th, 2015).

withdrawals.[149]  In addition, financial institutions themselves increasingly devote resources to detecting and stopping identity fraud, because financial institutions (rather than consumers) bear most of the costs of identity fraud.[150]

83.     Accordingly, even if Dr. Ponemon were correct that any increased risk of identity fraud could last longer than one year (which is, as discussed, highly doubtful), there would be steps that the Named Plaintiffs and putative class members could take to mitigate that risk at no cost to themselves and with a minimum of effort.

**B.     Plaintiffs' Experts Provide No Basis for Their Opinion that Purchasing Additional Identity Protection Is Necessary**

84.     Notwithstanding these considerations, Plaintiffs' experts Dr. Ponemon and Dr. Fishkind opine that it was reasonable and necessary for the Named Plaintiffs to purchase additional identity protection.[151]  There are several flaws with their opinions.

85.     *First*, Plaintiffs' experts provide no basis to conclude that it was necessary in the first year after the breach for class members to purchase credit monitoring products like LifeLock rather than enroll in the free protection provided by SPE through AllClear ID. Notably, the expert that Plaintiffs put forward on the risks of data breaches—Dr. Ponemon— testified in his deposition that he is "not offering an opinion" that it was "reasonable to purchase another ID theft monitoring service" instead of enrolling in AllClear ID.[152]  Further, Dr. Ponemon conceded that he is "not sure how [AllClear] compares to LifeLock."[153]  Dr. Fishkind does claim that it was reasonable for Plaintiffs to incur costs on other credit monitoring services,

---

[149] *See, e.g.*, Bank of America, *Track Your Finances with Online Banking Alerts*, *available at* https://www.bankofamerica.com/onlinebanking/education/online-banking-alerts.go (last visited August 8th, 2015).
[150] Federal law limits consumers' liability for unauthorized use of credit and debit cards.  *See* Federal Trade Commission, *Lost or Stolen Credit, ATM, and Debit Cards*, available at http://www.consumer ftc.gov/articles/0213-lost-or-stolen-credit-atm-and-debit-cards (last visited August 8th, 2015).  In addition, many financial institutions provide reimbursements for unauthorized charges beyond what is required by federal law.  Laura Gerstner, *What's Your Liability With Debit, Credit and Prepaid Cards*, Kiplinger, August 2013, *available at* http://www.kiplinger.com/article/credit/T016-C000-S002-liability-with-debit-credit-prepaid-cards html.
[151] Fishkind Rpt.¶ 48; Ponemon Rpt. ¶ 22.
[152] Ponemon Deposition at 191.
[153] Ponemon Deposition at 189.

stating that "many Plaintiffs reported that they felt compelled to purchase credit monitoring/identity theft protection services which exceeded the AllClear ID service provided for free."[154]  However, even he conceded at his deposition that he does not consider other services such as LifeLock to provide greater protection than AllClear ID.[155]

86.     Moreover, these individual choices may have been based on marketing, advertising, or even over-claiming by other identity protection services.  For example, in July 2015, the FTC charged that LifeLock "violated a 2010 settlement with the agency and 35 state attorneys general by continuing to make deceptive claims about its identity theft protection services, and by failing to take steps required to protect its users' data." [156]  In particular, LifeLock "falsely claimed it protected consumers' identity 24/7/365 by providing alerts 'as soon as' it received any indication there was a problem," and failed "to establish and maintain a comprehensive information security program to protect its users' sensitive personal data, including credit card, Social Security, and bank account numbers."[157]

87.     Ultimately, neither Plaintiffs nor their experts offer any evidence to support their view that expenses incurred during the first year after the breach to purchase services other than AllClear were reasonable or necessary.

88.     *Second*, Plaintiffs' experts also fail to justify purchases of credit monitoring following the expiration of AllClear ID after one year.  Dr. Ponemon cites no evidence or reliable methodology to support his "understanding" that "identity thieves may decide to sit on stolen data for many years before unleashing an attack on the data breach victim."[158]  Nor does

---

[154] Fishkind Rpt. ¶ 15.
[155] Fishkind Deposition at 178-182.
[156] Federal Trade Commission, *FTC Takes Action Against LifeLock for Alleged Violations of 2010 Order*, July 21, 2015, *available at* https://www.ftc.gov/news-events/press-releases/2015/07/ftc-takes-action-against-lifelock-alleged-violations-2010-order.
[157] *Id.*
[158] Ponemon Rpt. ¶ 20 n.8.

he explain what "experience" this understanding was based upon.  Further, Dr. Ponemon inaccurately claims that "the Javelin report recommends" that "victims of data breaches … *purchase* credit or identity theft services."[159]  That is wrong.  Rather, the Javelin report cited by Dr. Ponemon recommends only that individuals notified of a data breach "[o]pt in to any protection services offered in response to the breach" and "[p]lace a fraud alert on your credit report."[160]  Those recommendations are consistent with my opinions presented above.

89.    Dr. Fishkind's report also fails to show that purchasing credit monitoring in what he calls "Years Two and Three" is necessary.  To justify his recommendation, he relies on a survey by Javelin which found that "13% of all victims of new account fraud did not even discover that a fraudulent new account had been opened and used for a year or more."[161]  But there are obvious problems with this justification for purchasing two additional years of credit monitoring.  First, Javelin surveys everyone, including those who do not set up fraud alerts on their credit files or regularly monitor their credit reports.  As discussed above, fraud alerts significantly reduce the risks associated with new account fraud, and monitoring one's credit report can dramatically reduce the time it takes to discover new account fraud.  Second, new account fraud itself is *extremely* rare.  Javelin found that in 2014 the rate was 0.29%.[162]  And cases of new account fraud causing actual financial loss are rarer still: The DOJ's study found that only 17.4% of new account fraud victims had out-of-pocket losses.[163]  Indeed, Dr. Ponemon acknowledged in his deposition that he has *not* offered the opinion that SPE data breach victims

---

[159] Ponemon Rpt. ¶ 31 (emphasis added).
[160] Javelin, *2015 Identity Fraud* at 10.
[161] Fishkind Rpt. ¶ 34.
[162] Javelin, *2015 Identity Fraud* at 16.
[163] U.S. Dep't of Justice, *Victims of Identity Theft*, 2012 at 19, Table 8.

"will incur costs from actual identity theft that will not be reimbursed."[164]  Nor has Dr. Fishkind offered any such opinion.

90.     Thus, there is no reasonable need for all putative class members to purchase two additional years of credit monitoring beyond what SPE has already provided.

## VII.   The Reasonable Need for Any Additional Identity Protection (Beyond That Already Provided by SPE) Will Vary Across the Class

91.     To the extent Plaintiffs' experts are correct that it was reasonable for any class members to purchase additional identity protection beyond what SPE has already provided (which, again, is doubtful), the reasonable need for such services will vary case by case and require individual analysis.

92.     The Named Plaintiffs themselves illustrate these variations.  Joshua Forster has incurred no costs at all to date because he enrolled in AllClear ID.  He makes no claim that he will need to purchase additional protection in the future.  Indeed, he acknowledged in his deposition that he has also been provided—and enrolled in—two years of AllClear ID through the Anthem data breach.[165]  Other Plaintiffs assert that they require more expensive credit monitoring services provided by LifeLock, on the ground that (they believe) the AllClear product is less effective.[166]  Whether such purchases could ever be justified would turn on the extent of the risk posed by the cyberattack to potential class members.  As discussed above, Christina Mathis claims that only three pieces of information—her name, Social Security Number, and former address—were disclosed in the cyberattack.[167]  Despite her comparatively low risk, she claims that she needs the most expensive LifeLock credit monitoring product—LifeLock

---

[164] Ponemon Deposition at 295.
[165] Forster Deposition at 143-144.
[166] Mathis Deposition at 81-84; Springer Deposition at 230-32.
[167] *See supra* note 89.

Ultimate Plus.[168]  Her argument that the purchase was reasonably necessary would be significantly weaker than the arguments of other Named Plaintiffs who had more information disclosed.

93.     Likewise, Mathis's purchase of password protection software[169] will be more difficult to justify than other expenses incurred by the class.  She has not claimed that her passwords were exposed in the cyberattack,[170] or shown that such software is at all necessary to mitigate any risk of identity theft arising from the attack (indeed, nine months later, she has yet to even use the product).[171]  Similarly, whether it was reasonable for Plaintiff Steven Shapiro to incur costs freezing and then unfreezing his credit multiple times will turn on the specific risks he faced following the cyberattack.[172]

**VIII.   Determining Whether a Particular Instance of Identity Theft Was Due to the Cyberattack on SPE, and Not Another Cause, Can Only be Assessed on an Individual Basis**

94.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████     ██████████████████████

███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

████████████████

---

[168] Plaintiffs' Interrogatory Responses at 9; Mathis Deposition at 81-82.
[169] Mathis Deposition at 17, 88.
[170] *Id.* at 278-80.
[171] *Id.* at 89-93.
[172] Plaintiffs' Interrogatory Responses at 17-19.
[173] *See supra* note 31.

41

95. 



97.

98.



99.

100.



101.

102.    As this discussion demonstrates, determining whether the cyberattack on SPE was the cause of a particular incident of identity fraud, or of a particular "black market" alert, requires an investigation of the specific circumstances surrounding that incident of fraud or that alert.

Dated:  August 11, 2015

_Michael A. Turner_

Michael A. Turner



**Appendix B:  Other Data Breaches That Have Exposed the Named Plaintiffs' PII**

| Data Breach | Types of PII Exposed* | Named Plaintiffs Affected** |
|---|---|---|
| Anthem | Names, dates of birth, Social Security Numbers, health care ID numbers, home addresses, email addresses, and employment information, including income data | Marcela Bailey, Joshua Forster |
| Dropbox | Usernames, passwords, and account details (including videos, photos, and other files) | Michael Levine |
| eBay | Customer names, email addresses, passwords, home addresses, phone numbers, and birthdays | Joshua Forster |
| Evernote | Email addresses, passwords, and usernames | Michael Levine |
| Home Depot | Names, account numbers, card expiration dates and card verification values, email addresses | Michael Corona, Michael Levine, Christina Mathis, Steven Shapiro, Geoffrey Springer |
| Ouidad | Full names, credit card numbers, credit card security codes and expiration dates, billing addresses, email addresses, phone numbers, and potentially user names and passwords | Christina Mathis |
| Target | Names, Addresses, Credit/Debit Cards, Email Addresses, Phone Numbers | Michael Levine, Steven Shapiro, Geoffrey Springer |

\* Based on the public sources cited below.

\** Based on Named Plaintiff interrogatory responses and deposition testimony.  Based on the information I have reviewed to date, it is not clear whether each type of PII exposed in the data breaches above was exposed for each Named Plaintiff listed for that breach.  The Named Plaintiffs may also have been exposed to data breaches beyond those listed here.

*Sources*:

- Anthem: https://www.anthemfacts.com/
- Dropbox: http://www.independent.co.uk/life-style/gadgets-and-tech/nearly-seven-million-dropbox-passwords-hacked-pictures-and-videos-leaked-in-latest-thirdparty-security-breach-9792690.html
- eBay: https://www.ebayinc.com/stories/news/faq-ebay-password-change/
- Evernote: http://blog.evernote.com/blog/2013/03/02/security-notice-service-wide-password-reset/
- Home Depot: https://corporate.homedepot.com/MediaCenter/Documents/FAQs.pdf
- Ouidad: https://oag.ca.gov/system/files/Customer%20Notification_2.pdf?
- Target: https://corporate.target.com/about/shopping-experience/payment-card-issue-faq

## Appendix C:  List of Materials Relied On

I relied on the following documents and materials in forming my opinions:

*Documents from Corona, et al. v. Sony Pictures Entertainment, Inc.:*

1. Expert Report of Larry Ponemon (June 30, 2015).
2. Expert Report of Henry H. Fishkind (June 30, 2015).
3. Amended Class Action Complaint (Mar. 2, 2015).
4. Sony Pictures Entertainment Inc.'s Memorandum of Points and Authorities in Support of Its Motion to Dismiss Amended Class Action Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Mar. 23, 2015).
5. Plaintiffs' Memorandum of Points and Authorities in Opposition to Sony Pictures Entertainment Inc.'s Motion to Dismiss Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Apr. 13, 2015).
6. Sony Pictures Entertainment Inc.'s Reply In Support Of Motion To Dismiss Amended Class Action Complaint Pursuant To Federal Rules Of Civil Procedure 12(b)(1) And 12(b)(6) (Apr. 23, 2015).
7. Order on Sony Pictures Entertainment Inc.'s Motion to Dismiss Amended Class Action Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (June 15, 2015).
8. Plaintiffs' Amended and Consolidated Responses and Objections to Defendant Sony Pictures Entertainment Inc.'s First Set Of Interrogatories (June 9, 2015).
9. Plaintiffs' Memorandum of Points and Authorities in Support of Motion For Class Certification (July 10, 2015).
10. Declaration of Daniel C. Girard in Support of Plaintiffs' Motion for Class Certification (July 10, 2015), and exhibits.
11. Deposition of Christina Laverne Mathis (June 19, 2015), and exhibits.
12. Deposition of Ella Carline Archibeque (June 16, 2015), and exhibits.
13. Deposition of Geoffrey Springer (June 30, 2015), and exhibits.
14. Deposition of Jamie Chung (June 25, 2015), and exhibits.
15. Deposition of Joshua Forster (June 22, 2015), and exhibits.
16. Deposition of Marcela Bailey (July 30, 2015), and exhibits.
17. Deposition of Michael Corona (June 24, 2015), and exhibits.
18. Deposition of Michael Levine (June 8, 2015), and exhibits.
19. Deposition of Steven Sandor Shapiro (June 18, 2015), and exhibits.
20. Deposition of Larry Ponemon (Aug. 6, 2015), and exhibits.
21. Deposition of Henry H. Fishkind (July 28, 2015), and exhibits.
22. Sample of Spreadsheets Provided to Larry Ponemon: Bates Nos. SPE 000000020, SPE 000000117, SPE 000000142, SPE 000000175, SPE 000000189, SPE, 000000198, SPE 000000385, SPE 000000553, SPE 000000644, SPE, 000000750, SPE 000000875, SPE 000000934, SPE 000001043, SPE, 000001084, SPE 000001115, SPE 000001123, SPE 000001126, SPE, 000001210, SPE 000001222, SPE 000001249, SPE 000001291, SPE, 000001533, SPE 000001712, SPE 000001726, SPE 000001803, SPE, 000003088, SPE 000003121, SPE 000003259, SPE 000003330, and SPE, 000003680) 000000113, SPE 000000120, SPE 000000162, and SPE 000003195), 000000198, SPE 000000385, SPE 000000553, SPE 000000644, SPE, 000000750, SPE 000000875, SPE 000000934, SPE

000001043, SPE, 000001084, SPE 000001115, SPE 000001123, SPE 000001126, SPE, 000001210, SPE 000001222, SPE 000001249, SPE 000001291, SPE, 000001533, SPE 000001712, SPE 000001726, SPE 000001803, SPE, 000003088, SPE 000003121, SPE 000003259, SPE 000003330, and SPE, 000003680.

23. Spreadsheets Concerning Named Plaintiffs Provided to Larry Ponemon: Bates Nos. SPE 000000089, SPE 000000091, SPE 000000110, SPE 000000113, SPE 000000120, SPE 000000162, SPE 000003195.

24. Plaintiffs' Production of Materials for Dr. Larry Ponemon: Bates Nos. PONEMON_0000001 – PONEMON_0004534.

<u>Other Documents</u>

1. Lilliann Ablon, Martin C. Libicki, and Andrea A. Golay, *Markets for Cybercrime Tools and Stolen Data: Hackers' Bazaar*, Rand Corporation (2014).

2. AllClear ID, *AllClear ID Pro.*, https://www.allclearid.com/plans/pro-plan/ (last visited August 8, 2015).

3. AllClear ID, *AllClear Secure Terms of Use*, https://allclearid.com/legal/secure/ (last visited August 8, 2015).

4. AllClear ID, *Request Your Free Identity Protection*, https://spe.allclearid.com/ (last visited August 8, 2015).

5. Annual Credit Report, *available at* https://www.annualcreditreport.com/index.action (last visited August 8, 2015).

6. Anthem, *How to Access & Sign Up For Identity Theft Repair & Credit Monitoring Services*, *available at* https://www.anthemfacts.com/ (last visited August 8, 2015).

7. Bank of America, *Track Your Finances with Online Banking Alerts*, *available at* https://www.bankofamerica.com/onlinebanking/education/online-banking-alerts.go (last visited August 8, 2015).

8. Fred H. Cate, et al, Maurer School of Law: Indiana University, *Dos and Don'ts of Data Breach and Information Security Policy* (2009), *available at* http://www.repository.law.indiana.edu/cgi/viewcontent.cgi?article=1234&context=facpu b.

9. Penny Crosman, *Surprise — ID Theft Is Down Despite Data Breaches*, AmericanBanker, March 3, 2015.

10. *Don's United Super, Inc. v. Werries*, Case No. 98-6042-CV-SJ-6 (W.D. Mo.), Expert Report of Lawrence A. Ponemon, Ph.D. (July 30, 1999).

11. Experian, *Experian Launches Platform to Manage Cross-Channel Fraud Risk: Precise ID with FraudNet Provides a Single View of a Consumer's Identity Across Devices*, http://www.the41.com/buzz/announcements/experian-launches-platform-manage-cross-channel-fraud-risk.

12. Federal Trade Commission, *Lost or Stolen Credit, ATM, and Debit Cards*, http://www.consumer.ftc.gov/articles/0213-lost-or-stolen-credit-atm-and-debit-cards (last visited August 8, 2015).

13. Federal Trade Commission, *Guide for Assisting Identity Theft Victims*, Federal Trade Commission (2013).

14. Federal Trade Commission, *Taking Charge: What to do if your identity is stolen*, Federal Trade Commission (2013).

15. Kristin Finklea, *Identity Theft: Trends and Issues*, Congressional Research Service, January 16, 2014.

16. Laura Gerstner, *What's Your Liability With Debit, Credit and Prepaid Cards*, Kiplinger, *available at* http://www.kiplinger.com/article/credit/T016-C000-S002-liability-with-debit-credit-prepaid-cards.html (last visited August 9, 2015).

17. Government Accountability Office, *Social Security Numbers: Governments Could Do More to Reduce Display on Public Records And On Identity Cards* (2004).

18. Government Accountability Office, *Personal Information: Data Breaches Are Frequent, But Evidence Of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (2007).

19. Robert Hackett, *Stolen Uber User Logins Are For Sale on the Dark Web: Only $1 Each*, Fortune, Mar. 30, 2015, *available at* http://fortune.com/2015/03/30/uber-stolen-account-credentials-alphabay/.

20. Robert Hackett, *UCLA Health System data breach may affect millions*, Fortune, July 17, 2015.

21. Erika Harrell, Ph.D. and Lynn Langton, *U.S. Dep't of Justice, Victims of Identity Theft, 2012* (2013), *available at* http://www.bjs.gov/content/pub/pdf/vit12.pdf

22. E. Hassan, *Recall Bias can be a Threat to Retrospective and Prospective Research Designs*, The Internet Journal of Epidemiology, Vol. 3, No. 2, (2005).

23. Thomas J. Holt and Olga Smirnova, U.S. Dep't of Justice, *Examining the Structure, Organization, and Processes of the International Market for Stolen Data* (March 2014).

24. Identity Risk Calculator, LifeLock, https://www.lifelock.com/risk-calculator/ (last visited Aug. 9, 2015).

25. Adi Ignatius, *They Burned Down the House: An Interview with Michael Lynton*, Harvard Business Review, July/August 2015.

26. Intellius Reports for Named Plaintiffs.

27. ITRC, *Identity Theft Resource Center Breach Report Hits Record High in 2014*, http://www.idtheftcenter.org/ITRC-Surveys-Studies/2014databreaches.html (last visited August 8, 2015).

28. ITRC, *ITRC Breach Statistics 2005 – 2014*, http://www.idtheftcenter.org/images/breach/MultiYearStatistics.pdf (last visited August 8, 2015).

29. ITRC, *Data Breach Reports* (2014).

30. ITRC, *Data Breaches*, http://www.idtheftcenter.org/id-theft/data-breaches.html (last visited August 8, 2015).

31. Javelin Strategy and Research, *2009 Identity Fraud Survey Report: Consumer Version* (2009).

32. Javelin Strategy & Research, *2013 Identity Fraud Report (Insights Report Brochure)* (2013).

33. Javelin Strategy & Research, *2015 Identity Fraud: Protecting Vulnerable Populations* (2015).

34. Chris Johnston, *British man accused of hacking into US government networks arrested*, The Guardian. July 16, 2015.

35. Krebs on Security, *Posts tagged: Court Ventures*, *available at* http://krebsonsecurity.com/tag/court-ventures/ (last visited July 25, 2015).

36. Charles Leaver, Ziften, *Data breaches under-reported: Figures may be worse than they appear,* http://ziften.com/data-breaches-under-reported-figures-may-be-worse-than-they-appear/ (last visited August 8, 2015).

37. Sui Lee-Wee, *China Denies Snowden Leak That Beijing Hackers Stole F-35 Plans*, Business Insider, Jan. 19, 2015.

38. Thomas Lenard and Paul Ruben, *Privacy and the Commercial Use of Personal Information*, Technology Policy Institute, August 15, 2007, *available at* https://www.techpolicyinstitute.org/files/3.pdf.

39. Mastercard, *Zero Liability Protection*, https://www.mastercard.us/en-us/about-mastercard/what-we-do/terms-of-use/zero-liability-terms-conditions.html (last visited August 9, 2015).

40. Anna Wilde Mathews, *Anthem: Hacked Database Included 78.8 Million People*, Wall Street Journal, February 24, 2015, *available at* http://www.wsj.com/articles/anthem-hacked-database-included-78-8-million-people-1424807364.

41. Jay McGregor, *The Top 5 Most Brutal Cyberattacks of 2014 So Far*, Forbes, July 28, 2014, *available at* http://www.forbes.com/sites/jaymcgregor/2014/07/28/the-top-5-most-brutal-cyber-attacks-of-2014-so-far/.

42. Lily Hay Newman, *The Social Security Number's Insecurities*, Slate, July 10, 2015, *available at* http://www.slate.com/articles/technology/future_tense/2015/07/opm_anthem_data_breaches_show_the_insecurity_of_the_social_security_number.2.html

43. Monica Pearson, *FFIEC Authentication Guidance: The Case for Knowledge-based Authentication*,  Experian MicroAnalytics. Oct. 17, 2011, *available at* https://www.experian.com/assets/regulatory-compliance/decision-analytics/articles/ffiec-knowledge-based.pdf.

44. Office of the Director of National Intelligence, National Counterintelligence and Security Center, *How Much Do You Cost On the Black Market?*, http://www.ncsc.gov/issues/cyber/identity_theft.php (last visited August 8, 2015) (citing June 2011 study by *Consumer Reports*).

45. Online Identity Risk Calculator, EMC, http://www.emc.com/microsites/fraudgame/flash.htm.

46. Ponemon Institute, *2013 Survey on Medical Identity Theft* (2013).

47. Ponemon Institute, *2015 Global Study on IT Security Spending & Investments* (2015).

48. Ponemon Institute, *Exposing the Cybersecurity Cracks: United States* (2014).

49. Michael Riley, *China Hackers Got Past Costly U.S. Computer Security With Ease*, Bloomberg Business, June 5, 2015.

50. Jordan Robertson, *One Year of Your Life and $100,000: Growing Cost of Medical ID Theft*, Tech Blog, Bloomberg, June 26, 2012.

51. Aarthi Shahani, NPR All Things Considered, *Theft Of Social Security Numbers Is Broader Than You Might Think,* June 15, 2015.

52. Michael Staten and Fred Cate, *The Impact of Opt-in Privacy Rules on Retail Credit Markets: A Case Study of MBNA* (2003).

53. Pwned websites, *Breached websites that have been loaded into this service*, *available at* https://haveibeenpwned.com/PwnedWebsites

54. Statista, Annual number of data breaches and exposed records in the United States from 2005 to 2014, http://www.statista.com/statistics/273550/data-breaches-recorded-in-the-

united-states-by-number-of-breaches-and-records-exposed/ (last visited August 8, 2015).

55. Aliya Sternstein, *DHS Cyber Program Repels Threats In Real Time*, Nextgov, December 9, 2014, *available at* http://www.nextgov.com/cybersecurity/2014/12/dhs-cyber-program-repels-threats-real-time/100758/.

56. Target, *Data Breach FAQ*, https://corporate.target.com/about/shopping-experience/payment-card-issue-faq (last visited August 7, 2015).

57. Chad Terhune, *UCLA Health System data breach affects 4.5 million patients*, Los Angeles Times, July 17, 2015.

58. *FBI Director Gives New Clues Tying North Korea to Sony Hack*, New York Times, January 7, 2015.

59. TransUnion, *Fraud Alerts*, https://www.transunion.com/fraud?tab=typesoffraud (last visited August 8, 2015).

60. Travelers, *73% of identity fraud cases resulted from stolen personal items*, http://investor.travelers.com/Mobile/file.aspx?IID=4055530&FID=15508447 (last visited August 8, 2015).

61. Gerry Tschopp, *The Facts on Court Ventures and Experian*, March 30 2014, *available at* http://www.experian.com/blogs/news/2014/03/30/court-ventures/ (last visited July 25, 2015).

62. Michael Turner et al., *Give Credit Where Credit Is Due*, PERC, Dec. 2006, *available at* http://www.perc.net/wp-content/uploads/2013/09/alt_data.pdf.

63. Michael Turner, et al., *The Fair Credit Reporting Act: Access, Efficiency, and Opportunity*, PERC (2003), *available at* http://www.perc.net/wp-content/uploads/2013/09/fcra_report.pdf.

64. Michael Turner et al., *The Fair Credit Reporting Act: Access, Efficiency, and Opportunity – Part II*, PERC (2003), *available at* http://www.perc.net/wp-content/uploads/2013/09/institute_fcra_ptII.pdf.

65. Michael Turner et al., *The Impact of Provider Identifiable Data on Healthcare Quality and Cost*, PERC (2007), *available at* http://www.perc.net/wp-content/uploads/2013/09/provider_data.pdf.

66. Michael Turner, Robin Varghese and Patrick Walker, *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts*, PERC (2011).

67. United States Code, Fair Credit Reporting Act, 15 U.S.C. § 1681, *available at* http://www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0111-fair-credit-reporting-act.pdf.

68. Visa, *Visa's Zero Liability Policy*, http://usa.visa.com/personal/security/zero-liability.jsp (last visited August 9, 2015).

69. Lenny Zelster, *The Use of Pastebin for Sharing Stolen Data*, March 16, 2015, *available at* https://zeltser.com/pastebin-used-for-sharing-stolen-data/ (last visited August 8, 2015).

## Appendix D:  Expert Witness Testimony

I testified in federal district court for *IMS Health Inc. v. Rowe.* (Maine District Court, Case CV-07-127-B-W, Testified December 2007).   My testimony focused on the appropriate social scientific methodology for measuring the impacts of restricting the commercial use of prescriber identifiable data.

I testified in federal district court for *IMS Health Inc. v. Sorrell.* (Vermont District Court, Case 2:2007cv00188, Testified July 2008).  My testimony focused on the appropriate social scientific methodology for measuring the impacts of restricting the commercial use of prescriber identifiable data.

I provided an expert report in *Harris vs. Trans Union* (District Of South Carolina, Greenville Division, Civil Action No. 6:-6-cv-01811-GRA, Submitted January 2009).  My report concerned the provision of an impact analysis to measure the effects of including or excluding credit limit information in credit files on the credit scores using various credit-scoring models on a sample of Capitol One cardholders, using widely-used credit scoring models.  I also discussed the issue of data accuracy as it pertains to consumer credit reporting, and potential harm that may result from the inclusion of inaccurate data in a consumer's credit file.

I submitted an expert report in *David L. Jackson, Sr vs. Trans Union* (District of Oregon, Case No. 3:08-cv-08-0060-MO, Submitted October 2009).   My report concerned whether the defendant acted as required by the FCRA dispute resolution system and regarding the effectiveness of the FCRA dispute system.

## Appendix E:  List of Publications

Michael Turner and Patrick Walker, *Predicting Financial Account Delinquencies with Utility and Telecom Payment Data*, PERC (2015).

Michael Turner, Michael Staten, and Patrick Walker, *Is CROA Choking Credit Report Literacy?*, PERC (2015).

Michael Turner, Robin Varghese, and Sukanya Chaudhuri, *Research Consensus Confirms Benefits of Alternative Data*, PERC (2015).

Michael Turner, Patrick Walker, Robin Varghese, and Sukanya Chaudhuri, *The Impacts of Information Sharing on Competition in Lending Markets*, PERC (2014).

Michael Turner, Patrick Walker, and Robin Varghese, *Credit Bureaus in Emerging Markets: Overview of Ownership & Regulatory Frameworks*, PERC (2014).

Michael Turner, Patrick Walker, Robin Varghese, and Sukanya Chaudhuri, *Comparing FTC and PERC Studies on Measuring the Accuracy of U.S. Consumer Credit Reports*, PERC (2013).

Michael Turner, Patrick Walker, Robin Varghese, Sukanya Chaudhuri, and Walter Kitchenman, *A Reexamination of Who Gains and Who Loses From Credit Card Payments*, PERC (2013).

Michael Turner, Patrick Walker, Robin Varghese, and Sukanya Chaudhuri, *The Credit Impacts on Low-Income Americans from Reporting Moderately Late Utility Payments*, PERC (2012).

Michael Turner, Patrick Walker, Robin Varghese, Joseph Duncan and Sukanya Chaudhuri, *Credit Impacts of More Comprehensive Alternative Data Credit Reporting in Australia and New Zealand*, PERC (2012).

Michael Turner, Patrick Walker, Robin Varghese and Sukanya Chaudhuri, *A New Pathway to Financial Inclusion: Alternative Data, Credit Building, and Responsible Lending in the Wake of the Great Recession*, PERC (2012).

Michael Turner, Robin Varghese, and Patrick Walker, *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts*, PERC (2011).

Michael Turner, Robin Varghese, and Patrick Walker, *Louisiana Small Businesses Five Years Post-Katrina: Assessing LDRF Program Impacts and Measuring Existing Needs*, PERC (2011).

Michael Turner, Robin Varghese, and Patrick Walker, Assessment of Small Business Aid and Needs in Louisiana Five Years After Hurricane Katrina: Overview of Case Studies, PERC (2011).

Michael Turner, Robin Varghese, and Patrick Walker, *The Economic Consequences of Credit Information Sharing*, Organization for Economic Cooperation and Development (2010).

Michael Turner, Robin Varghese, and Patrick Walker, *Financial Inclusion through Credit Reporting: Hurdles and Solutions*, PERC (2010).

Michael Turner, Robin Varghese, and Patrick Walker, *The Consequences of Prohibiting Credit Inquiry Data in Chilean Credit Files*, PERC (2010).

Michael Turner, Robin Varghese, and Patrick Walker, *Credit Reporting Customer Payment Data*, PERC (2009).

Michael Turner, Robin Varghese, and Patrick Walker, *New to Credit from Alternative Data*, PERC (2009).

Michael Turner, Robin Varghese, Patrick Walker, and Joseph Duncan, *Information Sharing and SMME Financing in South Africa: A Review of the Landscape*, PERC (2008).

Michael Turner, Roadmap to Reform: *Lessons from Around the World to Guide Consumer Credit Reporting Reform in Australia*, PERC (2008).

Michael Turner, Recovering But Not Recovered: *Gulf Coast Small Business Three Years Later*, PERC Press (2008).

Michael Turner, Alyssa Lee, Eugene Gurenko, Robin Varghese, and Patrick Walker, *Financial Impacts of Disaster: What We Can Learn From Credit File Data*, PERC (2008).

Michael Turner, Alyssa Lee, Robin Varghese, and Patrick Walker, *You Score, You Win—The Consequences of Giving Credit Where Credit is Due*, PERC (2008).

Michael Turner and Amita X. Agarwal, *Using Non-Traditional Data for Underwriting Loans to Thin-File Borrowers: Evidence, Tips, and Precautions*,   Journal of Risk Management for Financial Institutions (2008).

Michael Turner and Robin Varghese, *The Structure of Information Sharing and Credit Access: Lessons for Policy*, PERC (2008).

Michael Turner and Robin Varghese, *Economic Fairness Through Smarter Lending: Some Factors to Consider on the Eve of Brazilian Credit Reporting Reform*, PERC (2007).

Michael Turner, Robin Varghese, and Patrick Walker, *Recovery, Renewal, and Resiliency: Gulf Coast Small Businesses Two Years Later*, PERC (2007).

Michael Turner, *Economic Impacts of Payment Reporting Participation in Latin America*, PERC Press (2007).

Michael Turner, Joseph Duncan, Robin Varghese, and Patrick Walker, *The Impact of Provider-Identifiable Data on Healthcare Quality and Cost*, PERC (2007).

Michael Turner, Robin Varghese, and Patrick Walker, *On the Impact of Credit Payment Reporting on the Financial Sector and Overall Economic Performance in Japan*, PERC (2007).

Michael Turner, Alyssa Lee, Robin Varghese, and Patrick Walker, *Give Credit Where Credit is Due: Increasing Access to Affordable Mainstream Credit Using Alternative Data*, Brookings Institution (2006).

Michael Turner, *Toward a Rational Personal Data Breach Notification Regime*, PERC (2006).

Michael Turner, *Giving Underserved Consumers Better Access to the Credit System: The Promise of Non-traditional Data*, PERC (2005).

Michael Turner, *How Safe and Secure Is It?: An Assessment of Personal Data Privacy and Security in Business Process Outsourcing Firms in India*, Information Policy Institute with the Financial Services Roundtable (2005).

Michael Turner, Pete A. Johnson, and Daniel Balis, *Privacy Rights and Policy Wrongs: How Data Restrictions Can Impair Information Led Development in Emerging Markets*, The Information Policy Institute (2003).

Michael Turner, *The Fair Credit Reporting Act: Access, Efficiency, and Opportunity*, The National Chamber Foundation of the United States Chamber of Commerce (2003).

Michael Turner, *The Fair Credit Reporting Act: Access, Efficiency, and Opportunity II*, The National Chamber Foundation of the United States Chamber of Commerce (2003).

Michael Turner, *Consumers, Citizens, Charity and Content: Attitudes Toward Teleservices*, The Information Policy Institute (2002).

Michael Turner, *Measuring the True Cost of Privacy: A Rebuttal to 'Privacy, Consumers, and Costs'*, The Information Policy Institute, (2002).

Michael Turner and Lawrence G. Buc, *The Impact of Data Restriction on Fundraising for Charitable and Nonprofit Institutions*, The Information Services Executive Council and the Privacy Leadership Initiative (2002).

Michael Turner and Robin Varghese, *Making Sense of the Privacy Debate: A Comparative Analysis of Leading Consumer Privacy Surveys* (2001).

Michael Turner, *The Cost of Data Restrictions on Consumer Distance Shopping*, Privacy Leadership Initiative and the Information Services Executive Council of The DMA (2001).

Michael Turner, *Regulating Personal Medical Information: Fears, Facts, and a Framework Setting the Record Straight*, The Direct Marketing Association (2000).