# EXHIBIT B

## PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

---

MICHAEL CORONA,
CHRISTINA MATHIS, et al.,
individually and on behalf of
others similarly situated,

      Plaintiffs,

v.

SONY PICTURES
ENTERTAINMENT INC.,


      Defendant.

CASE NO. 2:14—CV—09600—RGK—E

---

**EXPERT REPORT OF DR. JOHN H. JOHNSON, IV**

**AUGUST 11, 2015**

**TABLE OF CONTENTS**

I.     QUALIFICATIONS AND ASSIGNMENT ....................................................................... 1

II.    SUMMARY OF CONCLUSIONS ................................................................................ 2

III.   SUMMARY OF PLAINTIFFS' ALLEGATIONS ............................................................. 3

IV.    FRAMEWORK FOR ANALYSIS OF CLASS CERTIFICATION AND DAMAGES IN THIS
       MATTER ........................................................................................................... 4

V.     SUMMARY OF DR. FISHKIND'S OPINIONS .............................................................. 5

VI.    BACKGROUND INFORMATION RELATING TO PLAINTIFFS' CLAIMS IN THIS MATTER ............ 7
       A. SPE Provided AllClear ID Products to Class Members at No Cost ...............................7
       B. The Experiences and Asserted Damages of the Named Plaintiffs Vary .........................8

VII.   DR. FISHKIND'S "MODEL," WHICH IS BASED ON THE ALLEGED EXPERIENCES OF THE
       EIGHT NAMED PLAINTIFFS, IS FUNDAMENTALLY FLAWED ........................................ 18
       A. Dr. Fishkind's Reliance on a Supposed "Prudent Person Standard" is Unscientific and
          Unreliable ..........................................................................................................19
       B. Dr. Fishkind's Damages "Model" for Costs Incurred in "Year One" Ignores Variations in
          the Actual Evidence Provided by the Named Plaintiffs and Lacks a Scientific Basis .................22
          1. Dr. Fishkind assumed without basis that Named Plaintiffs' decisions to incur identity
             protection costs were "reasonably prudent" despite SPE's provision of complimentary
             AllClear ID products ...........................................................................................22
          2. Dr. Fishkind's assertion that the Named Plaintiffs' claimed costs are "precise" and
             "representative" of those incurred by all class members is without scientific basis ..............25
       C. Dr. Fishkind's "Model" of Damages That Plaintiffs Will Allegedly Incur in "Years Two
          and Three" Ignores Actual Evidence From the Named Plaintiffs and Lacks a Scientific
          Basis ..................................................................................................................26

VIII.  DR. FISHKIND'S "MODEL" CANNOT DETERMINE IMPACT OR DAMAGES ON A CLASS-
       WIDE BASIS ...................................................................................................... 29

APPENDIX A.   CURRICULUM VITAE OF DR. JOHN H. JOHNSON, IV ......................................... 33

APPENDIX B.   EDGEWORTH ECONOMICS BILLING RATES .................................................... 46

APPENDIX C.   MATERIALS CONSIDERED .......................................................................... 47

## I. QUALIFICATIONS AND ASSIGNMENT

1.      My name is John H. Johnson, IV.  I am the President and CEO of Edgeworth Economics, L.L.C. ("Edgeworth").  Edgeworth is a consulting firm that provides clients with objective expert economic and financial analysis for complex litigation and public policy debates.  Edgeworth's experts work in the areas of antitrust, data management, intellectual property, and labor and employment, including on issues of economic injury and damages calculation.  Edgeworth has offices in Washington, D.C., San Francisco, CA, and Pasadena, CA.  I am also on the Board of Directors of both National Appleseed—a nonprofit network of 17 public interest justice centers in the United States and Mexico—and the Hawaii Appleseed Center for Law and Economic Justice.

2.      I received my B.A. *magna cum laude* with highest distinction in Economics from the University of Rochester and my Ph.D. in Economics from the Massachusetts Institute of Technology ("MIT").  My areas of specialization at MIT were econometrics—the application of statistics to economics—and labor economics.  During my career as a professional economist, I have provided economic analysis in a wide range of litigation matters involving issues in antitrust, labor and employment, damages calculation, and statistics.  Prior to my employment as an economic consultant, I was an Assistant Professor of Economics and Labor and Industrial Relations at the University of Illinois at Urbana-Champaign, where I taught courses in labor economics.  I have also taught economics courses as an Affiliated Professor at Georgetown University's Public Policy Institute.

3.      I have testified and provided consulting on a wide range of matters related to class certification, liability, and damages.  I also have written numerous papers and given many talks on topics related to class certification, scientific standards in litigation, appropriate use of econometrics in litigation, and calculation of damages.  I previously was an Editor of the *Antitrust Law Journal*.  I submitted an amicus brief to the United States Supreme Court in *Comcast Corp. vs. Behrend* on the role of economic analysis in assessing the appropriateness of antitrust class certification.  I have been accepted as an expert in Economics, Econometrics, and Statistics in Federal District Courts.  I also hold a CIPP/US designation as a Certified Information Privacy Professional.  My curriculum vitae, which includes a list of my previous expert testimony and publications, is attached as **Appendix A** to this report.

4.      My firm, Edgeworth Economics, is compensated for my work and the work of my team in connection with this litigation based on hourly rates.  My rate is $725 per hour.  The rates for members of my staff are listed attached as **Appendix B** to this report.  Payment for Edgeworth's services is not contingent upon the outcome of this litigation.

5.      I have been asked by counsel for Defendant Sony Pictures Entertainment Inc. ("SPE") to assess the conclusions presented by Plaintiffs' expert Henry H. Fishkind, Ph.D.[1]  In preparation of this report, I and staff working under my direction reviewed Dr. Fishkind's report and turnover materials, as well as other materials in the discovery record.  A list of additional materials I relied upon is attached as **Appendix C** to this report.

## II.  SUMMARY OF CONCLUSIONS

6.      My conclusions are as follows:

- Dr. Fishkind's "class-wide" approach assumes away all variation in the experiences of the Named Plaintiffs upon which he purportedly bases his methodology;

- the "Prudent Person Standard" Dr. Fishkind has constructed is conceptually unscientific, not based on any accepted economic theory, and unreliable as a purportedly "class-wide" approach;

- Dr. Fishkind's estimate of "Year One" damages is unscientific and ignores the *actual* evidence provided by the eight Named Plaintiffs;

    - His assertion that the Named Plaintiffs' claimed costs were all "reasonably prudent" is untested and lacks any objective basis;

    - His approach assumed without basis that certain of the Named Plaintiffs' decisions to incur identity protection costs were reasonable despite SPE's provision of complimentary AllClear ID products;

    - His assertion that the Named Plaintiffs' claimed costs are "precise" and "representative" of those incurred by all class members is untested speculation.

- Dr. Fishkind's estimate of "Years Two and Three" damages is unscientific, speculative, and does not tie to any actual harm incurred by the Named Plaintiffs.

    - Dr. Fishkind's approach ignores—and is inconsistent with—testimony provided by the eight Named Plaintiffs about their expected future out-of-pocket expenditures.

- Dr. Fishkind's approach is incapable of applying the five-factor test outlined in this Court's Motion to Dismiss ruling to determine the "reasonableness and necessity" of the costs incurred by any individual class member (or set of class members).

---

[1] Expert Report in Support of Class Certification, Henry H. Fishkind, Ph.D., June 30, 2015 ("Fishkind Report").

### III. SUMMARY OF PLAINTIFFS' ALLEGATIONS

7.      It is my understanding that in November 2014, SPE was the victim of an attack on its information technology infrastructure and network.[2]  On November 30, 2014, a group of hackers called "Guardians of Peace" is alleged to have released to the public stolen Personally Identifiable Information ("PII") of many current and former SPE employees.[3]  On December 15, 2014, SPE posted a notice on its website intended for "current and former Sony Pictures employees and dependents, and for production employees," alerting them to the occurrence of the cyber-attack and providing information on how to access identity protection services.[4]

8.      The eight Named Plaintiffs in this action assert claims for negligence, as well as for violation of the California Confidentiality of Medical Information Act ("CMIA") and the California Unfair Competition Law ("UCL") arising from the exposure of their PII in the cyber-attack.[5]  Plaintiffs further allege that they have been injured by the cyber-attack because "[w]hen individuals have their PII stolen, they are at risk for identity theft," and need to take various steps to protect themselves, including "buy[ing] identity protection, monitoring, and recovery services," "monitor[ing] credit, financial, utility, explanation of benefits, and other account statements," and "plac[ing] and renew[ing] credit fraud alerts on a quarterly basis."[6]

9.      Plaintiffs have proposed a nationwide class of "all current and former SPE employees in the United States whose PII was compromised and posted on the Internet as a result of the data breach publicized in November 2014."[7]  Plaintiffs have also proposed "in the alternative" similarly defined separate subclasses for the states of California, Virginia, and Colorado "in addition to a nationwide class."[8]

---

[2] *See e.g.*, http://www.sonypictures.com/corp/notification/SPE_Cyber_Notification.pdf, (accessed July 22, 2015).

[3] Amended Class Action Complaint, *Corona, et al., v. Sony Pictures Entertainment, Inc.*, March 2, 2015, ("Complaint") ¶¶20-22.

[4] *See* note 2, *supra*.

[5] Complaint ¶¶139-155, 179-218.

[6] *Id.*, ¶147.

[7] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification, June 30, 2015, ("Plaintiffs' Class Cert. Motion"), p. 6.

[8] *Id.*, p. 19.

**IV. FRAMEWORK FOR ANALYSIS OF CLASS CERTIFICATION AND DAMAGES IN THIS MATTER**

10.      I understand that under the Federal Rules of Civil Procedure, in order for a class to be certified, several conditions set forth in Rule 23 must be met.[9]  I also understand that under the standard established in the Supreme Court's decision in *Comcast Corp. v. Behrend*, at the class-certification stage, a plaintiff must provide a reliable damages model which specifically measures only the damages or harm attributable to the plaintiff's particular theory of liability.[10]

11.      I understand that in its Order on the Motion to Dismiss, the Court limited the damages available for Plaintiffs' negligence claim.  Specifically, the Court stated that "[t]o the extent Plaintiffs allege future harm or an increased risk of harm that has not yet occurred, those allegations do not support a claim for negligence."[11]  The Court also stated that "general allegations of lost time are too speculative to constitute cognizable injury."[12]

12.      I further understand that the Court stated that Plaintiffs may recover damages relating to "costs already incurred, including costs associated with credit monitoring, password protection, freezing/unfreezing of credit, obtaining credit reports, and penalties resulting from frozen credit."[13]  The Court's order states that to recover such already incurred costs, Plaintiffs must show that "the need for future monitoring is a reasonably certain consequence of the defendant's breach of duty, and that the monitoring is reasonable and necessary."[14]  The Court laid out a five-factor test to "determine the reasonableness and necessity of such monitoring" costs that Plaintiffs have already incurred.[15]  These factors are:

> (1)  the significance and extent of the compromise to Plaintiffs' PII;
>
> (2)  the sensitivity of the compromised information;
>
> (3)  the relative increase in the risk of identity theft when compared to:

---

[9]  Specifically, I understand that Rule 23(a) requires Plaintiffs to demonstrate:  (i) numerosity; (ii) commonality of the factual and legal issues; (iii) typicality of Plaintiffs' claims and defenses to those of the class; and (iv) adequacy of Plaintiffs and their counsel as class representatives.  I understand that Rule 23(b)(3) further requires that the questions of law or fact common to class members "predominate" over questions affecting only individual members, and that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy.

[10]  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).

[11]  Order on Motion to Dismiss, June 15, 2015, ("Motion to Dismiss"), p. 4.

[12]  *Ibid.*

[13]  *Ibid.*

[14]  *Ibid.*

[15]  *Ibid.*

      (a)    Plaintiffs' chances of identity theft had the data breach not occurred, and

      (b)    the chances of the public at large being subject to identity theft;

    (4)  the seriousness of the consequences resulting from identity theft; and

    (5)  the objective value of early detection.[16]

13.      Lastly, I understand that Plaintiffs allege that medical information was disclosed in the cyber-attack in violation of the CMIA. The Court has indicated that "[w]here such violation has occurred, the remedies available include (1) nominal damages of $1,000, which does not require a showing of actual damages; and (2) the amount of actual damages, if any, sustained by the plaintiff."[17]

## V.  SUMMARY OF DR. FISHKIND'S OPINIONS

14.      I understand that Plaintiffs are relying on Dr. Fishkind's report in support of their argument that damages in this matter "are capable of measurement on a classwide basis."[18]  I summarize Dr. Fishkind's opinions—as presented in his report and further articulated at his deposition—below.

15.      Dr. Fishkind calculated damages separately for "the first year after the Breach," ("Year One") and for "the subsequent two years" ("Years Two and Three").[19]  He distinguished "Year One" because SPE offered all class members a year of identity theft protection through AllClear ID at no cost.[20]

16.      With respect to Year One, Dr. Fishkind indicated in his deposition that "in general, [AllClear ID] provides a high level of services,"[21] and that it was reasonable for some class members (such as Named Plaintiff Forster) to enroll in AllClear ID PRO and incur no additional out-of-pocket costs.[22]  However, Dr. Fishkind also opined that during Year One, it *was* reasonable for some class members to forego AllClear ID and to instead purchase other services such as LifeLock because "many Plaintiffs […] felt compelled to purchase [such] credit monitoring/identity theft protection services."[23]

---

[16] *Id.*, pp. 4-5.

[17] *Id.*, pp. 7-8.  Because Dr. Fishkind's report does not propose an approach to separately evaluate any remedy Plaintiffs may seek relating to their UCL claim, I do not address that claim in this report.

[18] Plaintiffs' Class Cert. Motion, p. 14 (quoting *Comcast*, 133 S. Ct. at 1433).

[19] Fishkind Report, ¶26.

[20] Deposition of Dr. Henry H. Fishkind, July 28, 2015, ("Fishkind Deposition"), 190:12-23.

[21] *Id.*, 177:3-4.

[22] *Id.*, 65:6-13.

[23] Fishkind Report, ¶15.

17.     Dr. Fishkind calculated "Year One" damages by taking an average of the out-of-pocket expenses claimed by the eight Named Plaintiffs and concluding that "[t]hese costs amount to $311 on average per Plaintiff."[24]   Dr. Fishkind opined that the "costs incurred by the Plaintiffs for Year One [*i.e.*, an average of $311] are representative of economic damages incurred by other members of the putative class for Year One."[25] Accordingly, under Dr. Fishkind's approach, if a class member spent *anything* in "Year One," damages for that class member are $311.[26]   A class member who spent nothing in "Year One" had damages of zero.[27]

18.     On damages for "Years Two and Three," Dr. Fishkind opined that "[i]t is economically reasonable and prudent to expect that the putative class members will need to purchase protective monitoring and insurance for at least two years beyond the initial year of credit monitoring provided by SPE following the Breach."[28]   Dr. Fishkind "calculated the reasonable cost for these services for [Years Two and Three] at $720 per class member, or $637 per class member when discounted to present value."[29]   Dr. Fishkind estimated these costs under the assumption that it would be reasonable for all class members to purchase "LifeLock Ultimate Plus" at a cost of $30 per month.[30]

19.     In total, Dr. Fishkind estimated "economic damages of $948 per Plaintiff to a reasonable degree of economic certainty" and stated that "[t]hese damages are common to each member of the putative class who also purchased credit monitoring/identity theft protection services for Year One."[31]   If a class member "did not purchase credit monitoring/identity theft protection services for Year One, the total economic damages [are] $637 per class member to a reasonable degree of economic certainty."[32]

20.     Dr. Fishkind did not provide an approach for assessing damages under the CMIA other than to indicate his understanding that "each member of the putative class whose medical information was compromised in the Breach has suffered additional [statutory harm] of $1,000."[33]

---

[24] *Id.*, ¶17.

[25] *Id.*, ¶17.

[26] Fishkind Deposition, 156:21-157:16.

[27] *Id.*, 55:24-56:1.

[28] Fishkind Report, ¶18.

[29] *Ibid.*, ¶18.

[30] *Id.*, ¶18, note 9.

[31] *Id.*, ¶22.

[32] *Id.*, ¶22.

[33] *Id.*, ¶19.

## VI. BACKGROUND INFORMATION RELATING TO PLAINTIFFS' CLAIMS IN THIS MATTER

### A. SPE Provided AllClear ID Products to Class Members at No Cost

21.     As I noted above, SPE provided identity protection services through AllClear ID at no charge to "potentially affected current and former [SPE] employees" through December 31, 2015.[34]  Specifically, SPE made two AllClear products available.  First, SPE provided access to the AllClear Secure product,[35] which provides "Identity Repair & Restoration."[36]  No action from Plaintiffs was required to enroll in this product.[37]

22.     Additionally, all eligible individuals could enroll in the AllClear ID PRO product "at no cost to them."[38]  The AllClear ID PRO product—which is otherwise available for purchase for $14.95 per month with a 30-day free trial—offers a variety of additional services.[39]  It includes the "Identity Theft Monitoring" service, which scans "a wide assortment of non-credit bureau sources" for "compromised Social Security numbers, credit card numbers, PIN numbers, bank account logins, and other online logins (emails & passwords)."[40]  The "AllClear Credit Monitoring" service monitors credit activity on credit reports, and "sends alerts when banks and creditors use your identity to open new accounts."[41]  Additionally, AllClear ID PRO provides "Identity Theft Insurance Coverage" of $1 Million, including a "zero deductible policy [that] provides reimbursement of certain fees, lost wages, and fraud losses related to recovering your identity."[42]

---

[34] *See*, https://spe.allclearid.com/, accessed July 22, 2015.

[35] *Ibid*.

[36] *See*, https://www.allclearid.com/plans/ (accessed August 6, 2015). The benefits of this product are that "AllClear ID will help do the work to repair your identity" and "AllClear Investigators work with you every step of the way, including contacting creditors and others involved, saving you hundreds of hours and potentially thousands of dollars."

[37] *See*, https://spe.allclearid.com/ (accessed July 22, 2015).

[38] *Ibid*.

[39] *See*, https://www.allclearid.com/plans/ (accessed August 6, 2015).

[40] *Ibid.*

[41] *Ibid.*

[42] *Ibid.* AllClearPRO also offers "Lost Wallet Protection" which helps "expedite cancelling and replacing your credit and debit cards if your wallet is lost or stolen" and allows customers to "receive secure and quick alerts by phone […] so you can take fast action to protect your identity."

**B.  The Experiences and Asserted Damages of the Named Plaintiffs Vary**

23.     The eight Named Plaintiffs have provided evidence concerning their claims through their interrogatory responses and deposition testimony.  This evidence demonstrates that these eight individuals' experiences and claimed damages vary in several ways.

24.     



25.     Second, the eight Named Plaintiffs vary in the out-of-pocket costs they claim to have incurred in response to the cyber-attack on SPE.  For example, since the cyber-attack, Mr. Forster enrolled in the AllClear ID PRO product provided by SPE at no cost and has incurred no out-of-pocket expenses.[45]  The

---

[45] First Interrogatories, pp. 27-28.

other seven Named Plaintiffs have incurred a range of costs for "Year One"—from $45 for Mr. Levine[46] to $1,028 for Ms. Bailey.[47]  The Named Plaintiffs have also purchased a variety of different types of services in response to the cyber-attack, including LifeLock's "Ultimate Plus" product (Mr. Springer),[48] credit monitoring through a AAA account (Mr. Levine),[49] as well as freezing and unfreezing their credit (Mr. Shapiro).[50]  Some Named Plaintiffs also bought other kinds of products, such as password management software (Ms. Mathis).[51]  These purchases also varied depending on whether the individual only purchased products for themselves (*e.g.*, Ms. Mathis)[52] or also purchased products for family members (*e.g.*, Mr. Corona and Ms. Bailey).[53]  **Exhibit 2** summarizes the types of products purchased by each Named Plaintiff, as well as the out-of-pocket costs related to these purchases each Named Plaintiff claims to have incurred.

---

[46] *Id.*, p. 12.

[47] *Id.*, p. 15.

[48] Springer Deposition, Exhibit 6.

[49] First Interrogatories, p. 12.

[50] *Id.*, p. 17.

[51] *Id.*, p. 9.

[52] *Id.*, p. 9.

[53] *Id.*, pp. 7, 15.

**EXHIBIT 2**
**SUMMARY OF EXPECTED "YEAR ONE" OUT-OF-POCKET COSTS CLAIMED BY NAMED PLAINTIFFS**



| | Corona | Mathis | Forster | Archibeque | Levine | Springer | Bailey | Shapiro |
|---|---|---|---|---|---|---|---|---|
| **Enrolled in AllClear?** | Yes | No | Yes | No | Yes | No | No | Yes |
| **Purchased Credit Monitoring?** | LifeLock Standard (x3) | LifeLock Ultimate Plus | None | LifeLock Advantage | AAA ProtectMyID | LifeLock Ultimate Plus | LifeLock Ultimate Plus Advantage (x4) | None |

Legend: ■ Credit Monitoring  ■ Password Manager  ■ Credit Bureau Fees  – – Average of named plaintiffs' claims

Notes:

[1] Amounts shown here represent annualized "Year One" costs.  Some Named Plaintiffs elected to pay for credit monitoring in monthly installments and therefore have not yet incurred the full amount of their expected "Year One" out-of-pocket costs.

[2] Mr. Springer claimed the cost of a LifeLock product he purchased at a monthly cost of $25.49.

Sources:

First Interrogatories, No. 1; Springer Deposition, 154:18-21; Deposition of Ella Archibeque, June 16, 2015, ("Archibeque Deposition"), 34:9-17; Bailey Deposition; 139:23-140:6; Deposition of Michael Corona, June 24, 2015, ("Corona Deposition"), 156:11-157:16; Deposition of Christina Mathis, June 19, 2015,  ("Mathis Deposition"), 81:25-82:7.

26. ████████████████████████████████████████████████
    ████████████████████████████████████████████████



27.

28.     The remainder of this section summarizes the Named Plaintiffs' testimony in more detail.

**1.  Michael Corona**

29.     Mr. Corona claims, based on his review of files from the cyber-attack, that his name, social security number, former address, salary, and dates of employment have been disclosed.[59]  He also believes, but has not verified, that certain other information may have been disclosed.[60]  Although he only verified that his own PII was exposed, Mr. Corona purchased LifeLock Standard for himself, his wife, and his daughter at a total annual cost of $282.[61]

30.



---

[59] Corona Deposition, 45:17-46:3.

[60] First Interrogatories, p. 7; Corona Deposition, 102:11-102:15.

[61] First Interrogatories, p. 7; Corona Deposition 156:11-21.  At his deposition, Mr. Corona testified that SPE did not have his daughter's social security number, as she was not born until several years after he left SPE.  (Corona Deposition, 161:14-20; 242:5-7.)



### 2.   Christina Mathis

31.     Ms. Mathis believes, but has not verified, that her name, social security number, and address were made public as a result of the SPE cyber-attack.[67]  She also believes that information about her beneficiaries may have been disclosed.[68]  Ms. Mathis claims to have changed passwords on her online accounts after the SPE cyber-attack.[69]  She chose not to enroll in the AllClear ID PRO service offered by SPE because she didn't see "the point of having it for a year and then having to pay for it after that."[70]  Instead, she signed up for the LifeLock Ultimate Plus credit monitoring service at the cost of $25.49 per month (though she indicated that she did not compare the attributes of LifeLock coverage to those offered by AllClear ID).[71]  Ms. Mathis also purchased a password management software called AgileBits at a one-time cost of $29.99, but as of the time of her deposition had not yet begun using the software.[72]  In all, Ms. Mathis has claimed out-of-pocket expenses of $335 to pay for AgileBits and 12 months of LifeLock.[73]

32.     

---

[67] Mathis Deposition, 53:2-6.

[68] *Id.*, 75:2-5; 79:3-12.

[69] *Id.*, 89:21-23.

[70] *Id.*, 86:15-16.

[71] *Id.*, 80:22-24, 82:4-23.

[72] Mathis Deposition, 88:5-7, 89:19-20.  (Notably, there exists a broad range of password management software, including many options that are free.  *See e.g.*, http://www.pcmag.com/article2/0,2817,2475964,00.asp, accessed August 7, 2015.)

[73] *See* **Exhibit 2**.



**3. Joshua Forster**

33.

34.

**4. Ella Archibeque**

35.

███████████████████████████████████ ██████████████████
████████████████████████████████████████
████████████████████

36.      In response to the SPE cyber-attack, Ms. Archibeque spent $99.95 for a year of LifeLock, which
she expects will increase to $239.88 annually after the first year.[89] Ms. Archibeque opted not to enroll in
the complimentary AllClear ID PRO identity monitoring service because she was not sure if accepting the
AllClear ID PRO offer would mean forgoing "recourse" against SPE and because her research indicated
that LifeLock was superior to AllClear ID PRO.[90] Ms. Archibeque has also indicated that she provided
her PII to several companies that have suffered data breaches.[91]

### 5.  Michael Levine

37.      Mr. Levine claims, based on files he reviewed online, that his name, address, social security
number, contracts, performance reviews, and salary information were made available online as a result of
the SPE cyber-attack.[92] Mr. Levine also believes, but has not verified, that certain other information about
him may have been disclosed.[93]

38.      

---



[89] Archibeque Deposition, 34:9-17.

[90] *Id.*, 143:6-16.

[91] First Interrogatories, pp. 31-32.

[92] Levine Deposition, 12:25-13:22.  Mr. Levine testified that he reviewed a list of files in the hackers' possession,
but did not review the files themselves.  (*Id.*, 56:20-57:16).

[93] First Interrogatories, p. 12.

█ ████████████████████████
█ ███████████████
█ ████████████████

15

39.     Mr. Levine is not aware of any attempts to misuse his personal information.[97]

### 6.   Geoffrey Springer

40.     Mr. Springer claims he found his name, email address, salary history, mailing address, social security number, start and end date as a Sony employee, and other miscellaneous information in a file he downloaded from the Internet after the SPE cyber-attack.[98] He also believes, but has not verified, that certain other information about him may have been disclosed.[99]

41.     In response to the cyber-attack on SPE, Mr. Springer placed credit freezes with the major credit bureaus at a cost of $30.[100] He did not sign up for SPE's complimentary AllClear ID PRO offer but did purchase a subscription to LifeLock at a price of $25.49 per month[101] because he heard from other SPE employees that "there were alerts that came through on LifeLock that never showed up on All Clear."[102]

42.



### 7.   Marcela Bailey

43.     Ms. Bailey claims that she found her name, signature, social security number, prior home address, birthdate, settlement agreement, salary information, and W-9 available online[107] and also believes, but has

---

[97] *Id.*, 172:15-22.

[98] Springer Deposition, 75:25-76:14.

[99] *Id.*, 127:15-129:1.

[100] *Id.*, 166:23-168:15.

[101] *Id.*, 154:10-15.

[102] *Id.*, 230:21-231:5.



[107] Bailey Deposition, 14:8-22.

not verified, that certain other information about her may have been disclosed.[108]  Her husband was also
an SPE employee,[109] and she claims to have found certain of his personal information disclosed online.[110]
(Based on the Plaintiffs' definition,[111] if Ms. Bailey's husband's PII was disclosed in the cyber-attack on
SPE, he would also be a member of the proposed class.)



46.      Mr. Shapiro claims he found his name, social security number, address, salary, SPE employment
information, and bank account information in an online archive.[117] He also believes, but has not verified,
that certain other information about him may have been disclosed.[118]

47.      Mr. Shapiro has indicated that he incurred costs of (i) $40 for freezing his credit,[119] (ii) $50 for
checking his credit,[120] and (iii) $80 for temporarily unfreezing his credit multiple times.[121] He enrolled in

---

[108] First Interrogatories, p. 14.

[109] Bailey Deposition, 16:9-23.

[110] *Id.*, 16:4-8.

[111] *See* ¶9, *supra*.



[117] Shapiro Deposition, 11:2-12:1.

[118] *Id.*, 22:15-22.

the AllClear ID PRO credit-monitoring service provided by SPE[122] and another monitoring service from "ID Experts," which was offered to him for free as a result of another cyberattack.[123]

48. 

## VII.   DR. FISHKIND'S "MODEL," WHICH IS BASED ON THE ALLEGED EXPERIENCES OF THE EIGHT NAMED PLAINTIFFS, IS FUNDAMENTALLY FLAWED

49.    Dr. Fishkind has proposed a damages model that consists of two components: (i) costs that plaintiffs "have already incurred [and will continue to incur] for the first year following the Breach" (which he refers to as "Year One"), and (ii) costs of "protective monitoring and insurance for at least two years beyond the initial year" (which he refers to as "Years Two and Three").[126]  Dr. Fishkind explains his calculations by asserting that they are "economically reasonable" and that "a reasonably prudent person would have purchased credit monitoring/identity theft protection services"[127] in response to the SPE cyber-attack.  Additionally, Dr. Fishkind has asserted that his approach calculates damages per class member to a "reasonable degree of economic certainty."[128]

50.    Dr. Fishkind has provided no objective explanation of what the terms "economically reasonable and prudent" and a "reasonable degree of economic certainty" mean or how they apply uniformly to the tens of thousands of alleged class members in this case.  In fact, as I describe below:

- the "Prudent Person Standard" he constructs is conceptually unscientific and unreliable as a supposedly "class-wide" approach;

---

[119] *Id.*, 36:17-20.

[120] *Id.*, 36:21-25.

[121] *Id.*, 38:23-39:4, 50:1-10.

[122] Shapiro Deposition, 62:12-14.

[123] Shapiro Deposition, 63:3-14.



[126] Fishkind Report, ¶¶17-18.

[127] *Id.*, ¶17.

[128] *Id.*, ¶22.

- his estimate of "Year One" damages is unscientific and ignores the *actual* evidence provided by the eight Named Plaintiffs;[129] and

- his estimate of "Years Two and Three" damages is unscientific, speculative, and does not tie to any actual harm incurred by the Named Plaintiffs.[130]

Additionally, Dr. Fishkind claims that "to the extent putative class members suffer harm in the form of fraudulent financial charges for which they incur out-of-pocket damages, these damages could also be accounted for in [his] damages model."[131]  However, he fails to provide *any* explanation of how his "model" can account for such fraudulent charges for the eight Named Plaintiffs, much less for the thousands of alleged class members in this case without conducting individualized plaintiff-level inquiries that would be required to gather such information.  As a result, based on my review of Dr. Fishkind's calculations, I conclude that they are unscientific and fundamentally flawed.

### A.  Dr. Fishkind's Reliance on a Supposed "Prudent Person Standard" is Unscientific and Unreliable

51.    Dr. Fishkind asserted that his damages "model" is built on something he refers to as a "prudent person standard."[132]  As an initial matter, despite his claim to the contrary, this is not a concept that is "widely used in economics."[133]  For example, there does not appear to be a single article on the

---

[129] Dr. Fishkind indicated, for example, that he had not reviewed any of the named plaintiffs' deposition testimony and that although he was provided "deposition excerpts" subsequent to submitting his report, they had "no impact on [his] opinions."  (Fishkind Deposition, 11:10-12:3.)

[130] Fishkind Report, ¶18.  In order to account for the fact that his "Years Two and Three" damages have not yet occurred, Dr. Fishkind "builds up" a discount rate by "combining the risk-free rate with the additional risk premiums from systematic risk and non-systematic risk."  (Fishkind Report, ¶45.)  This includes (i) "the risk-free rate [of 0.95 percent] is the average rate on a 3-Year U.S. Treasury Note in 2015," (ii) "the systematic risk amount [of 6.60 percent] is the risk calculated as the difference between the 3-year return on the stock market less the return on long term U.S. Treasury Bonds," and (iii) "the non-systematic risk at 5% to reflect the uncertainties surrounding the future effects of the Breach."  (Fishkind Report, ¶46.)  Dr. Fishkind stated that "the quantification of this [non-systematic] risk is a matter of professional judgment well recognized in the professional literature."  (Fishkind Report, note 25.)  In deposition, Dr. Fishkind indicated that he had made an error and that he intended to use a "non-systematic risk" rate of 1 percent and an overall discount rate of 8.55 percent.  (Fishkind Deposition, 7:15-8:16.)  However, he provided no objective basis or reference to any authority—other than his asserted "professional judgment"—as to why any of these arbitrary estimations are appropriate as measures of the discount rate in this case.

[131] Fishkind Report, note 8.

[132] Fishkind Deposition, 98:10-13.  He distinguishes this from something he refers to as an "individualistic" approach, which he asserts he "could have" used but chose not to.  (*Id.*, 231:7-11; 129:5-11).

[133] *Id.*, 52:13-18.

application of the "prudent person standard" as a framework for economic analysis[134] in the over 80
sources Dr. Fishkind claims to have relied upon in coming up with his opinions in this matter.[135]

52.      Dr. Fishkind claims that he constructed the notion of what is "reasonable and prudent" on the
basis of (i) "look[ing] at the type of the breach, the extraordinary array of personal identifying
information," (ii) "the fact that this [information] was published on the web," (iii) "[t]he fact that Sony
sent a letter [which] contains lots of information that would cause a reasonable person to be quite
concerned," (iv) "[t]he fact that Sony provided the insurance, and (v) "the fact that these individuals spent
money to mitigate either before they knew or were provided the AllClear or because they were untrusting
of the product that was offered by Sony."[136]

53.      Such a "standard," (*i.e.*, the occurrence of several contemporaneous events—the details of which
Dr. Fishkind has not actually analyzed),[137] however, does not constitute a rigorous analysis upon which an
economist can draw a conclusion regarding class certification or damages in this matter.  It is merely an
unscientific assertion.  As I have written in a paper on "junk economics" published by the American Bar
Association, "[a] basic demarcation line between science and non-science is that scientific hypotheses are
testable."[138]  Moreover, "[f]or a hypothesis to be testable, it must generate predictions that can be
compared to actual observed outcomes."[139]  Dr. Fishkind has done no such thing, in fact stating that "you

---

[134] In fact, the only article Dr. Fishkind claims to have relied upon that mentions this concept is by a law professor
and is on the topic of "noneconomic damages."  Moreover, this article appears to instruct that the "expectation of
what a reasonable, prudent person would have done" should *not* be relied on in the presence of case-specific
evidence.  ("The jury's findings regarding the facts and circumstances of the case (res gestae) are clearly different
than its finding as to whether the defendant's conduct fell below the community's expectation of what a
reasonable, prudent person would have done. The jury must decide the particular relevant facts and circumstances
of the case based on the evidence."  (*See* Zavos, Harry, *Monetary Damages for Nonmonetary Losses: An
Integrated Answer to the Problem of the Meaning, Function, and Calculation of Noneconomic Damages*, 43 Loy.
L.A. L. Rev. 193 (2009).  (Available at: http://digitalcommons.lmu.edu/llr/vol43/iss1/3), note 97.)
[FISHKIND_0003340 - FISHKIND_0003420]

[135] Dr. Fishkind appears to be using the term "prudent" interchangeably with "reasonable" and "rational."  (Fishkind
Deposition, 55:8-12).  The notion of "rationality" is a fundamental *assumption* in economic analysis.  It is not a
"*model*."  For example, a leading microeconomics textbook describes "rational people" as those who
"systematically and purposefully do the best they can to achieve *their* objectives."  (Mankiw, N. Gregory,
*Principles of Microeconomics*, (7th ed. 2014), p. 6, emphasis added.)  This concept says nothing about a class of
thousands of individuals acting *similarly* in response to the SPE cyber-attack, much less that any such action can
be *assumed* without any analysis or testing.

[136] Fishkind Deposition, 58:13-59:12.

[137] For example, Dr. Fishkind stated that he has "not reviewed *any* documents produced by Sony" in this case, nor
has he reviewed "*any* of the named plaintiffs' deposition transcripts."  (Fishkind Deposition, 11:10-23; 20:12-16.)

[138] Johnson, H. John and G. Leonard, "In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class
Certification Proceedings," Antitrust Magazine, Vol. 22, No.3, Summer 2008, ("Johnson & Leonard"), p. 109.

[139] *Ibid.*

don't need to test the calculation of the average, you'd just calculate it."[140]  The only "testing" he claims to have done—which is neither scientific, rigorous, nor reliable—is to compare his "Year One" calculation to that for "Years Two and Three."  His approach, however, is logically circular.  He assumes that his "Year One" calculation is "reasonable" because it yields a number "actually a bit lower" than the figure he picked for "Years Two and Three."[141]  Separately, he assumes that the figure he picked for "Years Two and Three" is reasonable because it is "close" to the "Year One" calculation.[142]

54.     Dr. Fishkind's deposition testimony further highlighted the flaws of his "prudent person" methodology.  Although his "model" for "Years Two and Three" is predicated on the cost of LifeLock Ultimate Plus, he stated that he is "not suggesting that everyone would sign up for LifeLock Ultimate Plus."[143]  He also stated that some other amount of out-of-pocket expenditure than what he has calculated may be prudent,[144] and that spending "time and effort" (which I understand is not compensable in this case)[145] rather than "[buying] a product" may also be reasonable.[146]  Dr. Fishkind further stated it may be possible that "people respond to the same data breach differently depending on their circumstances"[147] and that he did not evaluate "the activity associated with [Named Plaintiffs'] expenditure, to determine whether it was reasonable."[148]

55.     Although he acknowledges variation along all these dimensions across the thousands of people in the proposed class, Dr. Fishkind assumes it away in his "prudent person" model.  His model has no ability to determine for any class member, in light of their individual situations, (i) whether buying a particular identity protection product is "reasonable and necessary," (ii) which of the many available products is

---

[140] Fishkind Deposition, 161:21-162:21.  ("You wouldn't need to do any testing. The average is, in terms of the calculations, are pretty easy, so you wouldn't test that.")

[141] *Id.*, 58:4-7.

[142] "I found them to be reasonable by testing them against what the LifeLock product and other products cost in the marketplace today.  That's how I tested and that's why I came to the concept of using the prudent person as the metric and formula." (*Id.*, 226:10-14)

[143] *Id.*, 121:24-122:3. "I'm not offering this as this is what they would do." (*Id.*, 122:7-10)

[144] *Id.*, 61:16-23.

[145] Motion to Dismiss, p. 4.  ("[G]eneral allegations of lost time are too speculative to constitute cognizable injury.")

[146] Fishkind Deposition, 65:6-13.

[147] *Id.*, 171:10-20.  Dr. Fishkind also indicated that the fact that different people may respond differently to the exposure of their personal information is "irrelevant" to his approach. (*Id.*, 113:20-23)

[148] *Id.*, 227:11-228:4.  He stated that even if a plaintiff's "perception [about whether they were implicated by the SPE cyber-attack] ultimately proved to be wrong," that is "not germane" to the actions they took and expenses they claimed.  (*Id.*, 232:5-20)

appropriate, or (iii) how much SPE should reimburse that class member in order to return him to the position in which he would have been but for the cyber-attack.[149]

56.     Ultimately, Dr. Fishkind created his "prudent man"[150] entirely by assertion, not through any rigorous economic analysis.

**B.  Dr. Fishkind's Damages "Model" for Costs Incurred in "Year One" Ignores Variations in the Actual Evidence Provided by the Named Plaintiffs and Lacks a Scientific Basis**

57.     Dr. Fishkind opined that all class members who purchased "credit monitoring/identity theft protection services" during "Year One" are entitled to damages of $311.[151]  This number is calculated as an average of the amounts the eight individual Named Plaintiffs have claimed having incurred in response to the SPE cyber-attack.[152]  Dr. Fishkind's method for determining damages for "Year One" is flawed for several reasons.

**1.  Dr. Fishkind assumed without basis that Named Plaintiffs' decisions to incur identity protection costs were "reasonably prudent" despite SPE's provision of complimentary AllClear ID products**

58.     As I noted above, SPE provided identity protection services through AllClear ID to all class members free of charge for one year.[153]  Accordingly, in order to appropriately calculate damages in this case, Dr. Fishkind's model must show that the costs the Named Plaintiffs incurred during "Year One" were reasonable and necessary *given the availability of AllClear ID at no cost*.[154]  However, his "model" fails to do so.

59.     For example, as I have indicated above, Mr. Forster enrolled in the free AllClear ID PRO service provided by SPE[155] and incurred zero out-of-pocket costs during "Year One."  Dr. Fishkind acknowledged in his deposition that the decision not to spend any money in "Year One" was a "reasonable response"

---

[149] "Generally, compensatory damage is a monetary award intended to compensate an injured party for *its loss*," not for the loss allegedly sustained by some hypothetical "prudent" party.  (Boushie, Kristopher A., Christopher H. Spadea, and Martin F. Cunniff. *Calculating and proving damages*. Law Journal Press, 2011, ("Boushie, et. al."), § 1.04[1], emphasis added)

[150] Fishkind Deposition, 228:1-4.

[151] *Id.*, 61:1-4.

[152] Dr. Fishkind stated in deposition that Mr. Forster, who did not claim any out-of-pocket expenses, is excluded from the calculation of the $311.  (Fishkind Deposition, 56:2-10)  This is, in fact, wrong.  The $311 number is calculated as the average of claims from *all eight* named plaintiffs (*i.e.*, $282, $335, $240, $45, $390, $1,028, $170, as well as Mr. Forster's $0).  *See* Fishkind Report, Table 2.

[153] *See* ¶21, *supra*.

[154] Boushie, et. al., § 1.04[5][a].

[155] First Interrogatories, pp. 10-11; 27-28.

because Mr. Forster spent time taking steps to protect himself.[156]  Those steps included signing up for free fraud alerts with the national credit bureaus and obtaining a replacement bank card.[157]

60.     Despite acknowledging that Mr. Forster was able to act "reasonably" to protect himself at no cost, Dr. Fishkind claims that it was nonetheless also reasonable for other Named Plaintiffs to forego AllClear ID and instead incur costs on credit monitoring product like LifeLock.  For example, Ms. Bailey "did not enroll in any services with AllClearID"[158] and chose to incur over $1,000 in additional out-of-pocket costs on LifeLock.  However, Dr. Fishkind acknowledged in his deposition that the AllClear PRO product provided by SPE "provides a high level of services,"[159] is "similar"[160] to LifeLock Ultimate Plus, and is an "appropriate choice" in this matter.[161]  Given this similarity, Dr. Fishkind's model fails to conduct any evaluation of the reasonableness of Ms. Bailey's claim (as well as of other damages claims asserted by other Named Plaintiffs) in light of the availability of AllClear ID at no cost.[162]

61.     Ultimately, Dr. Fishkind's approach entirely ignores the fact that the Named Plaintiffs had the opportunity to mitigate their out-of-pocket costs by enrolling in AllClear ID.  His "model" has not shown that—given the facts of this case—any damages for "Year One" were "reasonable or necessary."

62.     Even if the Plaintiffs might claim that *some* additional costs might be reasonable for *some* class members, Dr. Fishkind's "model" is not capable of determining *which* costs those are.  Dr. Fishkind's "model" only looks at the *amounts* spent by the Named Plaintiffs, not at "the activity associated with that expenditure."[163]  That is, he uncritically accepts *all* costs claimed by the Named Plaintiffs for the purposes of his calculation.  This means that, by definition, he is assuming—rather than testing—that all the alleged costs are "prudent and reasonable."

---

[156] Fishkind Deposition, 65:6-13.

[157] First Interrogatories, pp. 10-11.

[158] *Id.*, p. 27.

[159] Fishkind Deposition, 177:1-6.

[160] *Id.*, 178:5-10.

[161] *Id.*, 186:17-21.

[162] Dr. Fishkind provides some hypothetical reasons why such expenses *may* have been reasonable.  For example, he suggests that some Named Plaintiffs may have been "untrusting of the product that was offered by Sony." (Fishkind Deposition, 59:1-5.)  Dr. Fishkind's model makes no evaluation of whether it was reasonable for any particular class member to be "untrusting" of the offer, much less whether the fact that the class member was "untrusting" abdicates that individual's duty to mitigate harm from the cyber-attack.  Additionally, Dr. Fishkind indicated that an out-of-pocket "Year One" purchase may have been reasonable because SPE did not "immediately provide" AllClear ID.  (Fishkind Report, ¶14,)  However, my understanding is that the Court has found "implausible any argument that Sony's alleged delay in notification proximately caused any of the economic injury."  (Motion to Dismiss, p. 5,)

[163] Fishkind Deposition, 227:11-228:4.

63. 

64.    Similarly, Ms. Mathis has claimed a $29.99 cost for "password management software" as part of her damages,[165] despite the fact that she "changed all [her] passwords online"[166] after the SPE cyber-attack and the fact that *she has never used the product since purchasing it*.[167] Dr. Fishkind's model, however, does not—and cannot—determine whether this claim is reasonable for Ms. Mathis, much less whether any such similar claim may be reasonable for any other class member.[168] It simply asserts that that *all* class members need this kind of product.

65.    Additionally, the costs some of the Named Plaintiffs incurred were for products that included features beyond identity theft "insurance." For example, the LifeLock Ultimate Plus product purchased by Mr. Springer includes features such as "Sex Offender Registry Reports."[169] Dr. Fishkind has provided no explanation of why it is "reasonable and necessary" that class members purchase such protections *as a result* of the SPE cyber-attack. Nor has he explained how the cost of any such features relates to the supposed risks they mitigate against.

66.    Dr. Fishkind's uncritical acceptance of all the Named Plaintiffs' claims as "reasonable" leads him to ignore differences among the Named Plaintiffs. As **Exhibit 1** and **Exhibit 2** (above) show, there is wide variation in the types of information allegedly disclosed, as well as the costs claimed by individual

---

[167] Ms. Mathis indicated that as of the time of her deposition—six months after purchasing the password management product—she had not yet begun using the software. (Mathis Deposition, 88:5-6, 89:19-20.) It is therefore unclear why this purchase constitutes a "reasonable and necessary" decision in the wake of the SPE cyber-attack for which she should be reimbursed. It also highlights the flaw with Dr. Fishkind's uncritical acceptance of all claims made by the Named Plaintiffs as being supposedly "prudent" simply because they were incurred, without analyzing the individual situations faced by the claimants.

[168] It is my understanding that 1Password—the product sold by AgileBits—"creates strong, unique passwords for all of your sites and logs you in with a single tap." It does not, to my knowledge, provide credit monitoring or identity theft protection services. (*See*, https://agilebits.com/onepassword/windows, accessed August 10, 2015)

[169] *See*, http://www.lifelock.com/products/lifelock-ultimate-plus/. Buying this feature means LifeLock will send the purchaser "notifications when sex offenders move into your zip code."

Named Plaintiffs.  For example, Ms. Archibeque has claimed an annualized cost of $240 for the purchase of LifeLock."[170]  Mr. Forster, who alleges to have had the same data elements compromised as Ms. Archibeque—in addition to several others—has not claimed *any* costs.[171]

67.     Rather than attempt to address these (and other) differences among the Named Plaintiffs, Dr. Fishkind's model simply ignores them.  Accordingly, he fails to determine whether the costs actually incurred by the eight Named Plaintiffs were "reasonable and necessary."

### 2.   Dr. Fishkind's assertion that the Named Plaintiffs' claimed costs are "precise" and "representative" of those incurred by all class members is without scientific basis

68.     Dr. Fishkind further claims that the average costs of $311 incurred by the eight Named Plaintiffs are "representative" of the "Year One" damages for the entire putative class, and can therefore be used to quantify "Year One" damages for the class to a "reasonable degree of economic certainty."[172]  This assumption that class-wide damages can simply be extrapolated from the average costs claimed by the eight Named Plaintiffs is without any scientific basis.  Dr. Fishkind has not conducted any analysis in support of his claim, so it is unclear what—other than his assertion—constitutes the basis of his conclusion.  In fact, as **Exhibit 2** shows, the average he calculated included values ranging from zero (for Mr. Forster) to over a thousand dollars (for Ms. Bailey).  Yet, Dr. Fishkind's "model" provides no method for determining which, if any, of those costs are *actually* reasonable and necessary (much less for assessing the magnitude as well as the reasonableness and necessity of damages that might be claimed by thousands of other class members).  As a result, Dr. Fishkind's estimate is highly *im*precise.[173]

69.     Dr. Fishkind also claims that his calculation derives a result to a "reasonable degree of economic certainty."  He provides no basis—other than his assertion—for what the "reasonable degree" standard he refers to requires.  For example, when conducting statistical analysis, scientific tests of hypotheses may be implemented to determine whether a particular proposition holds with a pre-determined degree of certainty.  Economists test hypotheses in many contexts, and hypothesis testing is central to the advancement of economic science, and indeed all science.[174]  These tests measure the proposition against

---

[170] *See* **Exhibit 2**.

[171] *Id*., pp. 10-11.

[172] Fishkind Report, ¶¶17, 22.

[173] As one leading statistics textbook put it: "diversity is hidden by the average."  (Freedman, David, Robert Pisani, and Roger Purves. *Statistics*, (4th ed. 2007), p. 60.)

[174] Johnson & Leonard, p. 109.  "To perform a hypothesis test, an economist must, before the fact, define in clear and objective terms the nature of the evidence that would result in rejection of the hypothesis. This aspect of hypothesis testing is important for several reasons. First, a clear and objective rejection criterion allows for easy verification of whether the hypothesis is rejected, as well as straightforward replication of the hypothesis test by

generally accepted thresholds to determine validity.[175] In asserting that his calculation has a "reasonable degree of economic certainty," however, Dr. Fishkind has established neither the criteria by which he is measuring "reasonableness" and "certainty," nor the test by which he is able to determine whether his result meets those criteria.

70.    In summary, even when assessing just the eight Named Plaintiffs (and not the thousands of putative class members), Dr. Fishkind's claims regarding what a "reasonably prudent person" would have done, as well as the "reasonable degree of economic certainty" of his results are not based on any scientific analysis.  Rather, he uncritically assumes not only that all of the Named Plaintiffs' claims are "reasonable," but also that they are necessarily representative of the proposed class.  Even a basic analysis of the claims and information provided by the Named Plaintiffs indicates that these assertions are unfounded and that is it not appropriate to apply his stylized valuation across the Named Plaintiffs.  To the contrary, the "reasonableness" of a given expense likely varies with the individual class member's situation, the nature of that individual's information which was disclosed, and the specifics of the steps that individual took to mitigate the potential identity-theft risks from the SPE cyber-attack.

### C. Dr. Fishkind's "Model" of Damages That Plaintiffs Will Allegedly Incur in "Years Two and Three" Ignores Actual Evidence From the Named Plaintiffs and Lacks a Scientific Basis

71.    In addition to his "Year One" calculation, Dr. Fishkind also provides a "model" for damages for "Years Two and Three," based on his conclusion that all class members require two additional years of "credit monitoring and insurance."[176] Dr. Fishkind calculates what he refers to as "the *reasonable cost* for these services for the subsequent two years […] at $720 per class member, or $637 per class member when discounted to present value."[177] To calculate this supposedly "reasonable cost," Dr. Fishkind uses

---

other economists. Second, and more importantly, an objective rejection criterion avoids having subjectivity influence the outcome of the test. A subjective hypothesis test, where one is asked to take the economist's word on the outcome of the test, is akin to the notion of 'ipse dixit' expert testimony."

[175] "Statistical inference is concerned with generalizations about the population on the basis of information provided by a sample. […] What makes the application of statistical inference *scientific* is that we take into account the way in which the sample was selected, and that we express our generalizations in *specific probability* terms.  For example, instead of saying that [a population parameter is true], we specify a range and state the level of probability associated with it. […] The purpose of sampling, and the business of statistical inference, is to make judgements about population parameters on the basis of sample statistics.  These judgements are, in fact, guesses endowed with a specific degree of reliability […] Judgments in the form of *hypothesis testing* involve an *a priori* assumption about the true value of the parameter.  If the sample information provides evidence against the hypothesis, we reject it; otherwise, we keep it.  The evidence provided by the observations in the sample is, for the purpose of hypothesis testing, summarized in the form of a *test statistic*; this is then used in arriving at a verdict concerning the hypothesis." (Kmenta, Jan. *Elements of Econometrics*. (1st ed., 1971), pp. 7-8, emphasis added.)

[176] Fishkind Report, ¶18.

[177] *Ibid.*.

26

the "current monthly rate for LifeLock Ultimate Plus offered at $30/month" for 24 months,[178] then discounting."[179]

72.     Dr. Fishkind provides no explanation of why the purchase of this LifeLock product for any (or all) Named Plaintiffs constitutes a "reasonable" cost.  As I have described, the amount and types of information exposed in the cyber-attack varies even among the Named Plaintiffs[180] (much less the entire proposed class), yet Dr. Fishkind asserts that *all* class members need LifeLock's most comprehensive (and most expensive) product.  In addition, as I have discussed above, the LifeLock Ultimate Plus product includes features (such as sex offender notifications) that do not appear to have any relevance to identity protection as it relates to the disclosure of an individual's PII.[181]

73.     Further, in conducting this arbitrary calculation, Dr. Fishkind has ignored the fact that Named Plaintiffs in this case have provided testimony regarding their *actual* expectations of future expenses related to this matter.[182]  For example:[183]

- Plaintiff Corona "expects to spend at least $282 each year in the future to renew the LifeLock services;"

- Plaintiff Mathis "expects to spend at least $305 each year in the future to renew the LifeLock services;"

- Plaintiff Archibeque "expects to spend at least $239.88 each year in the future to renew the LifeLock services;"

- Plaintiff Levine "expects to spend at least $44.92 each year in the future to renew the AAA ProtectMyID services;"

---

[178] The LifeLock Plus product is available on a monthly basis at a cost of $30 per month or a one-time annual cost of approximately $330.  (*See*, https://www.lifelock.com/products/lifelock-ultimate-plus/)  It is not clear why—if Dr. Fishkind assumes two full years of coverage are necessary—a "reasonable" consumer would pay the more expensive monthly installments rather than take the $30 discount given to the purchasers.

[179] Fishkind Report, note 9.

[180] *See* Section VI.B, *supra*.

[181] *See* ¶65, *supra*.

[182] Fishkind Deposition, 25:17-25.  (Dr. Fishkind indicated that he "did not see any information that would tell [him] what [Named Plaintiffs] think they might do," nor did he "believe that to be particularly relevant to [his] opinions."

[183] First Interrogatories, pp. 7-19.

27

- Plaintiff Springer "expects to spend approximately $360 each year in the future to renew the LifeLock services;" and

- Plaintiff Bailey "expects to spend at least $1,028.05 each year in the future to renew the LifeLock services."

Dr. Fishkind provides no basis for ignoring the actual testimony of the Named Plaintiffs regarding what they expect to do in the future, and fails to reconcile the broad range of expectations in the context of his "reasonable" estimate (*i.e.*, why it is "reasonable" to assume, for example, that both Plaintiff Levine and Plaintiff Bailey will purchase a $360-per-year product when they have indicated they will purchase ones that cost $45 and over $1,000, respectively). Additionally, neither Plaintiff Forster nor Plaintiff Shapiro purchased an identity protection product such as LifeLock, and Dr. Fishkind does not provide any evidence or explanation as to why it would be "reasonable" to assume that they will do so in future years.

74.     Dr. Fishkind states that a report published by a research firm called Javelin "informs [his] opinion concerning how long into the future credit monitoring and insurance may be needed in this case."[184] However, the statistics Dr. Fishkind points to measure the time between "misuse" of stolen information and the "detection" of that misuse. They say nothing about the amount of time during which it would be "reasonable and necessary" for an individual class member in this case to incur out-of-pocket identity theft protection expenses.[185]

75.     Dr. Fishkind himself states that it is "difficult to precisely gauge the future amount of time the members of the putative class will need to invest in the heightened scrutiny of their financial transactions."[186] However, the fact that this exercise is "difficult" does *not* mean that his arbitrary and unsupported assumption about three years of credit monitoring/identity theft protection services being "reasonable and necessary" for all putative class members is *conservative*. Ultimately, the Javelin report provides no basis for Dr. Fishkind's assumption that his "three-year [damages] period is a conservative estimate of the time period when the Plaintiffs and putative class members may be at risk" or that it is "likely that in this case additional misuse will occur for a number of additional years after the Breach."[187]

---

[184] Fishkind Report, ¶33.

[185] Notably, the Javelin report provides additional relevant information that Dr. Fishkind fails to take into account. For example, it indicates that victims of a data breach should "opt in to any free protection services offered in response to the breach." (Javelin, *2015 Identify Fraud: Protecting Vulnerable Populations*, p. 10.) This is contrary to Dr. Fishkind's assertion that choosing to not opt into the AllClear ID products offered by SPE is consistent with "prudent" behavior.

[186] Fishkind Report, ¶21.

[187] *Id.*, ¶36.

Nor does it provide any evidence for Dr. Fishkind's assumption that the length of any such alleged period of increased risk is common to all class members.

## VIII.   DR. FISHKIND'S "MODEL" CANNOT DETERMINE IMPACT OR DAMAGES ON A CLASS-WIDE BASIS

76.     At the class certification stage, it is necessary to undertake a rigorous analysis of whether the "model" proposed by Dr. Fishkind can appropriately estimate damages for all (or substantially all) class members.  Such a model should be able to distinguish (or at least allow for the possibility of) variation between class members in the factors laid out by the Court.  That is, the model should test whether the five-factor test outlined in this Court's Motion to Dismiss ruling (and described above)—when applied to any individual class member (or set of class members)—justifies the "reasonableness and necessity" of the costs incurred by that class member.  For example, such a model should be able to determine whether individualized inquiries may be required to ascertain if:

(1)  the nature and extent of the compromised PII *varied across individual class members*;

(2)  the sensitivity of the compromised PII *varied across individual class members*;

(3)  different class members had varied pre-cyber-attack differences in their risk profiles and whether the increase in the risk of identity theft resulting from the SPE cyber-attack (relative to that had the breach not occurred) *varied across individual class members*;

(4)  the seriousness of the consequences resulting from identity theft vary (or could vary) *across individual class members*; and

(5)  the "objective value of early detection" *varied across individual class members*.

77.







78.     In addition, on the issue of damages under CMIA, Dr. Fishkind's "model" simply adds $1,000 to the other values he has calculated.  That is, his "model" does not attempt to show which class members may be able to claim damages under CMIA, or even what portion of the class may be able to assert a CMIA claim.  Dr. Fishkind has also not provided a "model" for any actual damages that class members may claim under the CMIA.  However, determining whether any actual damages experienced by class members were caused by the cyber-attack on SPE (and not some other cause, such as another breach of medical information) would require individual plaintiff-by-plaintiff analyses.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 11th day of August, 2015 in Edgartown, MA.

Dr. John H. Johnson, IV

**Appendix A.   CURRICULUM VITAE OF DR. JOHN H. JOHNSON, IV**



1225 19th St, NW
8th Floor
Washington, DC 20036
202-559-4388

August 2015

# John H. Johnson, IV

## E D U C A T I O N

Massachusetts Institute of Technology
Ph.D., Economics, 1999

University of Rochester
BA, *magna cum laude* with Highest Distinction in Economics, 1995
Phi Beta Kappa

## C U R R E N T   E M P L O Y M E N T

Edgeworth Economics, Washington, D.C.
September 2009-present, President, Chief Executive Officer, Partner

## E M P L O Y M E N T   H I S T O R Y

Georgetown University, Washington, D.C.
2008-2011, Affiliated Professor, Georgetown Public Policy Institute

Criterion Economics, L.L.C., Washington, D.C.
March 2009-September 2009, President

NERA Economic Consulting, Washington, D.C.
2005-2009 Vice President
2003-2005 Senior Consultant
2001-2003 Consultant

University of Illinois at Urbana-Champaign
1999-2001 Assistant Professor of Economics and of Labor & Industrial Relations

## A P P O I N T M E N T S

*Appleseed Pro Bono Network*
Board of Directors, June 2011-present
Chair-Elect, February 2015-present
Chair of Nominating Committee, February 2013-January 2015

*Antitrust Law Journal*
Associate Editor- June 2011-May 2013
Assistant Editor- June 2010-May 2011

*Hawaii Appleseed Center for Law and Economic Justice*
     Board of Directors, February 2013-present

*American Bar Association Antitrust Agriculture and Food Committee*
     Vice Chairman, June 2013-July 2014

## TEACHING EXPERIENCE

Georgetown University Public Policy Institute Courses
     Antitrust and Public Policy
     Masters in Public Policy Thesis Research Seminar
     The Law and Economics of Labor Discrimination Public Policy

University of Illinois at Urbana-Champaign Courses
     Labor Problems
     Women in the Labor Market
     Graduate Labor Economics

## AWARDS AND HONORS

Pro Bono Innovator Award, Appleseed Pro Bono Network (2012)
Pro Bono Practice Award Recipient, Akin Gump Strauss Hauer and Feld (2012)
Finalist, Competition Economist of the Year, Global Competition Review (2012)
"Top Young Competition Economist", Global Competition Review (2006)

## CERTIFICATIONS

IAPP Certified Information Privacy Professional, US private-sector (CIPP-US)

## MEMBERSHIPS

American Economic Association
American Statistical Association
American Bar Association:
    o  Labor and Employment Section
    o  Antitrust Section
Information Systems Security Association
International Association of Privacy Professionals
National Association of Forensic Economists

T E S T I M O N Y   A N D   E X P E R T   R E P O R T S
P R I O R   F O U R   Y E A R S   A S   O F   A U G U S T   2 0 1 5

*O&R Construction, LLC. Individually and on behalf of all others similarly situated v. Dun & Bradstreet Credibility Corporation, et al.*
> In the United States District Court for the Western District of Washington, Seattle Division.
> Case No.2:12-cv-02184-TSV.
> Expert Report, July 29, 2015.

*Lenox MacLaren Surgical Corporation v. Medtronic, Incorporated; Medtronic Sofamor Danek, Incorporated; Medtronic PS Medical, Incorporated, d/b/a Medtronic Neurological Technologies; and Medtronic Sofamor Danek Co., Ltd.*
> In the United States District Court for the District of Colorado, Civil Action No. 1:10-CV-02139.
> Expert Report, May 29, 2015
> Hearing Testimony, July 8, 2015

*Michael J. Otto, individually, and on behalf of other members of the general public similarly situated, vs. Abbot Laboratories, Inc., a Delaware Corporation, d/b/a Abbott Nutrition.*
> In the United States District Court for the Central District of California, Eastern Division,
> Case No. 12-cv-1411-SVW-(DTBx)
> Expert Report, June 14, 2015.
> Deposition, June 26, 2015.

*Mark S. Wallach, as Chapter 7 Trustee for the Bankruptcy Estate of Performance Transportation Services, Inc. and Tauro Brothers Trucking Company, jointly and behalf of all others similarly situated vs. Eaton Corporation, Daimler Trucks North America LLC, Freightliner LLC, Navistar International Corporation, International Truck and Engine Corporation, Paccar, Inc., Kenworth Truck Company, Peterbilt Motors Company, Volvo Trucks North America, and Mack Trucks, Inc.*
> In the United States District Court for the District of Delaware, Civil Action No. 10-260-SLR.
> Expert Report, January 23, 2015
> Deposition, February 17, 2015
> Hearing Testimony, March 25, 2015
> Expert Report, May 22, 2015.
> Deposition, June 23, 2015.

*In Re Class 8 Transmission Indirect Purchaser Antitrust Litigation.*
> In the United States District Court for the District of Delaware, Civil Action No. 11-CV-00009 (SLR)
> Expert Report, January 23, 2015
> Deposition, February 18, 2015
> Hearing Testimony, March 25, 2015
> Expert Report, May 22, 2015
> Deposition, June 23, 2015

*Edgeworth Economics' Submission in the European Commission's Consultation on the Aviation Package for Improving the Competitiveness of the EU Aviation Sector*
> Written Testimony (with Michael Kheyfets), June 10, 2015

*Edgeworth Economics' Empirical Investigation and Analysis of Economic Issues Raised in "Restoring Open Skies: The Need to Address Subsidized Competition from State-Owned Airlines in Qatar and the U.A.E."*
> Written Testimony (with Michael Kheyfets), May 21, 2015

*In Re Mushroom Antitrust Litigation.*
> In the United States District Court for the Eastern District of Pennsylvania.
> Expert Report, May 16, 2013
> Deposition, October 24, 2013
> Hearing Testimony, May 19-20, 2015

*Expert Statement of John H. Johnson, IV, and Michael Kheyfets* in front of Tribunal Arbitral Du Sport
> Written Testimony (with Michael Kheyfets), May 5, 2015

*Margaret Tourtellotte, Karla Krieger, Ashley Hiser and Ana Reyes v. Eli Lilly and Company and Timothy Rowland.*
> In the United States District Court for the Eastern District of Pennsylvania., Case No. 09-CV-0774.
> Expert Reports:
> Regarding Economic Loss of Margaret Tourtellotte, March 16, 2011
> Regarding Economic Loss of Karla Krieger, March 16, 2011
> Regarding Economic Loss of Ana Reyes, March 16, 2011
> Deposition, August 29, 2013
> Trial Testimony, December 15, 2014

*In Re Pool Products Distribution Market Antitrust Litigation*
> In the United States District Court for the Eastern District of Louisiana
> Expert Report, April 10, 2014
> Rebuttal Expert Report, June 11, 2014
> Deposition, July 16, 2014
> Written Critique of the Supplemental Expert Report of Dr. Gordon Rausser, October 14, 2014
> Affidavit of Dr. John H. Johnson, IV In Support of Pool Defendant's Motions for Summary Judgment, November 24, 2014
> Affidavit of Dr. John H. Johnson, IV in Support of Defendants' Joint Motion to Exclude The Testimony of Gordon C. Rausser, PhD., November 24, 2014

*E.J. Brooks Company d/b/a TydenBrooks v. Cambridge Security Seals, et al.*
> In the United States District Court for the Southern District of New York
> Expert Report, July 2, 2014
> Deposition, October 2, 2014

*Angel Aguiar, Individually and on Behalf of All others Similarly Situated, v. Merisant Company and Whole Earth Sweetener Company, LLC.*
> In the United States District Court Central District of California Western Division
> June 30, 2014

*United States of America and State of New York v. Twin America, LLC, et al.*
In the United States District Court for the Southern District of New York.
> Expert Report, April 14, 2014
> Deposition, May 23, 2014

*Chris Sirko and Daniel Cervantes v. International Business Machines.*
In the U.S. District Court for the Central District of California, case no. VC13-3192 DMG (SSx).
> Expert Report, May 21, 2014

*James Blakes, Steven Clark, Herman Deckys, Bradley Hunt, Phillipe Porter, Ernest Roberts, Jr., Larry Williams  v. Illinois Bell Telephone Company.*
In the United States District Court Northern District of Illinois Eastern Division, Case No. 11-cv-00336.
      Expert Report, May 13, 2011
      Expert Report, January 14, 2013
      Deposition, March 22, 2013
      Rebuttal Report, July 9, 2013
      Expert Report May 9, 2014


*Isiah Elder, et al. v. Comcast Corporation and Comcast Cable Communications Management, LLC*
      In the United States District Court for the Northern District of Illinois Eastern Division
      Expert Report, January 17, 2014
      Deposition, February 11, 2014
      Supplemental Expert Report, March 21, 2014


*In Re NYC Bus Tour Antitrust Litigation.*
      In the United States District Court for the Southern District of New York.
      Expert Report, January 10, 2014
      Deposition, February 18, 2014


*Office of Federal Compliance Programs United States Department of Labor vs. Cargill Meat Solutions, Inc.*
      US Department of Labor Office of Administrative Law Judges, Case No. 2012-OFC-00001.
      Rebuttal Expert Report, October 21, 2013


*In Re Nexium (Esomeprazole) Antitrust Litigation*
      In the United States District Court District of Massachusetts, Civil Action No. 1:12-md-2409.
      Expert Report Regarding Direct Purchaser Class Certification, September 11, 2013
      Deposition, September 13, 2013
      Expert Report Regarding Damages, September 30, 2013.


*Kimberly S. Sethavanish, on behalf of herself and all others similarly situated, v. Zone Perfect Nutrition Company.*
      In the United States District Court for the Northern District of California, San Francisco Division.
      Case No. 3:12-CV-02907-SC.
      Expert Report, September 27, 2013


*Equal Employment Opportunity Commission v. JP Morgan Chase Bank, N.A.*
      In the United States District Court for the Southern District of Ohio, Eastern Division.
      Expert Report, December 12, 2011
      Deposition, January 5, 2012
      Expert Report, April 12, 2013
      Rebuttal Report May 13, 2013
      Deposition June 12, 2013


*In re: Rail Freight Surcharge Antitrust Litigation*
      In the United States District Court for the District of Columbia
      Expert Report, January 22, 2013
      Deposition, May 31, 2013

*Office of Federal Contract Compliance Programs, United States Department of Labor vs. Bank of America*
     US Department of Labor, Office of Administrative Law Judges.
     Expert Report, December 9, 2011
     Rebuttal Report, March 2, 2012
     Deposition, June 27, 2012
     Trial, March 27, 2013

*Peter H. Beer, U.W. Clemon, Terry J. Hatter, Jr., Richard A. Paez, Laurence H. Silberman, and A. Wallace Tashima v. United States.*
     In the United States Court of Federal Claims.
     Declaration (with Matthew Milner), February 22, 2013

*Pacific Bell Wage and Hour Cases.*
     In Superior Court of the State of California, County of Alameda
     Declaration, October 12, 2012
     Deposition, January 24, 2013

*In re: Chocolate Confectionary Opt-Out Antitrust Litigation*
     In the United States District Court for the Middle District of Pennsylvania, Harrisburg Division
     Expert Report August 3, 2012
     Deposition, August 23, 2012
     Declaration, October 21, 2012

*Rochelle Cohen v. Bank of New York Mellon Corporation.*
     In the United States District Court, Southern District of New York.
     Expert Report, May 24, 2012
     Deposition, June 29, 2012
     Rebuttal Expert Report, October 9, 2012

*In re: Wholesale Grocery Products Antitrust Litigation.*
     In the United States District Court, District of Minnesota
     Expert Report, January 31, 2012
     Daubert Declaration, January 31, 2012
     Deposition, March 2, 2012
     Declaration, April 20, 2012
     Evidentiary Hearing Testimony, May 22, 2012
     Declaration, August 24, 2012
     Declaration, October 1, 2012

*Rob Boelk, Jerry Seger, Dave Jacak, Greg Congdon, David Moffitt, and Jeff Sopel, on behalf of themselves and all others similarly situated, vs. AT&T Teleholdings, Inc., Wisconsin Bell, Inc., Ameritech Services, Inc. and AT&T Services, Inc.* In the United States District Court, Western District of Wisconsin.
     Expert Report, September 26, 2012

*Gabriel Fayerweather v. Comcast Corporation and Comcast Corporation of Contra Costa.* In the Superior Court for the State of California for the County of Contra Costa.
     Expert Report, March 24, 2010
     Deposition, October 6, 2011
     Expert Report, July 13, 2012
     Deposition, August 27, 2012

*James Bowman, as next friend for Jameel Bowman and  Melissa Gibson, as next friend for  Courtney Anderson on behalf of themselves and other similarly situated v. International Business Machines Corporation, ACS Human Services LLC, Phoenix Data Corporation and Arbor E & T, LLC.*
In the United States District Court Southern District of Indiana, Indianapolis Division.
Expert Report July 6, 2012
Deposition, August 8, 2012

*Gerald Paul Bodet, Jr. v. Charter Communications, Inc., Charter Communications Holding Company, LLC and Charter Communications, LLC.*     In the United States District Court, Eastern District of Louisiana.
Expert Report, January 24, 2012
Deposition, April 2, 2012
Rebuttal Report, May 15, 2012

*In re Hostess Brands, Inc. et, al.*
United States Bankruptcy Court, Southern District of New York
Declaration and Expert Report, January 25, 2012
Rebuttal Expert Report, February 25, 2012
Deposition, February 28, 2012
Rebuttal Expert Report, February 29, 2012
Hearing Testimony, April 18, 2012
Deposition, May 14, 2012

*Monique Da Silva Moore, Maryellen O'Donohue, Laurie Mayers, Heather Pierce, and Katherine Wilkinson on behalf of themselves and others similarly situated v. Publicis Groupe SA and MSL Group.*
In the United States District Court Southern District of New York.
Expert Report, March 19, 2012

*Barbara Gilley v. Eli Lilly and Company.*
In the United States District Court for the Eastern District of Tennessee at Knoxville.
Expert Report, February 6, 2012

*In Re Chocolate Confectionary Class Antitrust Litigation,* In the United States District Court, Middle District of Pennsylvania, Harrisburg Division
Expert Report, August 12, 2011
Deposition, September 15, 2011
Declaration, November 10, 2011
Evidentiary Hearing Testimony, November 15-16, 2011
Rebuttal Declaration, January 6, 2012

*District of Columbia Taxi Cab Commission*, Washington DC
Written Testimony, November 29, 2011

*In Re Wellbutrin XL Antitrust Litigation,* In the United States District Court, Eastern District of Pennsylvania
Expert Report (Direct Purchasers), September 16, 2011
Expert Report (Indirect Purchasers), October 3, 2011

PUBLICATIONS
PRIOR TEN YEARS AS OF 2015

"Tis the Season: Data Breaches and Data Analytics", (with Michael Kheyfets and Matthew Milner), *Privacy Law 360*
(November 2014).

"The Economic Underpinnings of Comcast v. Behrend", (with Laila Haider), *Competition Law 360* (April 2013).

Brief of Economists Amici Curiae Before the United States Supreme Court, *Comcast Corporation, et al. vs. Caroline
Behrend, et al.* (with Gregory K. Leonard and Laila Haider), August 24, 2012.

"Economic Analysis in Indirect Purchaser Class Actions." *Antitrust Magazine.* Vol. 26, No 1, Fall 2011.

"Systemic Discrimination: Let the Statistics Talk" (with Kara Gorski) *Employment Law 360* (November 2011)

"Rigorous Analysis of Class Certification Comes of Age" (with Gregory Leonard) *Antitrust Law Journal* (2011).

"Antitrust Damages" (with Joseph Ostoyich) in <u>Calculating and Proving Damages.</u> Law Journal Press, New York, NY.
2011.

"Causality and Damages Estimation in Antitrust Litigation: A Case Study" (with Michael Kheyfets and Matthew
Milner). *Antitrust Report.* Issue 1, 2011.

"An Economic Analysis of 'Non-Economic' Damages in Labor and Employment Litigation." (with Matthew Miller).
Prepared for American Bar Association ABA EEO Labor and Employment Meetings, New Orleans, LA.

"Empirical Evidence and Class Certification in Labor Market Antitrust Cases"
(with Jesse David and Paul Torelli) *Antitrust Magazine.* Fall 2010. Volume 25. Number 1.

"The Increasing Relevance of Expert Testimony in the Wake of *Hydrogen Peroxide*"
(with Boris Vabson and Matthew Milner)  *The Antitrust Practitioner,* September 2010.

"The Standards for Class Certification Expert Testimony After *In Re Hydrogen Peroxide Antitrust Litigation*" *Antitrust
Report*, Issue 2, 2009.

"In the Eye of the Beholder: Junk Science in Antitrust Class Certification." (with Gregory Leonard) *Antitrust Magazine.*
August 2008.

"A Regression Primer for Labor Practitioners." (with Kristin Terris), *Labor and Employment Law,* 2008.

"Frictions and Sticking Points: Applying the Textbook Model to the Analysis of Cost Pass-Through in Indirect
Purchaser Class Actions." (with Gregory Leonard) *Antitrust Insights*, Winter 2008.

"Economic Evidence in Criminal Cartel Cases." in *Economics of Antitrust: Complex Issues in a Dynamic
Environment*, ed. Lawrence Wu ((New York: National Economic Research Associates, 2007).

"Common Principles of Antitrust Damages Estimation," *The Antitrust Report.* Issue 1, 2007.

"Don't Feed the Trolls" (with Gregory Leonard, Christine Meyer, and Ken Serwin). *Les Nouvelles*, September 2007.

"Economics and the Rigorous Analysis of Class Certification in Antitrust Cases." (with Gregory K. Leonard) *Journal of Competition Law and Economics* 2007; doi: 10.1093/joclec/nhm009

"Separating Fact from Fiction: Recent Trends in Wage and Hours Litigation." *Labor and Employment Law*, Spring 2007, Vol. 35, No. 3.

"Downstream Discovery in Antitrust Class Actions." (with Laila Haider and Ian Simmons). *The Antitrust Practitioner*. July 2006.

"The Economics of Patent Policy: A Review of Recent Empirical Studies" in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh. (New York: National Economic Research Associates, 2005).

"The Use of Event Studies in Intellectual Property Litigation" (with Vinita Juneja) in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh. (New York: National Economic Research Associates, 2005).

P R E S E N T A T I O N S

"*Class Actions & Litigation Roundup: Recent Data Breach Cases, Mega Privacy Actions, TCPA and Texting Suits, and Assessing What Claims Are Worth*" ACI Advanced Global Legal & Compliance Forum on Cyber Security & Data Privacy and Protection, with Douglas Meal and Ronald Raether, Washington, DC, January 2015.

"Class Action Litigation Update 2014" DC Bar Association Continuing Legal Education Program, December 2014.

"The Importance of Data in Commercial Litigation." With Michael Kheyfets and Belinda Lee.
        Edgeworth Economics Webinar Forum Series, June 2014.
"Law Firm Economics." With Steven Schulman.
        Akin Gump Strauss Hauer and Feld, May 21, 2014.

"Statistical Analysis: How to Determine If Your Hiring, Pay, Promotion and Termination Patterns Are Defensible."
        California Employment Law Council Annual Meeting, with Paul Evans and Krissy Katzenstein.  Santa Clara, CA. November 2013.

"An Economist in the Courtroom." Georgetown University Alumni Association Webinar, with Chuck Fields, Washington, DC October 2013.

"New Supreme Court Cases on Evidentiary Standards: When do Plaintiffs Need to Prove What, and How Do They Need to Do That?" Law Seminars International Ninth Annual Comprehensive Conference on Class Actions and other Aggregate Litigation. Seattle, Washington. May 2013

"How to Utilize Pro Bono Financial Experts: The Benefits to Clients and Public Interest Organizations". ABA Equal Justice Conference, St. Louis, Missouri. May 2013.

"Pay Equity: Are You Prepared for the EEOC and the OFCCP?" Jones Day Government Contractor Labor and Employment Discussion Group, McLean, Virginia, April 2013.

"Battle of the Experts: A Plaintiff and Defense Lawyer's How To On Working With Economists in Antitrust Cases." The Bar Association of San Francisco, San Francisco, CA, July 2012.

"*Wage and Hours Class Actions After Dukes v. Walmart*" ACI Wages and Hours Class and Consumer Action Conference, New York, NY May 2012.

"*Wal-Mart Stores, Inc. v. Dukes and Antitrust Class Actions*" Panel Discussant, American Bar Association Civil and Criminal Procedure Committee, New York, NY, September 2011.

"What's This Case Really Worth?" American Bar Association EEO Labor and Employment Committee Meetings, New Orleans, LA, April 2011.

"The Future of U.S. Antitrust: Do Landmark Changes Portend a Turbulent Future?" ABA SIL International Law Committee Teleconference., with Ethan Litwin and Samuel Miller., November 2010.

District of Columbia National Institute of Trial Advocacy Advanced Trial Advocacy Program, Faculty. Washington, DC.  October 2010.

"The Intersection of Economics and Statistics in Employment and Health Care Litigation." Epstein Becker and Green, New York City. September 2010 with Chuck Fields and Matthew Milner.

"Pharmaceutical Patent Litigation: Economic and Data Issues." Duane Morris, Washington, DC September 2010 with Jesse David and Matthew Milner.

"The Influence of Daubert on Expert Testimony." Duane Morris, Philadelphia, PA, September 2010 with Matthew Milner.

"The Evolution of an Expert Report in a Complex Damages Case" Bingham McCutchen, Los Angeles, CA, January 2010, with Jesse David and Matthew Spitzer Womble Carlyle, Washington, DC, February 2010, with Paul Torelli and Kara Gorski Buchanan Ingersol and Rooney, Philadelphia, PA, April 2010 with Matthew Milner, Kara Gorski, and Jesse David.

"Lawyer and Consultant Perspectives on Working Effectively and Efficiently with Testifying and Consulting Experts." Law Seminars International Litigating Employment Class Actions Conference. Washington, D.C., April 6, 2009 with Carter DeLorme. San Francisco, CA, July 27, 2009 with Christopher Martin.

"The Economics of Large Corporate Law Firms." Building a Better Legal Profession National Conference of Student Leaders. Stanford University School of Law, Palo Alto, CA, April 3, 2009.

"The Debate Over the Billable Hour: A Rigorous Look at Competing Law Firm Profitability Models," Eighth Annual Legal Malpractice & Risk Management Conference, Chicago, March 5, 2009

"Economic Approaches to Wrongful Termination and Labor Discrimination Litigation," Orrick, Herrington & Sutcliffe, February 17, 2009, with Laila Haider

"Where's the Value: The ACC Model of Law Firm Profitability." with Matthew Milner and Frank Kyei-Manu. Womble Carlyle Sandridge & Rice, PLLC. November 24, 2008.

"Differences in Difference Estimation in Antitrust Cases." Skadden, Arps, Meager, and Flom, Washington, DC. November 17, 2008 with Gregory Leonard and Fei Deng Hogan & Hartson, Washington, D.C., February 2009

with Fei Deng

"What's in an Average? Misleading Statistics in Labor and Employment Litigation."
    Biltimore Hotel, Los Angeles, California, October 23, 2008
    with Kristin Terris, Elizabeth Newlon, and Travis Gemoets

    Mayflower Hotel, Washington, DC, November 13, 2008
    with Laila Haider and Johnine Barnes

    Gibson, Dunn & Crutcher, January 28, 2009
    with Laila Haider

"The Economics of Class Actions." with Gregory Leonard and Anne Gron.
    Drinker Biddle, Chicago, Illinois, September 2008.
    O'Melveny and Myers, October 2008.

"The Supreme Court and Antitrust Economics." NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM. July 2008 (panel moderator).

"Recent Evolution of Class Certification Standards." 56th American Bar Association Antitrust Law Spring Meeting, March, 2008.

"Don't Be Afraid: Statistics for OFCCP Audits." Virginia State Society of Human Resource Management Conference, October 2007.

"Antitrust Econometrics." with Michael Egge. Latham and Watkins Antitrust Academy, Orlando, FL. March 2007.
"Effectively Working with Statistical Experts." Jones Day, Washington, DC. February 2007.

"Antitrust Class Certification" with Laila Haider, Weil, Gotshal, and Manges, New York City, January 2007.

"The Post E-Bay World and Patent Damages" with Lynn Malinoski and Rodger Smith, Law Seminars International Conference on Proving and Calculating Patent Damages, Philadelphia, PA, October 30, 2006.

"Statistical Detection of Cheating: The Chicago Black Sox Scandal of 1919" as panelist on Frameworks for Effectively Presenting and Impeaching Cutting Edge Expert Testimony at the Edward Bennett Williams Inns of the Court, Washington, DC, October 19, 2006.

"Cutting Edge Econometrics in Antitrust Class Certification." NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2006.

"Patent Trolls and Injunctive Relief." NERA Economic Consulting Intellectual Property Practice Presentation. Villard Mansion, New York City, June 2006.

"The Economics of Antitrust Class Certification. Presentations at:
    Cadwalader, Wickersham & Taft, New York City, December 2005;
    Hogan & Hartson, Washington, DC, January 2006;
    O'Melveny & Myers, Washington, DC, February 2006.

"The Economics of Reasonable Royalties." Presentation at Hunton & Williams , Washington, DC, November 2005.

"The Role of Economists in Intellectual Property Litigation." Presentation at Hunton & Williams (with George Korenko), Washington, DC, November 2004.

Panelist, *Special Ethics Concerns in Class Actions.* Federal Trade Commission Conference on Protecting Consumer Interests in Class Actions, Washington, DC, September 2004.

"Class Certification: Theory and Practice." NERA Antitrust and Trade Regulation Seminar, Santa Fe, NM, July 2003.

"The Role of Economists in Litigation." CLE Course at Williams and Connolly (with James Jordan), Washington, DC, May 2003.

"The Economics of Antitrust Damage Estimation." Presentation at Wilmer, Cutler and Pickering, Washington, DC, January 2003.

**Appendix B.  EDGEWORTH ECONOMICS BILLING RATES**

### <u>Hourly Fee Schedule</u>

| | |
|---|---|
| Dr. John Johnson: | $725 |
| Partner: | $410 - $550 |
| Principal: | $325 - $350 |
| Managing Programmer: | $325 |
| Managing Consultant: | $290 - $295 |
| Senior Programmer: | $250 |
| Senior Consultant: | $245 - $255 |
| Consultant: | $200 - $210 |

Appendix C.  MATERIALS CONSIDERED

**Court Filings**

Amended Class Action Complaint, *Corona, et al., v. Sony Pictures Entertainment, Inc.*, March 2, 2015. (Doc. 43)

Plaintiffs' Amended Responses and Objections to Defendant Sony Pictures Entertainment Inc.'s First Set of Interrogatories, June 9, 2015.

Order on Motion to Dismiss, June 15, 2015. (Doc. 97)

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification, June 30, 2015. (Doc. 105)

Report of Larry Ponemon, Ph.D., June 30, 2015. (Doc. 107-2)

Expert Report in Support of Class Certification, Henry H. Fishkind, Ph.D., June 30, 2015 (Doc. 107-3) (including all materials Dr. Fishkind relied upon, FISHKIND_0000001 - FISHKIND_0005337).

**Depositions**

Deposition of Michael Levine, June 8, 2015.

Deposition of Ella Carline Archibeque, June 16, 2015.

Deposition of Marcela Bailey, June 18, 2015.

Deposition of Steven Sandor Shapiro, June 18, 2015.

Deposition of Christina Laverne Mathis, June 19, 2015.

Deposition of Joshua Forster, June 22, 2015.

Deposition of Michael Corona, June 24, 2015.

Deposition of Jamie Chung, June 25, 2015.

Deposition of Geoffrey Springer, June 30, 2015.

Deposition of Dr. Henry H. Fishkind, July 28, 2015.

**Articles, Books, and Additional Sources**

Boushie, Kristopher A., Christopher H. Spadea, and Martin F. Cunniff. *Calculating and proving damages*. Law Journal Press, 2011.

*Comcast v. Behrend*, 133 S. Ct. 1426 (2013).

Freedman, David, Robert Pisani, and Roger Purves. *Statistics*, (4th ed. 2007).

Javelin, *2015 Identify Fraud: Protecting Vulnerable Populations*.

Johnson, H. John and G. Leonard, "In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings," Antitrust Magazine, Vol. 22, No.3, Summer 2008.

Kmenta, Jan. *Elements of Econometrics*. (1st ed., 1971).

Mankiw, N. Gregory, *Principles of Microeconomics*, (7th ed. 2014).

Ponemon Institute, *2012 Most Trusted Companies for Privacy*, February 21, 2013. Available at http://www.ponemon.org/local/upload/file/2012_MTC_FINAL_1.pdf

Ponemon Institute, *Privacy and Security in a Connected Life: A Study of US, European and Japanese Consumers,* March 2015. Available at http://www.trendmicro.com/cloud-content/us/pdfs/security-intelligence/reports/rt_privacy_and_security_in_a_connected_life.pdf

Swire, Peter P., and Kenesa Ahmad., *U.S. Private Sector Privacy, Law and Practice for Information Privacy Professionals*, 2012.

Zavos, Harry, *Monetary Damages for Nonmonetary Losses: An Integrated Answer to the Problem of the Meaning, Function, and Calculation of Noneconomic Damages*, 43 Loy. L.A. L. Rev. 193 (2009). (Available at: http://digitalcommons.lmu.edu/llr/vol43/issl/3) (FISHKIND_0003340 - FISHKIND_0003420)

**Websites**

http://www.sonypictures.com/corp/notification/SPE_Cyber_Notification.pdf

https://spe.allclearid.com/

https://www.allclearid.com/plans/

http://www.lifelock.com/products/lifelock-ultimate-plus

http://www.pcmag.com/article2/0,2817,2475964,00.asp